**UNITED STATES COURT OF APPEALS**

**November 9, 2017**

**FOR THE TENTH CIRCUIT**

_____

**Elisabeth A. Shumaker**
**Clerk of Court**

PATRICK DWAYNE MURPHY,

Petitioner - Appellant,

v.

TERRY ROYAL Warden, Oklahoma State
Penitentiary,

Respondent - Appellee.

------------------------------

MUSCOGEE (CREEK) NATION;
SEMINOLE NATION OF OKLAHOMA;
KEETOOWAH BAND OF CHEROKEE
INDIANS,

Amici Curiae.

Nos. 07-7068 & 15-7041
(D.C. No. 03-cv-443-RAW-KEW)
(E.D. Okla.)

_____

**ORDER**
_____

Before **TYMKOVICH**, Chief Judge, **MATHESON**, and **PHILLIPS**, Circuit Judges.
_____

These matters are before the court on the respondent's *Petition for Panel Rehearing or Rehearing En Banc.* We also have responses from the petitioner and the United Keetoowah Band of Cherokee Indians, in addition to amici curiae briefs from the United States and The Muscogee (Creek) Nation. We also have several motions pending seeking to file additional amici curiae briefs.

Upon consideration, the request for panel rehearing is denied by the original panel members. For clarification, however, the panel has decided, *sua sponte*, to amend the original decision at pages 49-50. A copy of the amended decision is attached to this order, and the clerk is directed to reissue the opinion *nunc pro tunc* to the original filing date of August 8, 2017. In addition, Chief Judge Tymkovich has filed a concurrence to the denial of rehearing, and that concurrence is likewise attached.

The *Petition*, the responses, the amici filings and the amended opinion were also circulated to all the judges of the court in regular active service who are not recused. *See* Fed. R. App. P. 35(a). As no judge on the original panel or the en banc court requested that a poll be called the request for en banc review is denied.

Finally, the motions filed by the Oklahoma Independent Petroleum Association, the Oklahoma Municipal League, and the Oklahoma Oil and Gas Association, et al., seeking leave to file amici curiae briefs are granted. Those briefs will be shown filed as of the date of this order.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

Nos. 07-7068 & 15-7041, *Murphy v. Royal*

**TYMKOVICH**, Chief Judge, concurring in the denial of rehearing en banc.

En banc review is not appropriate when, as here, a panel opinion faithfully applies Supreme Court precedent. An en banc court would necessarily reach the same result, since Supreme Court precedent precludes any other outcome. I write only to suggest this case might benefit from further attention by the Supreme Court.

As the panel opinion explains, the three-part framework of *Solem v. Bartlett*, 465 U.S. 463 (1984), governs evaluating whether Congress has disestablished an Indian reservation. But strictly applying *Solem*'s three-part framework in this context, which strongly suggests *de facto* disestablishment, evokes "the thud of square pegs being pounded into round holes." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 426 F.3d 1162, 1193 (9th Cir. 2005) (Kozinski, J., concurring), *rev'd and remanded*, 551 U.S. 701 (2007), *and vacated*, 498 F.3d 1059 (9th Cir. 2007).

In 1893, Congress created the Dawes Commission to negotiate with the Creek Nation for the express purpose of extinguishing national title to lands held by the Creek Nation, preferably through allotment. Act of Mar. 3, 1893, § 16, 27 Stat. 212 at 645. The Creek Nation refused to negotiate, so Congress began imposing restrictions. Over the following five years, Congress destroyed the Creek legal system and threatened to terminate Creek land ownership unless the tribe agreed to allotment. Faced with this threat, the Creek Nation agreed to

allotment in 1901. Most land owned by the Creek Nation was then allotted to individual members of the tribe. *Murphy v. Royal*, 866 F.3d 1164, 1201–02 (10th Cir. 2017).

The parties hotly dispute the inferences to be drawn from the history of the Creek Nation. I am not without sympathy for Oklahoma's argument that Congress's series of actions here effectively constitute disestablishment, but the panel properly rejected that argument: *Solem* is clear that "[o]nce a block of land is set aside for an Indian Reservation and *no matter what happens to the title of individual plots within the area*, the entire block retains its reservation status until Congress explicitly indicates otherwise." 465 U.S. at 470 (emphasis added); *see also Murphy*, 866 F.3d at 1219 (explaining that allotment alone cannot terminate a reservation under Supreme Court precedent).

Supreme Court precedent thus requires that evidence of intent to disestablish be "unequivocal[]." *Nebraska v. Parker*, 136 S. Ct. 1072, 1080–81 (2016). History, however, is not always well suited to provide the unequivocal evidence of disestablishment that *Solem* requires. Sometimes history is ambiguous, making it impossible to decide between competing narratives. Historians have been debating the Fall of Rome for millennia. Sometimes there will be unequivocal evidence one way or another. But sometimes not. When confronted with contemporaneous history that is far from unequivocal, *Solem* gives the edge to the tribes.

*Solem* itself recognized that "[w]here non-Indian settlers flooded into the opened portion of a reservation and the area has long since lost its Indian character . . . *de facto*, if not *de jure*, diminishment may have occurred." 465 U.S. at 471. But, the *Solem* Court continued, this recognition only extends so far: "When both an act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands, we are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening." *Id.* at 472. And *Parker* confirmed this approach. *See Murphy*, 866 F.3d at 1198 (discussing how *Parker* illustrates the significance *Solem* places in statutory text, even in the face of strong subsequent demographic evidence).

This case may present the high-water mark of *de facto* disestablishment: the boundaries of the Creek Reservation outlined by the panel opinion encompass a substantial non-Indian population, including much of the city of Tulsa; and Oklahoma claims the decision will have dramatic consequences for taxation, regulation, and law enforcement. The panel faithfully applied Supreme Court precedent holding that such "demographic evidence [cannot] overcome the absence of statutory text disestablishing the Creek Reservation." *Murphy*, 866 F.3d at 1232. But this may be the rare case where the Supreme Court wishes to enhance Steps Two and Three of *Solem* if it can be persuaded that the square peg of *Solem* is ill suited for the round hole of Oklahoma statehood. As Justice

Cardozo wrote, "[e]xtraordinary situations may not wisely or fairly be subjected to tests or regulations that are fitting for the commonplace or normal." *Pokora v. Wabash Ry. Co.*, 292 U.S. 98, 105–06 (1934).

In sum, this challenging and interesting case makes a good candidate for Supreme Court review.

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

PATRICK DWAYNE MURPHY,

      Petitioner - Appellant,

v.

TERRY ROYAL, Warden, Oklahoma
State Penitentiary,

      Respondent - Appellee.

------------------------------

MUSCOGEE (CREEK) NATION;
SEMINOLE NATION OF OKLAHOMA;
UNITED KEETOOWAH BAND OF
CHEROKEE INDIANS IN OKLAHOMA,

      Amici Curiae.

No. 07-7068 & 15-7041

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. Nos. 6:03-CV-00443-RAW-KEW and 6:12-CV-00191-RAW-KEW)**
_____

Patti Palmer Ghezzi, Assistant Federal Public Defender (Randy A. Bauman and Michael
Lieberman, Assistant Federal Public Defenders, with her on the briefs), Office of the
Federal Public Defender, Oklahoma City, Oklahoma, appearing for Appellant.

Jennifer L. Crabb, Assistant Attorney General (E. Scott Pruitt, Attorney General, and
Jared B. Haines, Assistant Attorney General, with her on the brief), Office of the
Attorney General for the State of Oklahoma, Oklahoma City, Oklahoma, appearing for
Appellee.

David A. Giampetroni, Kanji & Katzen, PLLC, Ann Arbor, Michigan (Kevin Dellinger, Attorney General, and Lindsay Dowell, Assistant Attorney General, Muscogee (Creek) Nation, Okmulgee, Oklahoma; D. Michael McBride III, Attorney General, and Christina Vaughn, Assistant Attorney General, Seminole Nation of Oklahoma, Crowe & Dunlevy, Tulsa, Oklahoma; and Philip H. Tinker and Riyaz A. Kanji, Kanji & Katzen, Ann Arbor, Michigan, with him on the briefs), appearing for amici Muscogee (Creek) Nation and Seminole Nation of Oklahoma.

Klint A. Cowan, Fellers, Snider, Blankenship, Bailey & Tippens, P.C., Oklahoma City, Oklahoma, appearing for amicus United Keetoowah Band of Cherokee Indians in Oklahoma.

_____

Before **TYMKOVICH**, Chief Judge, **MATHESON**, and **PHILLIPS**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

TABLE OF CONTENTS

I. BACKGROUND ....................................................................................................2

   A. Factual History ..............................................................................................3

   B. Procedural History.........................................................................................5

      1. Trial ........................................................................................................5

      2. Direct appeal ...........................................................................................6

      3. First Application for State Post-Conviction Relief ...................................6

      4. Filing of First Application for Federal Habeas Relief ............................7

      5. Second Application for State Post-Conviction Relief ............................8

         a. Evidentiary hearing ...........................................................................9

         b. Appeal to the OCCA .......................................................................11

         c. *Atkins* trial and appeal ...................................................................14

      6. Federal District Court Proceedings on First Federal Habeas Application ..........14

      7. First Appeal to the Tenth Circuit (No. 07-7068) ..................................16

      8. Second Application for Federal Habeas Relief.....................................16

      9. This Consolidated Appeal .....................................................................16

II. LEGAL BACKGROUND ...................................................................................17

   A. Standard of Review ......................................................................................17

      1. The Parties' Dispute ..............................................................................18

      2. The AEDPA Standard ...........................................................................19

         a. Overview ..........................................................................................20

         b. The "contrary to" clause...................................................................21

   B. Indian Country Jurisdiction .........................................................................23

      1. Reservations ..........................................................................................23

      2. The Major Crimes Act ..........................................................................24

      3. Indian Country ......................................................................................27

      4. Reservation Disestablishment and Diminishment ...............................29

         a. Presumption against disestablishment and diminishment .......................30

         b. The policy of allotment .....................................................................32

    c.  *Solem* factors ...................................................................................34

III. DISCUSSION ...........................................................................................37

  A.  Clearly Established Federal Law.............................................................37

    1.  *Solem*—Clearly Established Law in 2005 ......................................38

    2.  The State's Arguments.....................................................................40

  B.  The OCCA Decision—Contrary to Clearly Established Federal Law....41

    1.  The OCCA's Merits Decision ..........................................................42

    2.  The OCCA's Decision Was Contrary to *Solem* ..............................46

      a.  No citation to *Solem* ................................................................46

      b.  Failure to apply *Solem* ............................................................47

      c.  The State's arguments ..............................................................49

  C.  Exclusive Federal Jurisdiction................................................................51

    1.  Additional Legal Background...........................................................53

      a.  Supreme Court authority ..........................................................53

      b.  Tenth Circuit authority .............................................................56

    2.  Additional Factual Background—Creek Nation History...................58

      a.  Original homeland and forced relocation..................................59

      b.  Nineteenth century diminishment .............................................60

      c.  1867 Constitution and government...........................................61

      d.  Early congressional regulation of modern-day Oklahoma ........62

      e.  The push for allotment..............................................................62

      f.  Allotment and aftermath...........................................................64

      g.  Creation of Oklahoma ..............................................................66

      h.  Away from allotment.................................................................66

      i.  Public Law 280.........................................................................67

      j.  A new Creek Constitution .........................................................68

      k.  Our decision in *Indian Country, U.S.A.* ..................................69

    3.  Applying *Solem*...............................................................................70

      a.  Step One: Statutory Text ..........................................................70

i.  The statutes ...................................................................................73

    1) Act of March 3, 1893, ch. 209, 27 Stat. 612 ("1893 Act") ...............73

    2) Act of June 10, 1896, ch. 398, 29 Stat. 321 ("1896 Act") ...............75

    3) Act of June 7, 1897, ch. 3, 30 Stat. 62 ("1897 Act") .......................75

    4) "Curtis Act," ch. 517, 30 Stat. 495 (June 28, 1898)........................76

    5) "Original Allotment Agreement," ch. 676, 31 Stat. 861 (March 1, 1901)...................................................................................77

        a) Allotment ......................................................................77

        b) Town sites.....................................................................80

        c) Lands reserved for tribal purposes ..............................81

        d) Future governance.........................................................81

    6) "Supplemental Allotment Agreement," ch. 1323, 32 Stat. 500 (June 30, 1902) .................................................................................84

    7) "Five Tribes Act," ch. 1876, 34 Stat. 137, April 26, 1906..............85

    8) "Oklahoma Enabling Act," ch. 3335, 34 Stat. 267 (June 16, 1906).89

ii. Analysis ........................................................................................90

    1) No hallmarks of disestablishment or diminishment........................91

    2) Signs Congress continued to recognize the Reservation.................95

    3) The State's title and governance arguments ...................................97

        a) Title ...............................................................................98

        b) Governance ...................................................................99

b. Step Two: Contemporary Historical Evidence.......................................101

i.  The State's evidence.......................................................................103

    1) 1892 Senate debate........................................................................104

    2) 1894 Senate committee report .......................................................105

    3) Other sources ................................................................................107

ii. Mr. Murphy's and the Creek Nation's evidence ................................108

    1) 1894 Dawes Commission records...................................................108

    2) 1895 Dawes letter..........................................................................108

3) 1900 Attorney General opinion ..................................................109

4) Post-allotment evidence ..................................................110

iii. Analysis ..................................................112

c. Step Three:  Later History ..................................................113

i. Treatment of the area..................................................114

1) Congress ..................................................114

2) Executive ..................................................117

3) Federal courts..................................................118

4) Oklahoma..................................................120

5) Creek Nation ..................................................123

ii. Demographics ..................................................124

iii. Step-three concluding comment ..................................................125

IV. CONCLUSION ..................................................126

Patrick Dwayne Murphy asserts he was tried in the wrong court. He challenges the jurisdiction of the Oklahoma state court in which he was convicted of murder and sentenced to death. He contends he should have been tried in federal court because he is an Indian and the offense occurred in Indian country. We agree and remand to the district court to issue a writ of habeas corpus vacating his conviction and sentence.

The question of whether the state court had jurisdiction is straightforward but reaching an answer is not. We must navigate the law of (1) federal habeas corpus review of state court decisions, (2) Indian country jurisdiction generally, (3) Indian reservations specifically, and (4) how a reservation can be disestablished or diminished. Our discussion on each of these topics reaches the following conclusions.

First, we assume that a federal habeas court must give deference to a state court's determination that it had jurisdiction. Nonetheless, in this case, the Oklahoma court applied a rule that was contrary to clearly established Supreme Court law. We must apply the correct law.

Second, when an Indian is charged with committing a murder in Indian country, he or she must be tried in federal court. Mr. Murphy is a member of the Muscogee (Creek) Nation. Because the homicide charged against him was committed in Indian country, the Oklahoma state courts lacked jurisdiction to try him.

Third, Congress has defined Indian country broadly to include three categories of areas: (a) Indian reservations, (b) dependent Indian communities, and (c) Indian allotments. *See* 18 U.S.C. § 1151. The reservation clause concerns us here. All land

within the borders of an Indian reservation—regardless of whether the tribe, individual Indians, or non-Indians hold title to a given tract of land—is Indian country unless Congress has disestablished the reservation or diminished its borders.

Fourth, only Congress may disestablish or diminish an Indian reservation. Applying the Supreme Court's test to determine whether Congress has done so as to the Creek Reservation, we conclude it has not.

Mr. Murphy and the State agree that the offense in this case occurred within the Creek Reservation if Congress has not disestablished it. We conclude the Reservation remains intact and therefore the crime was committed in Indian country. Mr. Murphy, a Creek citizen, should have been charged and tried in federal court.[1]

## I. BACKGROUND

We begin with the facts of the crime as presented by the Oklahoma Court of Criminal Appeals ("OCCA").[2] We then discuss the procedural journey Mr. Murphy's case has traveled.

---

[1] Mr. Murphy raises eight issues in this appeal. Because we resolve his first issue by concluding the state courts lacked jurisdiction over this case, we do not address his other seven issues.

[2] *See* 28 U.S.C. § 2254(e)(1) (providing federal habeas court must presume state court's factual determinations are correct); *see also Al-Yousif v. Trani*, 779 F.3d 1173, 1181 (10th Cir. 2015) ("The presumption of correctness also applies to factual findings made by a state court of review based on the trial record." (quotations omitted)).

A. *Factual History*

In August 1999, Mr. Murphy lived with Patsy Jacobs. *Murphy v. State*, 47 P.3d 876, 879 (Okla. Crim. App. 2002). Ms. Jacobs was previously in a relationship with the victim in this case, George Jacobs, and had a child with him, George, Jr. *Id.* at 879-80. Mr. Murphy had an argument with her about Mr. Jacobs and said he was "going to get" Mr. Jacobs and his family. *Id.* at 879.

On August 28, 1999, Mr. Jacobs spent the day drinking with his cousin, Mark Sumka. *Id.* Around 9:30 p.m., Mr. Sumka was driving to a bar in Henryetta, Oklahoma, with Mr. Jacobs passed out in the back seat. *Id.* Mr. Murphy was driving on the same road in the opposite direction with two passengers—Billy Long and Kevin King. *Id.* After the cars passed each other, they stopped. *Id.* Mr. Murphy backed up and told Mr. Sumka to turn off the car, but Mr. Sumka drove off. *Id.*

Mr. Murphy and his passengers pursued and forced Mr. Sumka off Vernon Road, which runs through an area that is "remarkably rural [and] heavily treed . . . without any sort of improvement . . . except perhaps a rickety barbed wire fence." *Murphy v. State*, 124 P.3d 1198, 1206 (Okla. Crim. App. 2005); *see also* 47 P.3d at 879.

Mr. Murphy exited the car and confronted Mr. Sumka. 47 P.3d at 879. Mr. Long and Mr. King began hitting Mr. Jacobs. *Id.* at 880. Mr. Murphy approached Mr. Jacobs, trading places with Mr. Long, who went over and hit Mr. Sumka. *Id.* at 880. Mr. Sumka briefly ran off but came back about five minutes later. *Id.*

- 3 -

When he did, he saw Mr. Murphy throw a folding knife into the woods, and he saw Mr. Jacobs lying in a ditch along the road, barely breathing. *Id.* Mr. Murphy and his companions threatened to kill Mr. Sumka and his family if he said anything, and Mr. King struck Mr. Sumka in the jaw. *Id.*

Following Mr. Murphy's instructions, Mr. Sumka left the scene with the other men. *Id.* During the car ride away, they told Mr. Sumka they had cut Mr. Jacobs's throat and chest and had severed his genitals. *Id.* The group later went to Mr. King's home, where Mr. Jacobs's son, George, Jr., was staying, in an apparent attempt to kill him. *Id.* Mr. King's mother intervened and "thwarted [their] plan." *Id.* Mr. King went inside, and the rest of the group left. *Id.*

A passerby found Mr. Jacobs in the ditch with his face bloodied and slashes across his chest and stomach. *Id.* His genitals had been cut off and his throat slit. *Id.* According to a state criminalist, Mr. Jacobs had been dragged off the road after his genitals were severed. *Id.* His neck and chest had been cut on the side of the road, where he bled to death over the course of four to twelve minutes, though it may have taken longer. *Id.*

After Mr. Murphy returned home and confessed to Ms. Jacobs, he was arrested. *Id.* The State of Oklahoma charged him with Mr. Jacobs's murder and sought the death penalty.

- 4 -

B. *Procedural History*

A jury convicted Mr. Murphy of murder in Oklahoma state court and imposed the death penalty. His appeal and post-conviction proceedings have since moved through the Oklahoma and federal courts as recounted below.

Although the overall history of Mr. Murphy's case is complex, the history of the jurisdictional claim we resolve here can be succinctly summarized. After Mr. Murphy's conviction and death sentence were affirmed on direct appeal, he applied for state post-conviction relief in 2004, arguing the Oklahoma state courts had lacked jurisdiction to try him. The OCCA ordered an evidentiary hearing. Following the hearing, the state district court concluded Oklahoma's jurisdiction was proper because the crime did not occur in Indian country. The OCCA affirmed that conclusion in 2005. Mr. Murphy then sought federal habeas relief, but the federal district court denied relief in 2007. Mr. Murphy now appeals.

In the interest of thoroughness, and because Mr. Murphy's case has until now proceeded in a disjointed fashion, we provide a complete procedural history below.

1. **Trial**

In 2000, a jury in McIntosh County, Oklahoma, convicted Mr. Murphy of first degree murder under Okla. Stat. tit. 21 § 701.7(A) (1999). In the penalty phase, the jury found aggravating circumstances supported the death penalty. *Murphy*, 47 P.3d at 879. In accordance with the jury's verdict, the trial court imposed a death sentence. *Id.*

## 2. **Direct appeal**

Mr. Murphy raised a variety of trial issues in a direct appeal to the OCCA. On May 22, 2002, the OCCA affirmed his conviction. *Id.* at 888. The court also performed a statutorily mandated sentencing review in which the court considered the aggravating circumstances in light of the mitigating evidence, including Mr. Murphy's "mild mental retardation," and concluded his death sentence was "factually substantiated and appropriate." *Id.* at 887-88.[3]

## 3. **First Application for State Post-Conviction Relief**

On February 7, 2002, while his direct appeal was pending in the OCCA, Mr. Murphy filed his first application for state post-conviction relief. *See Murphy v. State*, 54 P.3d 556, 560 (Okla. Crim. App. 2002). He asked that his application be held in abeyance, *id.* at 566, until the Supreme Court decided its then-pending case of *Atkins v. Virginia*, 536 U.S. 304 (2002), which addressed whether the Eighth Amendment prohibits the execution of "mentally retarded persons," *id.* at 306.

On June 20, 2002, about a month after the OCCA affirmed on direct appeal, the Supreme Court held in *Atkins* that the Eighth Amendment "places a substantive restriction on the State's power to take the life of a mentally retarded offender." *Id.* at 321 (quotations omitted). *Atkins* "[left] to the States the task of developing appropriate ways to enforce the constitutional restriction." *Id.* at 317 (brackets and quotations omitted).

---

[3] On April 21, 2003, the U.S. Supreme Court denied Mr. Murphy's petition for a writ of certiorari. *See Murphy v. Oklahoma*, 538 U.S. 985 (2003).

On September 4, 2002, the OCCA denied relief on all of the issues Mr. Murphy had raised in his first application for state post-conviction relief except his *Atkins* claim. 54 P.3d at 570. The OCCA used Mr. Murphy's case to adopt new, post-*Atkins* procedures to shield "mentally retarded" persons from execution. *See id.* at 567-69. These procedures, the OCCA explained, would govern "until such time" as the Oklahoma legislature enacted an alternative framework. *Id.* at 568. The OCCA remanded to the state district court "for an evidentiary hearing on the sole issue of [Mr. Murphy's] claim of mental retardation in accordance with" the OCCA's newly announced procedures. *Id.* at 570.

On remand, the state district court concluded Mr. Murphy "had not raised sufficient evidence to create a fact question on the issue of mental retardation." *Murphy v. State*, 66 P.3d 456, 458 (Okla. Crim. App. 2003). On March 21, 2003, the OCCA ruled this conclusion was "not clearly erroneous" and affirmed Mr. Murphy's death sentence. *Id.* at 458, 461.

4. **Filing of First Application for Federal Habeas Relief**

On March 5, 2004, Mr. Murphy filed a federal habeas application under 28 U.S.C. § 2254 asserting 13 grounds for relief.

On August 30, 2004, the U.S. District Court for the Eastern District of Oklahoma concluded Mr. Murphy's application contained some claims that had not been exhausted in Oklahoma state court. The federal district court directed Mr. Murphy to drop his unexhausted claims.

On September 10, 2004, Mr. Murphy did so by filing an amended application containing eight claims, all of which were exhausted. His amended application remained pending in the federal district court while he pursued additional relief in state court.[4]

5. **Second Application for State Post-Conviction Relief**

On March 29, 2004—shortly after he filed his original federal habeas application—Mr. Murphy returned to state court and filed a second application for post-conviction relief to exhaust claims he had dropped from his federal habeas application. His second application for state post-conviction relief alleged:

1. Oklahoma lacked jurisdiction because the Major Crimes Act gives the federal government exclusive jurisdiction to prosecute murders committed by Indians in Indian country.[5]

2. The OCCA's earlier denial of a jury trial on the issue of his "mental retardation" had violated his constitutional rights.

3. Oklahoma's lethal injection protocol violated the Eighth Amendment.

---

[4] The same day he filed his amended application, Mr. Murphy launched a short-lived appeal. He sought our review of the district court's order denying his request to stay the federal proceedings while he pursued his unexhausted claims in state court. Another panel of this court dismissed the appeal for lack of jurisdiction. *See Murphy v. Mullin*, No. 04-7094 (10th Cir. Dec. 16, 2004).

[5] In Oklahoma, "issues of subject matter jurisdiction are never waived and can therefore be raised on a collateral appeal." *Wallace v. State*, 935 P.2d 366, 372 (Okla. Crim. App. 1997); *see also Triplet v. Franklin*, 365 F. App'x 86, 95 (10th Cir. 2010) (unpublished) (recognizing that, in Oklahoma, issues of subject matter jurisdiction are not waivable and can be raised for the first time in collateral proceedings); *Wackerly v. State*, 237 P.3d 795, 797 (Okla. Crim. App. 2010) (considering jurisdictional claim that crime occurred on federal land raised in prisoner's second application for post-conviction relief); *Magnan v. State*, 207 P.3d 397, 402 (Okla. Crim. App. 2009) (considering Indian country jurisdictional challenge and explaining subject matter jurisdiction may be challenged at any time).

- 8 -

*See Murphy*, 124 P.3d at 1200, 1208-09. The OCCA ordered an evidentiary hearing on the jurisdictional claim. *Id.* at 1199.[6]

    a. *Evidentiary hearing*

The state district court held a one-day evidentiary hearing. *Id.* at 1201. Mr. Murphy argued Oklahoma lacked jurisdiction because the crime occurred in Indian country and 18 U.S.C. § 1153 provides for exclusive federal jurisdiction over murders committed by Indians in Indian country.[7] The parties agreed that Mr. Murphy and Mr. Jacobs, both members of the Muscogee (Creek) Nation, were Indians, but they disputed whether the crime occurred in Indian country, a term defined in 18 U.S.C. § 1151:

---

[6] The OCCA ordered that the hearing answer the following six questions:

    (1) Where exactly did the crime occur?

    (2) Who "owns" title to the property upon which the crime occurred?

    (3) If some or all of the crime occurred on an easement, how does that factor into the ownership question?

    (4) How much of the crime occurred, if any, on an easement?

    (5) Did the crime occur in "Indian County," as defined by 18 U.S.C. § 1151?

    (6) Is jurisdiction over the crime exclusively federal?

124 P.3d at 1201 n.3 (paragraph breaks added).

[7] "Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder . . . within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." 18 U.S.C. § 1153(a).

- 9 -

[T]he term "Indian country" . . . means

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,

(b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and

(c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151 (paragraph breaks added). An area qualifies as Indian country if it fits within any of these three categories. Mr. Murphy argued the crime occurred in Indian country under all three categories.[8]

In December 2004, the state district court concluded state jurisdiction was proper because the crime had occurred on state land. *See* 124 P.3d at 1200, 1202. The court, however, addressed only one of Mr. Murphy's three theories. *Id.* at 1207. It concluded the land was not an Indian allotment under § 1151(c), but it failed to address whether the location was (a) part of the Creek Reservation or (b) part of a dependent Indian community. *See id.* (noting the state district court failed to address these questions although the OCCA had "clearly asked" it to do so). Although the state district court viewed these matters as outside the scope of the evidentiary hearing, it allowed Mr.

---

[8] In this appeal, however, he argues the location of the crime qualifies under the reservation clause of subsection (a) and the allotment clause of subsection (c). Because we agree with him that the crime occurred on an Indian reservation, we do not reach his allotment argument.

Murphy to make an offer of proof on his other two theories. *Id.*[9] The court ultimately

ruled the State's exercise of criminal jurisdiction was proper and denied relief. *Id.* at

1202.

b. *Appeal to the OCCA*

Mr. Murphy appealed to the OCCA. On December 7, 2005, the OCCA denied

relief on his jurisdictional and Eighth Amendment claims but granted limited relief on the

*Atkins* claim. *See id.* at 1209.

On the jurisdictional issue, the OCCA found the record did not support some

of the state district court's determinations, but it affirmed the ultimate determination

that Oklahoma's jurisdiction was proper. *Id.* at 1201-08. The OCCA accepted the

state district court's findings regarding where the crime unfolded, but it rejected the

court's conclusion that Oklahoma owned the road and the ditch abutting it. *Id.* at

1202. Rather, the OCCA concluded, Oklahoma's "interest in the area in question is

in the nature of an easement or right-of way." *Id.* The Creek Nation had long owned

---

[9] On the reservation question that concerns us here, Mr. Murphy argued:

> [T]he homicide occurred within the boundaries of the Creek Nation, which qualifies as Indian county because of its status as a reservation under federal jurisdiction. Unlike some other tribes, the Creek treaty lands were not disestablished or diminished by the acts of allotment and other federal legislation adopted in the early 20th century. As of 1999, the entirety of the historic Creek Nation lands thus remained Indian country, regardless of non-Indian ownership of particular tracts within those boundaries.

Def. Tr. Br. at 12 (filed Nov. 16, 2004), State Post-Conviction Record, OCCA Case No. PCD-2004-321, Vol. 1 at 66 (citing *Solem v. Bartlett*, 465 U.S. 463 (1984)).

- 11 -

the land in question when, under a statute enacted in 1902, Oklahoma received the right to build a public highway. *Id.* at 1203. Tracing the history of the specific tract where the crime occurred, the OCCA concluded it had passed in the early twentieth century from the Creek Nation to Lizzie Smith, a member of the Creek Nation, and that all interest in the land—except for a restricted 1/12 mineral interest—had since been conveyed to non-Indians. *See id.* at 1204-06. The OCCA concluded this Indian interest was insufficient to qualify the land as an Indian allotment under § 1151(c): "A fractional interest in an unobservable mineral interest is insufficient contact with the situs in question to deprive the State of Oklahoma of criminal jurisdiction." *Id.* at 1206.[10]

The OCCA criticized the state district court for not addressing whether the crime was committed within the Creek Reservation or within a dependent Indian community, but it concluded the error was harmless because Mr. Murphy had been afforded a chance "to make an extended offer of proof." *Id.* at 1207. The OCCA said that the evidence, had it been admitted, was "insufficient" to show "that the tract in question qualifies as a reservation or dependent Indian community." *Id.*

With respect to the reservation theory, the OCCA acknowledged our decision in *Indian Country, U.S.A., Inc. v. Oklahoma ex rel. Oklahoma Tax Commission*, 829 F.2d 967 (10th Cir. 1987), *cert. denied*, 487 U.S. 1218 (1988), where we recognized the Creek

---

[10] We discuss the OCCA's decision regarding Mr. Murphy's allotment theory under § 1151(c) because it forms part of the procedural history of this case, but we offer no comment on the merits of the OCCA's decision on this front. Our opinion is limited to the reservation question under § 1151(a).

Reservation still exists but reserved the question whether its 1866 boundaries remain intact, 829 F.2d at 975-76. *See* 124 P.3d at 1207-08 (discussing *Indian Country, U.S.A.*). The OCCA stated: "If the federal courts remain undecided on this particular issue, we refuse to step in and make such a finding here." *Id.* at 1208.[11]

As for the two non-jurisdictional issues Mr. Murphy raised in his second post-conviction application, the OCCA granted limited relief on one and denied relief on the other. First, it reversed course on the *Atkins* issue and found Mr. Murphy *had* provided sufficient evidence to create a factual question for a jury on his "mental retardation claim." *Id.* It therefore ordered the case remanded. *Id.* Second, the OCCA ruled Mr. Murphy had waived his Eighth Amendment challenge to Oklahoma's lethal injection protocol by failing to raise it earlier. *Id.* at 1209.

In summary, the OCCA rejected the jurisdictional challenge and the Eighth Amendment claim, but it remanded for a jury trial on Mr. Murphy's *Atkins* claim.[12]

---

[11] The OCCA also rejected the dependent Indian community theory under § 1151(b). *See* 124 P.3d at 1208. That ruling is not before us because Mr. Murphy now raises only the allotment and reservation theories.

[12] Mr. Murphy petitioned the U.S. Supreme Court for certiorari on two aspects of the OCCA's jurisdictional decision: (1) whether Oklahoma lacked jurisdiction because the crime occurred on a restricted Indian allotment under § 1151(c) and (2) whether Oklahoma lacked jurisdiction because the crime occurred within the limits of an Indian reservation under § 1151(a). The Supreme Court called for the views of the United States, and the Solicitor General filed a brief arguing the Court should deny Mr. Murphy's petition because the OCCA had correctly determined that the crime was not within the exclusive jurisdiction of the federal government. *See* Brief for the United States as Amicus Curiae, *Murphy v. Oklahoma*, No. 05-10787, 2007 WL 1319320, at *4. The Supreme Court denied Mr. Murphy's petition for certiorari without comment. *Murphy v. Oklahoma*, 551 U.S. 1102 (2007).

- 13 -

c. Atkins *trial and appeal*

Following a September 2009 trial in the state district court, a jury in McIntosh County rejected Mr. Murphy's claim of "mental retardation." *Murphy v. State*, 281 P.3d 1283, 1287 (Okla. Crim. App. 2012) (discussing jury trial). But the trial judge declared a mistrial based on an error of state law and reset the case for a new trial. *Id.*[13]

Before the re-trial, the State moved to terminate further proceedings. A state statute had supplanted the OCCA's *Atkins* procedures and provided that no defendant who received an intelligence quotient ("I.Q.") score of 76 or above could "be considered mentally retarded." Okla. Stat. tit. 21 § 701.10b(C); *see also* 281 P.3d at 1287-89. Because Mr. Murphy had received an I.Q. score of 80 on one test and 82 on another, the trial court granted the State's motion and terminated proceedings on January 27, 2011. 281 P.3d at 1288.

Mr. Murphy appealed and raised four propositions of error to the OCCA. *Id.* at 1287. On April 5, 2012, the OCCA ruled the district court had properly relied on the new state law. *Id.* at 1289. The OCCA rejected all of Mr. Murphy's claims, thus concluding proceedings on the second post-conviction application. *Id.* at 1294.

## 6. **Federal District Court Proceedings on First Federal Habeas Application**

On December 28, 2005, after the OCCA rejected his jurisdictional and Eighth Amendment claims but before the conclusion of the *Atkins* proceedings, Mr. Murphy

---

[13] The court declared a mistrial because neither side had been afforded its full complement of peremptory challenges—a structural error under Oklahoma law at the time. *See* 281 P.3d at 1287 & n.1.

- 14 -

moved to amend his federal habeas application.  The district court granted the motion and allowed Mr. Murphy to add two newly exhausted claims:  (1) the challenge to Oklahoma's jurisdiction, and (2) the Eighth Amendment lethal-injection challenge. These two claims were added to Mr. Murphy's eight previously exhausted federal claims, which were still pending.

On August 1, 2007, the district court entered an opinion and order denying all ten claims in Mr. Murphy's habeas application.  *Murphy v. Sirmons*, 497 F. Supp. 2d 1257, 1294-95 (E.D. Okla. 2007).

On the jurisdictional claim, Mr. Murphy argued the crime had occurred in Indian country under just two theories:  (1) the land was part of the Creek Reservation under § 1151(a) and (2) the land was an Indian allotment under § 1151(c).  *Id.* at 1288. Applying the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), the district court ruled that the OCCA's decisions against Mr. Murphy on these theories were neither contrary to nor an unreasonable application of clearly established federal law.  *See* 497 F. Supp. 2d at 1286-92.

The district court rejected Mr. Murphy's other claims but granted him three certificates of appealability ("COAs")[14] to challenge his counsel's effectiveness, one of the death-eligibility aggravating circumstances, and the trial court's failure to define life without parole for the jury.

---

[14] "[A] prisoner who was denied habeas relief in the district court must first seek and obtain a COA from a circuit justice or judge" before an appeal can be heard. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003); *see* 28 U.S.C. § 2253(c).

7. **First Appeal to the Tenth Circuit (No. 07-7068)**

Mr. Murphy appealed to this court. On November 16, 2007, we abated the appeal to await resolution of Mr. Murphy's then-pending *Atkins* claim in Oklahoma state court.

8. **Second Application for Federal Habeas Relief**

On April 26, 2012, following the OCCA's final denial of his *Atkins* claim, Mr. Murphy filed a second § 2254 application in the Eastern District of Oklahoma that challenged the OCCA's resolution of the *Atkins* issue.[15] The district court denied relief. *Murphy v. Trammell*, No. CIV-12-191-RAW-KEW, 2015 WL 2094548, at \*13 (E.D. Okla. May 5, 2015) (unpublished).

9. **This Consolidated Appeal**

Mr. Murphy sought to appeal from the district court's denial of relief on his second § 2254 habeas application. We consolidated that appeal (No. 15-7041) with his appeal from the denial of his first habeas application (No. 07-7068) to form this case.

Mr. Murphy raises eight issues. Because he obtained COAs for each one,[16] our jurisdiction is proper under 28 U.S.C. § 2253(a), (c)(1)(A).

---

[15] The district court treated the application as second and successive and transferred it to this court. We concluded that at least a portion of Mr. Murphy's *Atkins* challenge could proceed and ordered a partial remand. *In re Murphy*, No. 12-7055, at 2 (10th Cir. Nov. 1, 2012) (unpublished order).

[16] The district court granted Mr. Murphy three COAs and we granted five more. The district court granted COAs for Mr. Murphy's arguments regarding: (1) ineffective assistance of counsel, (2) the "heinous, atrocious, or cruel" aggravating circumstance, and (3) the trial court's failure to define "life without parole" for the jury. In June 2015, we ordered Mr. Murphy to file a motion for additional COAs across both appeals. We granted COAs for his claims regarding: (1) victim-impact statements, (2) Oklahoma's

Continued . . .

As to one of the issues—whether Oklahoma or the federal government had jurisdiction over the murder case—we granted the motion of the Muscogee (Creek) Nation and the Seminole Nation of Oklahoma to file a joint amici brief.[17] We likewise permitted the United Keetoowah Band of Cherokee Indians in Oklahoma to file an amicus brief. The Tribes also participated at oral argument.

## II. LEGAL BACKGROUND

We conclude the crime occurred on the Creek Reservation and therefore the Oklahoma courts lacked jurisdiction. This section addresses the law applicable to the jurisdictional issue. We begin with (A) our standard of review and then address (B) the substantive law of Indian country jurisdiction.

### A. *Standard of Review*

The parties disagree over the standard of review that should apply to Mr. Murphy's jurisdictional claim. The State contends AEDPA's deferential standard should apply. Mr. Murphy disagrees and argues we should review his claim de novo. We begin by discussing this disagreement, but we choose not to resolve it because Mr. Murphy

jurisdiction, (3) the district court's refusal to stay and abate proceedings on his first federal habeas application, (4) Oklahoma's procedural handling of his *Atkins* claim, and (5) cumulative error. *Murphy v. Warrior*, Nos. 07-7068 & 15-7041, at 1-2 (10th Cir. Jan. 6, 2016) (unpublished order). All eight issues are properly before us in this appeal, but our resolution of the jurisdictional claim obviates the need to address the other seven issues.

[17] Because this case concerns the Creek Reservation, we refer to the Tribes' joint brief with the shorthand "Creek Nation Br."

- 17 -

prevails even under AEDPA review.  Because we assume the AEDPA standard applies, we then go on to describe it.

## 1. **The Parties' Dispute**

As we discuss in greater detail below, AEDPA generally requires federal habeas courts to defer to state court decisions.  Mr. Murphy argues AEDPA does not apply when, as here, a state court denies a defendant's challenge to the state court's subject matter jurisdiction.  AEDPA deference, he maintains, "presupposes" the state court had jurisdiction to decide a given claim in the first place.  Aplt. Br. at 26.  Because the question of Indian country jurisdiction implicates tribal and federal sovereignty interests, he also contends that federal courts, unconstrained by AEDPA, must make the final determination over the jurisdictional issue.  And he argues that applying AEDPA to jurisdictional claims would pose separation-of-powers and other constitutional problems.

The State responds that nothing in AEDPA says subject matter jurisdiction claims should be reviewed de novo.  It notes Mr. Murphy has failed to cite a case in support of his view that AEDPA does not apply to jurisdictional questions.  It argues Mr. Murphy has waived any argument against AEDPA's application because he supported the district court's application of AEDPA below.  The State also disputes his constitutional arguments.

We need not decide whether this issue is waivable, whether Mr. Murphy has waived it here, or even whether AEDPA is the appropriate standard.  We choose to assume without deciding that AEDPA applies.

We took this approach in *Magnan v. Trammell*, 719 F.3d 1159 (10th Cir. 2013). Both sides agree *Magnan* left open the question of whether AEDPA applies to Indian country jurisdictional claims. *Magnan* concerned an Indian defendant whom an Oklahoma state court had sentenced to death. *Id.* at 1160-61. The defendant challenged the state court's jurisdiction. *Id.* at 1163. We assumed without deciding that AEDPA applied and concluded that, even under AEDPA's deferential standard, the OCCA had erred in concluding Oklahoma had jurisdiction over the case. *Id.* at 1160-61, 1164.[18] We held the crime occurred in Indian country, making jurisdiction exclusively federal. We ordered Mr. Magnan released from state custody without resolving the "difficult question" of whether AEDPA constrains federal court review of a state court's jurisdictional ruling regarding Indian country. *Id.* at 1164, 1176-77.[19] As in *Magnan*, we can assume without deciding that AEDPA applies because Mr. Murphy is entitled to relief even under that formidable standard of review.

2. **The AEDPA Standard**

We first discuss AEDPA's general framework and then focus on the statute's "contrary to" clause because that provision guides our analysis.

---

[18] *See also Yellowbear v. Att'y Gen. of Wyo.*, 380 F. App'x 740, 743 (10th Cir. 2010) (unpublished) (leaving open the question of whether AEDPA applies and concluding on federal habeas review of state murder case that Wyoming Supreme Court's ruling on Indian reservation issue in favor of state jurisdiction should be affirmed regardless of whether de novo or AEDPA standard applied).

[19] Mr. Magnan was later convicted in federal court of three counts of murder in Indian country. We affirmed his convictions. *See United States v. Magnan*, __ F.3d __, No. 16-7043, 2017 WL 3082157, at *1, *4 (10th Cir. July 20, 2017).

- 19 -

a. *Overview*

"AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013). When a state court adjudicates a claim on the merits, AEDPA prohibits federal courts from granting habeas relief unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). "If this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).[20]

Section 2254(d) provides three ways to overcome AEDPA deference. Two appear in § 2254(d)(1), which provides that a state prisoner can qualify for habeas relief by showing a state court decision was (1) "contrary to" or (2) "involved an unreasonable application of" federal law that was clearly established by the Supreme Court. 28 U.S.C. § 2254(d)(1); *see Bell v. Cone*, 535 U.S. 685, 694 (2002) (explaining the "contrary to" and "unreasonable application" clauses each carry "independent meaning"). The third way, in § 2254(d)(2), requires a state prisoner to show that a state court decision was

---

[20] AEDPA concerns federal court deference to the decisions of state courts. Our review of the federal district court's application of AEDPA is de novo. *See Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014) ("[W]e review the district court's legal analysis of the state court decision de novo and its factual findings, if any, for clear error." (quotations omitted)).

based on an unreasonable factual determination.  *See* 28 U.S.C. § 2254(d)(2).  Thus, "[e]ach of AEDPA's three prongs—contrary to clearly established federal law, unreasonable application of clearly established federal law, and unreasonable determination of the facts—presents an independent inquiry."  *Budder v. Addison*, 851 F.3d 1047, 1051 (10th Cir. 2017).

Mr. Murphy makes arguments based on all three, but because we need apply only § 2254(d)(1)'s "contrary to" provision to resolve this case, we restrict our discussion to that clause.

b.  *The "contrary to" clause*

When a state court adjudicates a prisoner's federal claim on the merits, review under § 2254(d)(1)'s "contrary to" clause proceeds in three steps.

<u>First</u>, we must decide whether there is clearly established federal law that applies to the claim.  *See House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008) ("Whether the law is clearly established is *the* threshold question under § 2254(d)(1).").  In discerning what law is "clearly established," we must look only to the decisions of the Supreme Court, *see Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) (per curiam) (explaining circuit precedent "cannot form the basis for habeas relief under AEDPA"), and we must "measure state-court decisions against [the Supreme] Court's precedents as of the time the state court renders its decision,"

*Greene v. Fisher*, 565 U.S. 34, 38 (2011) (emphasis and quotations omitted).[21]

Within this set of cases, "'clearly established Federal law' for purposes of

§ 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme]

Court's decisions." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (brackets and

quotations omitted).

Second, if we can identify clearly established law, we then must assess whether

the state court's decision was "contrary to" that law. *See* 28 U.S.C. § 2254(d)(1); *see*

*also House*, 527 F.3d at 1018. "The word 'contrary' is commonly understood to mean

'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'"

*Williams v. Taylor*, 529 U.S. 362, 405 (2000) (controlling opinion of O'Connor, J.)

(quoting Webster's Third New International Dictionary 495 (1976)). A state court

decision violates the "contrary to" clause if it "applies a rule that contradicts the

governing law set forth in [the Supreme Court's] cases." *Id.* If the state court identifies

and applies "the correct legal rule," its decision will not be "contrary to" federal law, but

the state court's application of the correct rule can still be evaluated under § 2254(d)(1)'s

"unreasonable application" clause. *Id.* at 406.

Third, if the state court rendered a decision that was "contrary to" clearly

established Supreme Court precedent by applying the wrong legal test, we do not

necessarily grant relief; rather, we review the claim applying the correct law. Put

---

[21] Similarly, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

differently, "it is . . . a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review," but habeas relief does not "automatically issue if a prisoner satisfies the AEDPA standard." *Horn v. Banks*, 536 U.S. 266, 272 (2002). By showing the state court decision was "contrary to" clearly established federal law, the prisoner surmounts AEDPA, and the federal habeas court "must then resolve the claim without the deference AEDPA otherwise requires." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007); *see also Williams*, 529 U.S. at 406 (explaining that if "the state-court decision falls within" the "contrary to" clause, "a federal court will be unconstrained by § 2254(d)(1)"); *Milton v. Miller*, 744 F.3d 660, 670-71 (10th Cir. 2014) (concluding OCCA's decision was "contrary to" clearly established federal standard and reviewing claim de novo).

As previously mentioned, we choose to assume that AEDPA supplies our standard of review and now turn to the substantive law governing Indian country jurisdiction.

## B. *Indian Country Jurisdiction*

Understanding the Indian country jurisdiction issue in this case requires background knowledge about (1) reservations, (2) the Major Crimes Act, (3) the meaning of "Indian country," and (4) how a reservation can be disestablished or diminished. We address these topics below.

### 1. **Reservations**

The federal government began creating Indian reservations during the nineteenth century. *See* Felix S. Cohen's Handbook of Federal Indian Law 60 (Nell Jessup Newton ed., 2012) [hereinafter "Cohen"]. "During the 1850s, the modern

meaning of Indian reservation emerged, referring to land set aside under federal protection for the residence or use of tribal Indians, regardless of origin." *Id.* at 190-91. "[T]he term ['Indian reservation'] has come to describe federally-protected Indian tribal lands, meaning those lands which Congress has set apart for tribal and federal jurisdiction." *Indian Country, U.S.A.*, 829 F.2d at 973 (citation and quotations omitted). As we explain further below, the term "Indian country" includes not only reservations but other lands as well.

2. **The Major Crimes Act**

The Major Crimes Act is the jurisdictional statute at the heart of this case. It applies to enumerated crimes committed by Indians in "Indian country." When the Major Crimes Act applies, jurisdiction is exclusively federal. *See Negonsott v. Samuels*, 507 U.S. 99, 103 (1993) ("[F]ederal jurisdiction over the offenses covered by the Indian Major Crimes Act is exclusive of state jurisdiction." (quotations omitted)); *United States v. Sands*, 968 F.2d 1058, 1062 (10th Cir. 1992) ("The State of Oklahoma does not have jurisdiction over a criminal offense committed by one Creek Indian against another in Indian country."); *Cravatt v. State*, 825 P.2d 277, 279 (Okla. Crim. App. 1992) ("[Q]uite simply the State of Oklahoma does not have jurisdiction over crimes committed by or against an Indian in Indian Country." (quotations omitted)). "The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history." *Rice v. Olson*, 324 U.S. 786, 789 (1945) (citing *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515 (1832)).

The current version of the Major Crimes Act provides in relevant part:

- 24 -

> Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder . . . within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

18 U.S.C. § 1153(a). If the Major Crimes Act applies to an Indian defendant, he or she "shall be tried in the same courts and in the same manner as are all other persons committing such offense within the exclusive jurisdiction of the United States." 18 U.S.C. § 3242.

The parties agree that Mr. Murphy and Mr. Jacobs, both members of the Creek Nation, qualify as Indians for purposes of the Major Crimes Act. *See* 124 P.3d at 1200; *see also* Aplt. Br. at 20; Aplee. Br. at 11.[22] Murder is among the Act's enumerated offenses. *See* 18 U.S.C. § 1153(a). The dispute centers on whether the crime occurred in Indian country, in particular on the Creek Reservation. Before we discuss the meaning of Indian country, we provide the following history of the Major Crimes Act because it aids our analysis.

In *Ex parte Crow Dog*, 109 U.S. 556 (1883), the Supreme Court held that federal and territorial courts lacked jurisdiction to try an Indian for the murder of another Indian committed in Indian country. *Id.* at 572. In response, Congress passed the Major Crimes Act in 1885. *See* Act of Mar. 3, 1885, ch. 341, § 9, 23 Stat. 362, 385; *Keeble v. United*

---

[22] Whether the Major Crimes Act applies does not depend on whether the victim is an Indian. *See* 18 U.S.C. § 1153(a) (reaching crimes against an Indian "or other person").

*States*, 412 U.S. 205, 209-10 (1973) (discussing *Ex parte Crow Dog* and legislative response).  As originally enacted, the Major Crimes Act provided:

> [A]ll Indians, committing against the person or property of another Indian or other person any of the following crimes, namely, murder . . . within any Territory of the United States, and either within or without an Indian reservation, shall be subject therefor to the laws of such Territory relating to said crimes . . . ; and all such Indians committing any of the above crimes against the person or property of another Indian or other person within the boundaries of any State of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States.

§ 9, 23 Stat. at 385.  Thus, unlike the current law, which applies in "Indian country," the original Act applied to crimes committed in federal territories and "within the boundaries of any State of the United States, and within the limits of any Indian *reservation*."  *Id.* (emphasis added); *see also United States v. Kagama*, 118 U.S. 375, 377-78, 383-85 (1886) (discussing original Act and upholding its constitutionality).

In cases decided in the late nineteenth and early twentieth centuries, the Supreme Court explained that the Major Crimes Act applied to crimes committed within the boundaries of Indian reservations regardless of the ownership of the particular land on which the crimes were committed.  *See United States v. Celestine*, 215 U.S. 278, 284-87 (1909); *United States v. Thomas*, 151 U.S. 577, 585-86 (1894). The Court explained in *Celestine* that reservation status depends on the boundaries Congress draws, not on who owns the land inside the reservation's boundaries: "[W]hen Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress."  215 U.S. at

285. This understanding of reservations has continued. *See Solem v. Bartlett*, 465 U.S. 463, 470 (1984) ("Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." (citing *Celestine*, 215 U.S. at 285)).

3. **Indian Country**

In 1948, Congress amended the Major Crimes Act and codified the definition of "Indian country." *See* Act of June 25, 1948, ch. 645, 62 Stat. 683, 757; *see also Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 528-30 (1998) (discussing term's case-law origins); Cohen at 189-90 (discussing codification). Within the definition, Congress included the boundaries-based concept of reservations that had developed in the case law under the Major Crimes Act.[23] Under 18 U.S.C. § 1151, "Indian country" means:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,
>
> (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and
>
> (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

---

[23] Before the 1948 codification, Congress in 1932 had also provided that the Major Crimes Act would apply to enumerated crimes committed by Indians "on and within any Indian reservation under the jurisdiction of the United States Government, including rights of way running through the reservation." Act of June 28, 1932, 47 Stat. 336, 337.

18 U.S.C. § 1151 (paragraph breaks added).[24] If an area qualifies under any of these definitions, it is Indian country. *See Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 123 (1993) ("Congress has defined Indian country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States."); *see also Indian Country, U.S.A.*, 829 F.2d at 973 ("A formal designation of Indian lands as a 'reservation' is not required for them to have Indian country status."). *Id.*

At the same time Congress enacted this definition of Indian country, it also amended the Major Crimes Act so that it would apply in Indian country as defined in the statute. *See* 62 Stat. at 758. Thus, the Major Crimes Act now applies in all of Indian country, *see* 18 U.S.C. § 1153(a), not only reservation land.

Within § 1151's definition of Indian country, the § 1151(a) reservation clause concerns us here. Congress provided that "Indian country" includes "*all land within the limits of any Indian reservation* under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." 18 U.S.C. § 1151(a) (emphasis added). Thus, land within the boundaries of an Indian reservation is in "Indian country."

---

[24] "Indian country" carries a different meaning for certain laws relating to intoxicants. *See* 18 U.S.C. §§ 1154, 1156; *see also* 18 U.S.C. § 1151 (defining "Indian country" "[e]xcept as otherwise provided in sections 1154 and 1156 of this title"). These exceptions are not relevant here.

The Supreme Court confirmed this understanding in *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351 (1962). In that case, an Indian sought federal habeas relief after being convicted in Washington state court of burglary, one of the Major Crimes Act's enumerated offenses. *See* 18 U.S.C. § 1153(a); *see also Seymour*, 368 U.S. at 352 n.2. He argued the United States had exclusive jurisdiction because the crime occurred within an Indian reservation and therefore within Indian country. *See* 368 U.S. at 352-54. The State of Washington argued that even though the crime occurred on land within the reservation's borders, the particular parcel was owned by a non-Indian. *See id.* at 357. Ruling for the Indian petitioner, the Supreme Court said Congress's definition of Indian country in § 1151(a) "squarely put to rest" this argument. *Id.* "Since the burglary with which [the defendant] was charged occurred on property plainly located within the limits of [the] reservation, the courts of Washington had no jurisdiction to try him for that offense." *Id.* at 359. Under § 1151(a), therefore, all lands within the boundaries of a reservation have Indian country status.

4. **Reservation Disestablishment and Diminishment**

Only Congress can disestablish or diminish a reservation.[25] In *Lone Wolf v. Hitchcock*, 187 U.S. 553 (1903), the Supreme Court said Congress has the power to

---

[25] The terms "disestablished" and "diminished" "have at times been used interchangeably," but "disestablishment generally refers to the relatively rare elimination of a reservation while diminishment commonly refers to the reduction in size of a reservation." *Yankton Sioux Tribe v. Gaffey*, 188 F.3d 1010, 1017 (8th Cir. 1999). Here, the State argues Congress disestablished the Creek Reservation.

unilaterally abrogate treaties made with Indian tribes. *Id.* at 566. "Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights." *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998). This includes the power to eliminate or reduce a reservation against a tribe's wishes and without its consent. *See Solem*, 465 U.S. at 470 n.11 (explaining the *Lone Wolf* Court "decided that Congress could diminish reservations unilaterally"). Because "only Congress can alter the terms of an Indian treaty by diminishing a reservation," the Supreme Court has said the "touchstone" of whether a reservation's boundaries have been altered is congressional purpose. *Yankton Sioux Tribe*, 522 U.S. at 343; *see also Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 588 n.4 (1977) ("The focus of our inquiry is congressional intent.").

Having recognized Congress's power to disestablish and diminish Indian reservations, the Supreme Court also has developed a framework to determine whether Congress has exercised its power with respect to a given reservation. We next discuss (a) the presumption against disestablishment and diminishment, (b) Congress's pursuit of a policy called allotment and its relationship to reservation borders, and (c) the Supreme Court's three-part *Solem* test for determining whether Congress has altered a reservation's boundaries.

    a. *Presumption against disestablishment and diminishment*

Courts do not lightly infer that Congress has exercised its power to disestablish or diminish a reservation. *See DeCoteau v. Dist. Cty. Court for the Tenth Judicial Dist.*, 420 U.S. 425, 444 (1975) ("[The Supreme] Court does not lightly conclude that

an Indian reservation has been terminated."). Indeed, the Supreme Court has said

courts must approach these issues with a "presumption" that Congress did not intend

to disestablish or diminish a reservation. *Solem*, 465 U.S. at 481; *see also Absentee*

*Shawnee Tribe v. Kansas*, 862 F.2d 1415, 1417 (10th Cir. 1988) ("With regard to acts

of Congress subsequent to the establishment of the reservation, the courts adopt an

interpretational policy against diminishing an Indian reservation.").[26] Congress can

do so, but its intent "must be 'clear and plain.'" *Yankton Sioux Tribe*, 522 U.S. at

343 (quoting *United States v. Dion*, 476 U.S. 734, 738-39 (1986)); *see also Solem*,

465 U.S. at 470 (explaining Congress must "clearly evince an intent to change

boundaries before diminishment will be found" (quotations omitted)); *id.* at 476

(discussing a statute's lack of "explicit expression of congressional intent to

diminish" and finding reservation preserved); *DeCoteau*, 420 U.S. at 444 ("[The

Supreme Court] requires that the congressional determination to terminate . . . be

expressed on the face of the Act or be clear from the surrounding circumstances and

legislative history." (ellipsis in original) (quotations omitted)).

---

[26] The presumption against reservation disestablishment and diminishment accords with the general principle that an intent "to abrogate or modify a treaty is not to be lightly imputed to the Congress." *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 413 (1968) (quotations omitted); *see also South Dakota v. Bourland*, 508 U.S. 679, 687 (1993).

b. *The policy of allotment*

The Supreme Court's test, discussed below, for determining whether Congress intended to disestablish or diminish a reservation developed after Congress pursued a policy known as allotment.

Following decades of setting aside "large sections of the western States and Territories . . . for Indian reservations," Congress in the late nineteenth century adopted "the view that the Indians tribes should abandon their nomadic lives on the communal reservations and settle into an agrarian economy on privately-owned parcels of land." *Solem*, 465 U.S. at 466.[27] This policy involved Congress dividing, or "allotting," communal Indian lands into individualized parcels for private ownership by tribal members. Not incidentally, the policy also "open[ed] up unallotted lands for non-Indian settlement," allowing these "surplus" lands to be sold to non-Indians. *Id.* at 467. Laws designed "to force Indians onto individual allotments carved out of reservations and to open up unallotted lands for non-Indian settlement" are often referred to as "surplus land acts." *Id.*

Allotment on its own does not disestablish or diminish a reservation. *See Mattz v. Arnett*, 412 U.S. 481, 497 (1973) (explaining allotment can be "completely consistent with continued reservation status"). But Congress, in passing surplus land

---

[27] Or, as the Supreme Court described the policy at the time, "Of late years a new policy has found expression in the legislation of Congress,[] a policy which looks to the breaking up of tribal relations, the establishing of the separate Indians in individual homes . . . ." *In re Heff*, 197 U.S. 488, 499 (1905), *overruled in part by United States v. Nice*, 241 U.S. 591, 601 (1916).

- 32 -

acts, has altered the boundaries of some reservations. *See Solem*, 465 U.S. at 469 ("[S]ome surplus land acts diminished reservations, and other surplus land acts did not." (citations omitted)).

Congress pursued the allotment policy on a national scale in the 1887 General Allotment Act. *See* Act of Feb. 8, 1887, ch. 119, 24 Stat. 388.[28] That law, however, did not affect all Indian tribes and reservations. The Creek Nation was not included in the General Allotment Act. *See* § 8, 24 Stat. at 391. By the early twentieth century, "Congress was dealing with the surplus land question on a reservation-by-reservation basis, with each surplus land act employing its own statutory language, the product of a unique set of tribal negotiation and legislative compromise." *Solem*, 465 U.S. at 467.

During the allotment era, Congress "anticipated the imminent demise" of reservations. *Id.* at 468; *see also id.* ("[M]embers of Congress voting on the surplus land acts believed to a man that within a short time—within a generation at most— the Indian tribes would enter traditional American society and the reservation system would cease to exist."); *see also Yankton Sioux Tribe*, 522 U.S. at 343 (explaining Congress "assumed that the reservation system would fade over time").

---

[28] The policy of the General Allotment Act, the Supreme Court has said, "was to continue the reservation system and the trust status of Indian lands, but to allot tracts to individual Indians for agriculture and grazing. When all the lands had been allotted and the trust expired, the reservation could be abolished." *Mattz*, 412 U.S. at 496.

The Supreme Court has said this general hostility to reservations and Indian communal life does not establish that a particular reservation was disestablished:

> Although the Congresses that passed the surplus land acts anticipated the imminent demise of the reservation and, in fact, passed the acts partially to facilitate the process, we have never been willing to extrapolate from this expectation a specific congressional purpose of diminishing reservations with the passage of every surplus land act. Rather, it is settled law that some surplus land acts diminished reservations, and other surplus land acts did not.

*Solem*, 465 U.S. at 468-69 (citations omitted); *see also Pittsburg & Midway Coal Mining Co. v. Yazzie*, 909 F.2d 1387, 1395 (10th Cir. 1990) (explaining congressional belief "that all reservations would be temporary is irrelevant in determining whether the boundaries of a *specific* reservation were being diminished by the language of a given statute").  Whether there was "a specific congressional purpose" to disestablish or diminish a particular reservation "depends on the language of the act and the circumstances underlying its passage."  *Solem*, 465 U.S. at 469.  To distinguish congressional acts that changed a reservation's borders from those "that simply offered non-Indians the opportunity to purchase land within established reservation boundaries," the Supreme Court has developed a three-part framework.  *Id.* at 470.

c.  Solem *factors*

In *Solem v. Bartlett*, a member of the Cheyenne River Sioux Tribe sought habeas relief after a state court in South Dakota convicted him of attempted rape.  *Id.* at 465; *see also id.* at 465 n.2 (explaining offense fell within Major Crimes Act).  The defendant argued the state court lacked jurisdiction because the crime occurred on the

reservation. *Id.* The Supreme Court developed and applied its three-part framework to assess whether the reservation had been diminished. *See id.* at 470-80. It concluded the reservation had not been diminished and granted habeas relief because the federal government had exclusive jurisdiction. *Id.* at 481. *Solem*'s three factors are as follows:

First, *Solem* instructs courts to examine the text of the statute purportedly disestablishing or diminishing the reservation. Statutory language is "[t]he most probative evidence of congressional intent." *Id.* at 470. "Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unallotted opened lands." *Id.* When such language is combined with language committing Congress to compensate the tribe for its land with a fixed sum, Congress's intent to diminish a reservation is especially clear. *Id.* at 470-71. No "particular form of words," however, is necessary to diminish a reservation. *Hagen v. Utah*, 510 U.S. 399, 411 (1994).

Second, *Solem* requires courts to consider "events surrounding the passage" of the statute. 465 U.S. at 471. Even when the statutory language "would otherwise suggest reservation boundaries remained unchanged," the Court has been willing to find that Congress altered the borders if evidence at step two "unequivocally reveal[s] a widely-held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation." *Id.* Step-two contemporary

- 35 -

historical evidence includes "the manner in which the transaction was negotiated with the tribes . . . and the tenor of legislative reports presented to Congress." *Id.*

Third, *Solem* considers, though "[t]o a lesser extent," "events that occurred after the passage" of the relevant statute. *Id.* This evidence can include "Congress's own treatment of the affected areas" as well as "the manner in which the Bureau of Indian Affairs and local judicial authorities dealt with unallotted open lands." *Id.* Later demographic history—evidence of "who actually moved onto opened reservation lands"—also offers a "clue as to what Congress expected would happen once land on a particular reservation was opened to non-Indian settlers." *Id.* at 471-72.

In conducting this three-part inquiry, "[t]here are . . . limits to how far" courts can "go to decipher Congress's intention in any particular surplus land act." *Id.* at 472. "Throughout the inquiry," courts must "resolve any ambiguities in favor of the Indians" and remember that disestablishment and diminishment are not to be lightly found. *Hagen*, 510 U.S. at 411. The "rule by which legal ambiguities are resolved to the benefit of the Indians" is applied to its "broadest possible scope" in disestablishment and diminishment cases. *DeCoteau*, 420 U.S. at 447. Absent "substantial and compelling evidence" courts are "bound by . . . traditional solicitude for the Indian tribes" to conclude "that the old reservation boundaries survived." *Solem*, 465 U.S. at 472.

*   *   *   *

Having addressed AEDPA, the substantive law of Indian country jurisdiction,

and reservation disestablishment and diminishment, we turn now to our analysis.

III.  **DISCUSSION**

Our analysis addresses three issues:

(A) Whether there was clearly established federal law as determined by the

Supreme Court when the OCCA addressed Mr. Murphy's jurisdictional claim.  We

conclude the *Solem* framework constituted clearly established law.

(B) Whether the OCCA rendered a decision contrary to this clearly established law

when it resolved Mr. Murphy's jurisdictional claim.  We conclude that it did because the

OCCA failed to apply the *Solem* framework and took an approach incompatible with it.

(C) Whether the federal government has exclusive jurisdiction over Mr. Murphy's

case.  We conclude that it does because, under the *Solem* framework, Congress has not

disestablished the Creek Reservation.

Because the crime occurred in Indian country, Oklahoma lacked jurisdiction.  We

therefore reverse the district court's denial of habeas relief and remand with instructions

to grant Mr. Murphy's application for a writ of habeas corpus under 28 U.S.C. § 2254.

A. *Clearly Established Federal Law*

Our first inquiry under § 2254(d)(1) is whether clearly established federal law

governed Mr. Murphy's claim.  *See House*, 527 F.3d at 1015.  The OCCA issued its

jurisdictional decision on December 7, 2005.  *See Murphy*, 124 P.3d 1198.  Our survey of

clearly established federal law is therefore limited to decisions of the Supreme Court

- 37 -

before that date.  *See* 28 U.S.C. § 2254(d)(1); *Greene*, 565 U.S. at 38.  We conclude the three-part *Solem* framework supplied the OCCA with clearly established federal law to decide Mr. Murphy's claim.

1.  ***Solem*—Clearly Established Law in 2005**

The Supreme Court decided *Solem* in 1984, more than two decades before the OCCA decided Mr. Murphy's case.  Even in 1984, the *Solem* Court recognized the three-part framework it applied was not a new development in the law.  The *Solem* Court explained its precedent had already "established a fairly clean analytical structure" for deciding whether Congress altered a reservation's borders.  465 U.S. at 470.  The Court's pre-*Solem* decisions relied on the factors discussed in *Solem* to assess reservation disestablishment and diminishment.  *See Rosebud Sioux Tribe*, 430 U.S. at 587 (reservation diminished); *DeCoteau*, 420 U.S. at 427-28 (reservation disestablished); *Mattz*, 412 U.S. at 505 (reservation not disestablished); *Seymour*, 368 U.S. at 359 (reservation not disestablished); *see also Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455, 1476 n.30 (10th Cir. 1987) ("Although the Tribe refers to *Solem* as 'significant new authority,' *Solem* is rather one of a line of cases construing the dimensions of 'Indian country.'" (citation omitted)).

Between 1984 when *Solem* was decided and 2005 when the OCCA issued its decision in Mr. Murphy's case, the Supreme Court did nothing to call *Solem* into doubt.  Rather, it reaffirmed *Solem*'s three-part framework and applied it to other reservations in the 1990s.  *See Yankton Sioux Tribe*, 522 U.S. at 333, 344 (discussing three factors and concluding reservation was diminished); *Hagen*, 510 U.S. at 410-11, 421 (concluding

- 38 -

Congress diminished reservation and explaining *Solem* directs courts "to look to three factors").

In the years before the OCCA's decision, federal appeals courts, including this court, recognized *Solem* provided the governing framework. *See, e.g.*, *Shawnee Tribe v. United States*, 423 F.3d 1204, 1221 (10th Cir. 2005) (discussing *Solem* and explaining that "we look to three factors to determine whether a reservation's boundaries have been altered"); *United States v. Webb*, 219 F.3d 1127, 1131 (9th Cir. 2000) (identifying *Solem* as "well established Supreme Court precedent"); *Yankton Sioux Tribe v. Gaffey*, 188 F.3d 1010, 1022-23 (8th Cir. 1999) (explaining *Solem* provides "the standard rules of interpretation"); *Yazzie*, 909 F.2d at 1395 ("The current analytic structure has been summarized in *Solem*."). So did state high courts. *See, e.g.*, *State v. Greger*, 559 N.W.2d 854, 860-61 (S.D. 1997) (explaining *Hagen* retained *Solem*'s "traditional approach to diminishment questions"); *State v. Davids*, 534 N.W.2d 70, 72 (Wis. 1995) (noting *Solem* Court "identif[ied] the governing principles of diminishment"); *State v. Perank*, 858 P.2d 927, 935-36 (Utah 1992) (reciting *Solem* framework as governing law).

The Supreme Court has recognized that a legal framework for evaluating a given type of claim can constitute clearly established law under § 2254(d)(1). For example, the Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), announced a two-part test for evaluating claims of ineffective assistance of counsel, *see id.* at 687 (discussing performance and prejudice), and the Court has since said this framework constitutes clearly established law, *Williams*, 529 U.S. at 391 (controlling opinion of Stevens, J.) ("It is past question that the rule set forth in

- 39 -

*Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" (quoting 28 U.S.C. § 2254(d)(1))).  Although claims of lawyer ineffectiveness are each unique and require fact-intensive analysis, *Strickland*'s framework still applies, and the variety of fact patterns "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by [the Supreme] Court."  *Id.*

We conclude *Solem*'s three-part framework for evaluating whether Congress has disestablished or diminished an Indian reservation was clearly established when the OCCA rendered its decision.  The State's arguments to the contrary miss the mark.

2. **The State's Arguments**

The State acknowledges the Supreme Court has applied the *Solem* framework to "surplus land acts, which provided for the sale of large areas of land for white settlement," but it argues that, with respect to the Creek Nation, Congress allotted almost all of the Reservation to tribal members.  Aplee. Br. at 46-47.  This point has nothing to do with whether the *Solem* framework applies, though it does suggest Congress did not intend to disestablish the Creek Reservation.  The State offers no explanation for why the proportion of land allotted to tribal members relative to the land opened to non-Indian settlement makes a difference to whether *Solem* applies.  In making its disestablishment case, the State relies on statutes that allotted the Creek Reservation, and we discuss these laws below.  Those statutes, like the statute in *Solem*, "force[d] Indians onto individual allotments carved out of [a] reservation[] and . . . open[ed] up unallotted lands for non-Indian settlement."  *Solem*, 465 U.S. at 467.  Whether Congress disestablished the Creek

Reservation through those statutes is the kind of question the *Solem* framework was built to answer.

The State also argues that Congress, in addition to allotting Creek lands, "took a number of steps toward[] the complete abolition of the Creek Nation as a political entity." Aplee. Br. at 46; *see also id.* at 47. Below, we consider the State's arguments about political dissolution as they relate to reservation disestablishment. But the State offers no explanation or legal authority for why legislation dealing with a tribe's political status would make the *Solem* framework anything less than clear when it comes to reservation disestablishment—the issue before us.

Despite its arguments that there is no clearly established law, the State's brief recognizes *Solem* is controlling. It defends the substantive correctness of the OCCA's decision by reference to *Solem*'s three-part test. Nowhere does the State argue that some other legal framework applies.

\* \* \* \*

Because clearly established Supreme Court law governs Mr. Murphy's Indian country jurisdictional claim, we proceed to the next step of the § 2254(d)(1) inquiry: whether the OCCA rendered a decision that was "contrary to" the *Solem* framework.

B. *The OCCA Decision—Contrary to Clearly Established Federal Law*

Before we address whether the OCCA's decision was "contrary to" *Solem*, we consider—and reject—Mr. Murphy's threshold argument that the OCCA failed to adjudicate his reservation claim on the merits. We then consider whether the OCCA's

merits decision was "contrary to" the clearly established *Solem* framework discussed above. We conclude it was.

## 1. **The OCCA's Merits Decision**

The following is the entirety of the OCCA's discussion of the jurisdictional issue with respect to the Reservation:

> The remaining issue, under proposition one, is whether or not the land in question is part of a Creek Nation reservation that has never been disestablished or is part of a dependent Indian community.[29] Unfortunately, the District Court decided, based upon the Assistant District Attorney's urging, that these questions were beyond the scope of the evidentiary hearing, even though we clearly asked the Court to determine if the tract in question was Indian country under 18 U.S.C. § 1151.
>
> Be that as it may, the error was alleviated when the District Court allowed Petitioner's[30] counsel to make an extended offer of proof regarding the testimony and evidence that would have been presented on these two questions had that opportunity been given. Accordingly, we find the error was harmless. Even if the evidence had been admitted, it is insufficient to convince us that the tract in question qualifies as a reservation or dependent Indian community.
>
> Petitioner's proffered expert, Monta Sharon Blackwell, stated by affidavit that "[t]here was never a formal Creek Nation 'reservation' but for practical purposes" certain treaty language was "tantamount to a reservation under Federal law." Thus, the "Creek Nation, historically and traditionally, is a

---

[29] As already mentioned, Mr. Murphy pursued three theories for Indian country jurisdiction before the OCCA. This part of the OCCA's discussion addressing Mr. Murphy's reservation argument under § 1151(a) followed its rejection of his allotment theory under § 1151(c). We omit the OCCA's discussion of the "dependent Indian community" theory under § 1151(b) because that issue is not before us. And although Mr. Murphy again raises the allotment theory in this appeal, we do not reach that issue because we agree with him that the crime occurred within the Creek Reservation.

[30] The OCCA referred to Mr. Murphy as "Petitioner."

confederacy of autonomous tribal towns, or Talwa, each with its own political organization and leadership."[31]

Ms. Blackwell and Jeff Dell[32] both took the position that the historical boundaries of the Creek Nation remained intact even after the various Creek lands were subjected to the allotment process, but no case is cited for the position that the individual Creek allotments remain part of an overall Creek reservation that still exists today.[18]

> 18 It seems redundant, however, to treat lands as both a reservation and an allotment. Section 1151 clearly makes a distinction between the two.

The best authority on this point is *Indian Country, U.S.A., Inc. v. State of Oklahoma*, 829 F.2d at 975, which treats the Creek Nation lands as a "reservation" as of 1866.[19] However, the Tenth Circuit declined to answer the question of whether the exterior boundaries of the 1866 Creek Nation have been disestablished and expressly refused to express an opinion in that regard concerning allotted Creek lands. *See id.* at 975 n. 3, 980 n. 5.

> 19 The case finds the term "reservation," for purposes of defining Indian country, "simply refers to those lands which

---

[31] As part of his offer of his proof on the reservation issue, Mr. Murphy submitted an affidavit from Ms. Blackwell, an attorney with more than two decades of experience practicing Indian law with the U.S. Department of the Interior. *See* Blackwell Aff. ¶¶ 3-4, State Post-Conviction Record, Vol. 1 at 151. Ms. Blackwell stated the tract of land where the crime occurred "falls within the territorial boundaries of the Muscogee (Creek) Nation." *Id.* ¶ 13. As the OCCA pointed out, she stated "[t]here was never a formal Creek Nation 'reservation'" because the Creek Nation had "acquired the land at issue in this case through treaty with the United States." *Id.* ¶ 14. But there is no dispute that the Creek Nation had a reservation; the State agrees it was intact in 1900, *see* Aplee. Br. at 75 n.25. Rather, the dispute is whether Congress has disestablished the Creek Reservation. In Ms. Blackwell's opinion, "[t]he exterior territorial boundaries of the Creek Nation were not altered" by congressional acts around the turn of the twentieth century. Blackwell Aff. ¶ 21. She concluded "the Muscogee (Creek) Nation has not been disestablished" and that "regardless of title ownership as Indian or non-Indian, the [tract where the crime occurred] is Indian country within the meaning of Federal Law." *Id.* ¶ 22.

[32] Mr. Dell, "an Assistant Realty Officer for the Creek Nation, rendered a title opinion on behalf of the State." 124 P.3d at 1203.

> Congress intended to reserve for a tribe and over which Congress intended primary jurisdiction to rest in the federal and tribal governments." 829 F.2d at 973.
>
> If the federal courts remain undecided on this particular issue, we refuse to step in and make such a finding here.

*Murphy*, 124 P.3d at 1207-08 (paragraph numbers omitted).

Mr. Murphy, focusing mainly on the court's last sentence, argues the OCCA refused to adjudicate his reservation claim on the merits. The State maintains the OCCA decided the reservation issue on the merits because it considered Mr. Murphy's evidence, found it insufficient, and denied relief.

Whether the OCCA adjudicated the jurisdictional claim "on the merits" as that phrase is used in 28 U.S.C. § 2254(d) determines our standard of review. As discussed above, we have chosen to assume (without deciding) that AEDPA applies to jurisdictional claims of the type Mr. Murphy raises. But even when a type of claim can qualify for AEDPA review, federal courts do not apply AEDPA deference when the state court did not adjudicate the specific claim "on the merits." *See Cone v. Bell*, 556 U.S. 449, 472 (2009); *Stouffer v. Duckworth*, 825 F.3d 1167, 1179 (10th Cir. 2016) ("[I]f the state court did not decide the claim on the merits, the stringent principles of deference under 28 U.S.C. § 2254 are inapplicable." (quotations omitted)), *cert. denied*, 137 S. Ct. 1226 (2017). If the state court did not adjudicate the claim "on the merits," there is no decision to which the federal court can defer. *See Stouffer v. Trammell*, 738 F.3d 1205, 1213 (10th Cir. 2013) (explaining that, when AEDPA does not apply, "[w]e consider legal questions de novo and factual findings, if any, for clear error").

The Supreme Court has explained that a state court's decision is "on the merits" even when it denies the prisoner's claim "without an accompanying statement of reasons." *Richter*, 562 U.S. at 92. Indeed, "it may be *presumed* that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99 (emphasis added); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1091, 1094-96 (2013). Thus, outside of the "unusual circumstances" when the presumption of a merits adjudication is rebutted, *Johnson*, 133 S. Ct. at 1096, federal habeas relief is available to state prisoners only under the limited circumstances stated in § 2254(d).

Although the OCCA's opinion gives both sides something to draw on, we agree with the State that the court rendered a merits decision.[33] The OCCA remarked in conclusion that it "refuse[d] to step in," 124 P.3d at 1208, but Mr. Murphy's argument ignores the rest of the OCCA's discussion in which the court discussed his offer of proof on the reservation issue and said his argument was unpersuasive. We do not read the OCCA's final sentence as a refusal to decide the reservation question at all but rather as a refusal to decide it in Mr. Murphy's favor. Even if Mr. Murphy's reading is plausible, ambiguity is insufficient to overcome the presumption that the OCCA's adjudication was on the merits. *See Richter*, 562 U.S. at 92 (discussing presumption of merits adjudication). Thus, because the OCCA's adjudication of the reservation issue was on the merits, AEDPA applies and Mr. Murphy cannot receive habeas relief without

---

[33] Because we agree with the State, we need not address its alternative contention that Mr. Murphy waived his merits-determination argument.

- 45 -

showing the OCCA's decision meets the standard set out in § 2254(d).  *See Lay v. Royal*, 860 F.3d 1307, 1317 (10th Cir. 2017) ("Because the OCCA addressed the merits . . . we may only grant habeas relief if we find that the OCCA's decision was contrary to . . . settled federal law . . . ." (citation omitted)).  We turn to that question next.

### 2.  **The OCCA's Decision Was Contrary to *Solem***

Mr. Murphy argues that, if the OCCA decided the reservation jurisdiction issue, its decision was "contrary to" clearly established Supreme Court authority.  We agree.

#### a.  *No citation to* Solem

Nowhere in its discussion of the reservation issue—nor anywhere else in its opinion—did the OCCA cite *Solem*, *Hagen*, *Yankton Sioux Tribe*, or any of the Supreme Court's other Indian reservation disestablishment precedent.[34]  This failure to cite governing law, however, does not on its own mark the OCCA decision as "contrary to" that law.  *See Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (per curiam) ("A state court's decision is not contrary to clearly established Federal law simply because the court did not cite [the Supreme Court's] opinions." (alterations and quotations omitted)).  State courts can apply clearly established federal law without citing to it.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  Indeed, AEDPA "does not even require [state court] *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Id.*

---

[34] The OCCA included *Rosebud Sioux Tribe*, 430 U.S. 584, in one footnoted string citation, but it was in the context of the allotment issue, not the reservation question.  *See* 124 P.3d at 1205 n.14.

- 46 -

Here, the OCCA did not merely fail to cite controlling Supreme Court authority, it failed to apply it, and in deviating from *Solem*, the OCCA's reasoning contradicted clearly established law.

b. *Failure to apply* Solem

Setting aside the absence of citations, the substance of the OCCA's analysis lacks even cursory engagement with any of the three *Solem* factors. The OCCA did not evaluate any statute to see if Congress had disestablished the Creek Reservation. It also did not evaluate the historical context of any laws. Nor did the OCCA evaluate later treatment of the area in question or demographic history. The OCCA's decision failed to apply the required legal standard to the facts.

What the OCCA did say in its analysis contradicted *Solem*. Instead of heeding *Solem*'s "presumption" that an Indian reservation continues to exist until Congress acts to disestablish or diminish it, *see* 465 U.S. at 481, the OCCA flipped the presumption by requiring evidence that the Creek Reservation had *not* been disestablished—that it "still exists today," 124 P.3d at 1207. In other words, the OCCA improperly required Mr. Murphy to show the Creek Reservation had *not* been disestablished instead of requiring the State to show that it had been. This "contradicts" governing law. *Williams*, 529 U.S. at 405 (controlling opinion of O'Connor, J.); *see id.* ("A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases."); *see also Lafler v. Cooper*, 566 U.S. 156, 173 (2012) ("[T]he [State] Court of Appeals identified respondent's ineffective-assistance-of-counsel claim but failed to apply *Strickland* to assess it. . . . By

- 47 -

failing to apply *Strickland* to assess the ineffective-assistance-of-counsel claim respondent raised, the state court's adjudication was contrary to clearly established federal law."). The OCCA applied the wrong law.

Instead of applying the *Solem* factors, the OCCA looked for federal court decisions holding that the Reservation continues to exist. This yielded the OCCA's single citation to legal authority—our decision in *Indian Country, U.S.A.*, which was not a disestablishment case. *See* 829 F.2d at 975 ("In the present case, we need not decide whether the exterior boundaries of the 1866 Creek Nation have been disestablished."). The OCCA called *Indian Country, U.S.A.*, the "best authority" for the position that there is still a Creek Reservation. 124 P.3d at 1207. Indeed, we held there *is* still a Creek Reservation, but we had no occasion to determine whether the Reservation's 1866 boundaries remained intact. *See* 829 F.2d at 975 n.3, 976 (holding lands at issue "still retain their reservation status within the meaning of 18 U.S.C. § 1151(a)"); *id.* at 980 n.5 (setting aside boundary question).

The Supreme Court has occasionally faulted federal habeas courts for concluding state courts issued decisions that were "contrary to" federal law when the federal court failed to give the "benefit of the doubt" to the state court. *See, e.g.*, *Holland v. Jackson*, 542 U.S. 649, 655 (2004) (per curiam); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). In those cases, state courts properly articulated the governing legal test in one part of their opinions but went on to misstate the standard or give the impression that what was actually applied deviated from binding federal law. *See Holland*, 542 U.S. at 654; *Woodford*, 537 U.S. at 22-24.

This is not one of those cases. The OCCA failed to articulate or apply the proper

legal framework anywhere in its opinion, and its analysis is incompatible with the

*Solem* framework. At oral argument, we questioned the State about whether the OCCA

had applied *Solem*:

> THE COURT: Is there anything to indicate [the OCCA] applied [*Solem*]?
> Anything? Did they mention steps one, two, and three?
>
> THE STATE: They did not, Your Honor.
>
> THE COURT: Did [the OCCA] say anything that would fit in steps one,
> two, and three?
>
> THE STATE: They—No.

Oral Arg. at 46:00-46:13. The State argues the OCCA's decision was not contrary to

*Solem*. But the OCCA applied the wrong law in adjudicating Mr. Murphy's reservation

claim. Its adjudication was "contrary to" clearly established law.

  c. *The State's arguments*

The State, repeating the OCCA's mistake in reversing the presumption against

disestablishment, argues Mr. Murphy "failed to present evidence that Congress did *not*

intend disestablishment." Aplee. Br. at 48 (emphasis added). But under *Solem*, that is

not the test. *Solem* and every case applying it presume that a reservation continues to

exist unless Congress has legislated otherwise. As demonstrated above, the OCCA not

only ignored but also reversed this presumption. So does the State. We will not make

the same mistake here.

The State further argues that Mr. Murphy "bears the burden of establishing federal

jurisdiction, and the burden under AEDPA." *Id.* Of course, the burden of showing

- 49 -

federal jurisdiction—our jurisdiction in this proceeding—is on Mr. Murphy. He has carried that burden. Our jurisdiction is proper under 28 U.S.C. § 2253(a), (c)(1)(A), because he secured COAs for the issues on appeal. And his burden under AEDPA is to show that the OCCA rendered a decision that was "contrary to" clearly established federal law. He has.

The State also argues that our deference to the OCCA should be "at its apex" when the clearly established law states a general standard. Aplee. Br. at 52. Although the State is correct that "the more general the rule at issue . . . the more leeway state courts have in reaching outcomes in case-by-case determinations," *Renico v. Lett*, 559 U.S. 766, 776 (2010) (brackets and quotations omitted), and although we further agree *Solem* supplies a general standard meant for application to various disestablishment and diminishment cases, these principles do not entitle the OCCA's decision to deference. The State's argument concerns § 2254(d)(1)'s "unreasonable application" clause, but that clause does not come into play here because, to benefit from the wide berth federal courts give state courts in applying general standards, the state court must actually apply the standard. *See Eizember v. Trammell*, 803 F.3d 1129, 1140 (10th Cir. 2015) ("The Supreme Court has long recognized that a state court's identification of the correct governing legal standard and the reasonableness of its application of that standard to the facts are two distinct statutory inquiries."). The OCCA did not unreasonably apply *Solem*; it didn't apply it at all.

The State reminds us that our review under AEDPA is limited to the record before the OCCA. But we have no need to expand the record. The State acknowledges that the

- 50 -

state-court evidentiary hearing determined Mr. Murphy's status as an Indian as well as the precise location of the crime. The OCCA relied on these facts, and we do not question them. Our analysis requires us only to compare the OCCA's adjudication of Mr. Murphy's claim with the Supreme Court's clearly established law. That comparison reveals the OCCA's decision is contrary to *Solem*.

Mr. Murphy put the issue of whether the Creek Reservation had been disestablished squarely before the OCCA, but the court decided the claim by ignoring and contradicting *Solem*. Its decision was thus "contrary to . . . clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). Consequently, we must review his jurisdictional claim without AEDPA deference. *See Milton*, 744 F.3d at 670-71 (explaining that "satisfaction of the § 2254(d)(1) standard" does not entitle the prisoner to habeas relief but it does "effectively remove[] AEDPA's prohibition on the issuance of a writ"). We now apply the *Solem* framework to analyze Mr. Murphy's jurisdictional claim.

## C. *Exclusive Federal Jurisdiction*

Mr. Murphy has overcome AEDPA's barrier to habeas relief, and we must now decide his jurisdictional claim de novo.[35] In this section, we begin by (1) addressing additional legal authority. Although our evaluation of the OCCA's decision under

---

[35] "[T]he Supreme Court has applied, without comment, a de novo standard of review in determining congressional intent regarding reservation boundary diminishment." *Wyoming v. EPA*, 849 F.3d 861, 869 (10th Cir. 2017) (brackets and quotations omitted).

AEDPA was limited to clearly established Supreme Court law decided before December 2005, our de novo analysis of Mr. Murphy's claim must account for Supreme Court and Tenth Circuit authority post-dating the OCCA's decision. *See Lafler*, 566 U.S. at 173 (explaining that, when "AEDPA does not present a bar to granting" relief because the state court "failed to apply" the correct legal test, the federal habeas court "can determine the principles necessary to grant relief"); *Williams*, 529 U.S. at 406 (explaining that when a state-court decision falls within the "contrary to" clause, "a federal court will be unconstrained by § 2254(d)(1)"); *see also Brown v. Uphoff*, 381 F.3d 1219, 1225 (10th Cir. 2004).[36] After addressing this recent legal authority, we (2) recap relevant history of

---

[36] Independent of AEDPA, the Supreme Court's *Teague* doctrine, *Teague v. Lane*, 489 U.S. 288 (1989), imposes another limitation on habeas relief in certain circumstances. *See Brown*, 381 F.3d at 1225-26; *see also Horn*, 536 U.S. at 272 ("[T]he AEDPA and *Teague* inquiries are distinct."). *Teague* does not pose a barrier to Mr. Murphy.

For one thing, the State does not argue that *Teague* should preclude relief. In such circumstances, "a federal court may . . . decline to apply *Teague*." *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994). Even if we were to raise *Teague* on the State's behalf, it would not affect our analysis.

*Teague* provides that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." 489 U.S. at 310 (plurality opinion); *see also Danforth v. Minnesota*, 552 U.S. 264, 266 n.1 (2008) (explaining that "[a]lthough *Teague* was a plurality opinion . . . the *Teague* rule was affirmed and applied by a majority of the Court shortly thereafter"). "Finality occurs when direct state appeals have been exhausted and a petition for writ of certiorari from [the Supreme] Court has become time barred or has been disposed of." *Greene*, 565 U.S. at 39.

*Teague* has two exceptions. "First, the bar does not apply to rules forbidding punishment of certain primary conduct or to rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." *Beard v. Banks*, 542 U.S. 406, 416 (2004) (brackets and quotations omitted). "The second exception is for watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Id.* at 417 (quotations omitted).

Continued . . .

the Creek Nation, which provides important context for the critical period in this case—

the years around the turn of the twentieth century. Finally, we (3) apply *Solem*'s three-

part framework and conclude that Congress has not diminished or disestablished the

Creek Reservation.

1. **Additional Legal Background**

We review the Supreme Court's and our court's most recent applications of *Solem*.

a. *Supreme Court authority*

In *Nebraska v. Parker*, the Supreme Court unanimously recommitted to the "well

settled" *Solem* framework. 136 S. Ct. 1072, 1078 (2016). The Court held Congress did

not diminish the Omaha Indian Reservation in Nebraska and that the land at issue

---

Mr. Murphy's conviction became "final" on April 21, 2003—the date the
Supreme Court denied his petition for certiorari following his direct appeal to the
OCCA. *See* 538 U.S. 985. (This is before the OCCA adjudicated his jurisdictional
claim on post-conviction review in 2005.) Mr. Murphy has no need for *Teague*'s
exceptions because he does not seek the benefit of a rule that falls within *Teague*'s
retroactivity bar. The post-2003 cases we discuss in our de novo analysis are
applications of the *Solem* framework. We need not decide whether these cases
qualify as "constitutional" and "procedural" under *Teague* because, even if they do,
they are not "new." A case does not announce a new rule under *Teague* "when it is
merely an application of the principle that governed a prior decision to a different set
of facts." *Chaidez v. United States*, 133 S. Ct. 1103, 1107 (2013) (brackets and
quotations omitted). "[A] rule of general application," that is, "a rule designed for
the specific purpose of evaluating a myriad of factual contexts," will only
"infrequent[ly] . . . yield[] a result so novel that it forges a new rule, one not dictated
by precedent." *Id.* (quotations omitted). When a court "appl[ies] a general standard
to the kind of factual circumstances it was meant to address, [the resulting decision]
will rarely state a new rule for *Teague* purposes." *Id.*; *see also id.* at 1107-08
(explaining "garden-variety applications" of the *Strickland* framework "do not
produce new rules"). The post-finality cases we discuss apply the *Solem* framework
to factual scenarios for which the test was developed; none of the cases created a new
rule. Moreover, even if *Teague* required us to limit our analysis to pre-finality law,
we would still reach the same result.

remained part of the Reservation. *Id.* at 1082. The Court reiterated that only Congress

can divest land of its reservation status "and its intent to do so must be clear." *Id.* at

1078-79. *Parker* shed light on how the *Solem* factors interact and further underscored the

importance of discerning congressional intent from statutory text, which is "the first and

most important step" of the *Solem* framework. *Id.* at 1080.

Before examining the 1882 statute at issue, the Court reviewed its precedent and

identified "[c]ommon textual indications" of a congressional intent to alter reservation

boundaries. *Id.* at 1079. "[H]allmarks of diminishment" include:

- explicit references to cession or surrender of tribal interests,

- unconditional congressional commitments to compensate the tribe with a fixed sum for the total surrender of tribal claims to opened lands, and

- provisions restoring reservation lands to "the public domain."

*Id.* The statute in *Parker* featured none of these hallmarks. *Id.* Rather, it provided for a

government survey and appraisal of certain lands and for sales to non-Indians. *Id.* The

Court contrasted the statute with earlier nineteenth century treaties between the Omaha

Tribe and United States that had addressed other lands and had "terminated the Tribe's

jurisdiction over their land in unequivocal terms." *Id.* at 1080 (quotations omitted). The

Court concluded the 1882 statute did not diminish the Reservation's boundaries. *Id.*

Turning to the second *Solem* step, the *Parker* Court determined the "mixed

historical evidence" around the law's passage could not "overcome the lack of clear

textual signal that Congress intended to diminish the reservation." *Id.* To find

diminishment, step-two evidence must "'*unequivocally* reveal[] a widely held,

- 54 -

contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation.'" *Id.* (emphasis added by *Parker* Court) (quoting *Solem*, 465 U.S. at 471). Floor statements by members of Congress cutting both ways, the Court ruled, "are far from the clear and plain evidence of diminishment required." *Id.* (quotations omitted).

The Court then considered step three—the later treatment of the area and its demographic history. *Id.* at 1081. Step-three evidence, the Court explained, "might reinforce a finding as to diminishment or nondiminishment based on the text" of the statute, but "never" has the Court "relied solely on this third consideration to find diminishment." *Id.* (alteration and quotations omitted).

The step-three evidence in *Parker* strongly favoring diminishment helps illustrate the significance *Solem* places in step-one statutory text. In *Parker*, "the Tribe was almost entirely absent from the disputed territory for more than 120 years." *Id.* It did not enforce any regulations in the area, nor did it "maintain an office, provide social services, or host tribal celebrations or ceremonies." *Id.* For more than a hundred years, the federal government treated the lands as belonging to Nebraska. *Id.* at 1082. Of the people living in the town on the disputed site, most were not associated with the Tribe, and, since the early twentieth century, less than two percent of the Tribe's members lived in the disputed area. *Id.* at 1078.

This history was nonetheless insufficient, the Supreme Court said, to "overcome the statutory text, which is devoid of any language indicative of Congress' intent to diminish." *Id.* at 1082 (quotations omitted). Despite the "compelling" justifiable

- 55 -

expectations of non-Indian settlers stemming "from the Tribe's failure to assert jurisdiction" over a long period of time, the Court held such non-Indian expectations "cannot diminish reservation boundaries." *Id.* "Only Congress has the power to diminish a reservation." *Id.* And as *Parker* makes clear, the Supreme Court looks first and foremost to statutory text when attempting to discern Congress's intent.

b. *Tenth Circuit authority*

This court has addressed Indian reservation disestablishment and diminishment issues on numerous occasions. *See, e.g.*, *Osage Nation v. Irby*, 597 F.3d 1117 (10th Cir. 2010); *Shawnee Tribe*, 423 F.3d 1204; *Yazzie*, 909 F.2d 1387; *Ute Indian Tribe v. Utah*, 773 F.2d 1087 (10th Cir. 1985) (en banc), *overruled by Hagen*, 510 U.S. 399.

Most recently, in *Wyoming v. EPA*, 849 F.3d 861 (10th Cir. 2017), we applied *Solem*'s "well-settled approach" and concluded that Congress diminished the Wind River Reservation when it enacted a 1905 agreement the federal government negotiated with the Eastern Shoshone and Northern Arapaho Tribes. *Id.* at 865, 869.

Applying the "hierarchical, three-step framework" of *Solem*, we began with the statutory text. *Id.* at 869-74. We held the following language evinced Congress's intent to diminish the Reservation:

> The said Indians belonging on the Shoshone or Wind River Reservation, Wyoming, for the consideration hereinafter named, do hereby cede, grant, and relinquish to the United States, all right, title, and interest which they may have to all the lands embraced within said reservation, except the lands within and bounded by the following lines . . . .

*Id.* at 870 (emphasis omitted) (quoting Act of March 3, 1905, ch. 1452, 33 Stat. 1016, 1016). We called this "express language of cession" notwithstanding the absence of the

- 56 -

words "sell" or "convey." *Id.* at 871.[37] "There are no magic words of cession required to find diminishment. Rather, the statutory language, whatever it may be, must establish an express congressional purpose to diminish." *Id.* at 869-70 (brackets and quotations omitted).

Turning to step two—the historical context surrounding the passage of the Act— we found it "further confirm[ed] Congress intended to diminish the Wind River Reservation." *Id.* at 874 (majority opinion). A history of failed congressional attempts to sever the area north of the Big Wind River from the Reservation informed our evaluation of the eventually enacted law that accomplished that diminishment. *Id.* at 874-79.

Our analysis at step three—concerning the later treatment and demographics of the area—was "brief and ultimately d[id] not impact our conclusion." *Id.* at 879. "Unsurprisingly," from the "volumes of material" unearthed by the parties, "each side . . . managed to uncover treatment by a host of actors supporting its respective position," but because we could not "discern clear congressional intent" from the conflicting evidence, we found the later history held little value. *Id.*; *see also id.* at 887-88 (Lucero, J., dissenting) (agreeing with majority that step three "comes into play only at the margins" and that the post-act history was too "muddled" to provide clear evidence of congressional intent).

\* \* \* \*

---

[37] The Act elsewhere used the word "conveyed." *See id.* at 872.

This more recent case law, though unavailable to the OCCA in 2005, informs our de novo review of Mr. Murphy's claim. Indeed, we are bound by this precedent. Before turning to apply the *Solem* framework, we discuss relevant aspects of the Creek Nation's history, which provides important context for our *Solem* analysis.

## 2. Additional Factual Background—Creek Nation History

The following overview of the Tribe's history provides important context for the parties' arguments and our application of *Solem*.

a. *Original homeland and forced relocation*

The Creek Nation once exercised domain over much of present day Alabama and Georgia. *See Indian Country, U.S.A.*, 829 F.2d at 971. "In the 1820's, the federal government adopted a policy to forcibly remove the Five Civilized Tribes[38] from the southeastern United States and relocate them west of the Mississippi River, in what is today Oklahoma." *Id.*; *see also Woodward v. De Graffenried*, 238 U.S. 284, 293 (1915) ("The history of the removal of the Muskogee or Creek Nation from their original homes to lands purchased and set apart for them by the government of the United States in the territory west of the Mississippi river does not differ greatly from that of the others of the Five Civilized Tribes . . . ."). *See generally* Cohen at 49-50 (discussing Creek Nation's forced removal).

The federal government and the Creek Nation entered into several treaties related to this forced relocation. In 1826, the Creek Nation "cede[d] to the United States" certain lands in Georgia. Treaty with the Creeks, art. 2, Jan. 24, 1826, 7 Stat. 286, 286, *available at* 1826 WL 2688. In an 1832 treaty, "the Creeks ceded their eastern homelands to the United States, in exchange for lands west of the Mississippi River" in present-day Oklahoma. *Indian Country, U.S.A.*, 829 F.2d at 971 (discussing Treaty with the Creeks, Mar. 24, 1832, 7 Stat. 366, *available at* 1832 WL 3599). "In a subsequent [1833] treaty regarding these lands, the United States agreed to grant 'a patent, in fee simple, to the

---

[38] "The Cherokees, Chickasaws, Choctaws, Creeks, and Seminoles historically have been referred to as the 'Five Civilized Tribes.'" *Indian Country, U.S.A.*, 829 F.2d at 970 n.2.

Creek nation.'" *Id.*; *see* Treaty with the Creeks, art. 3, Feb. 14, 1833, 7 Stat. 417, 419, *available at* 1833 WL 4533. Thus, "[t]he Creek Tribe had a fee-simple title, not the usual Indian right of occupancy with the fee in the United States." *United States v. Creek Nation*, 295 U.S. 103, 109 (1935); *see also Woodward*, 238 U.S. at 293 ("Pursuant to treaty provisions, the Creeks held their lands under letters patent issued by the President of the United States, dated August 11, 1852, vesting title in them as a tribe, to continue so long as they should exist as a nation and continue to occupy the country thereby assigned to them." (citations omitted)). In sum, by the mid-nineteenth century, treaties with the federal government had given the Creek Nation a vast tract of land in modern Oklahoma.

b. *Nineteenth century diminishment*

After the Creek Nation's relocation west, its land was diminished on multiple occasions in the mid-nineteenth century. "In 1856, the Creeks agreed to cede to the Seminole Tribe a portion of their lands." *Indian Country, U.S.A.*, 829 F.2d at 971. In the 1856 treaty, the federal government reaffirmed the Creek Nation's title and tenure to its remaining Reservation. It guaranteed "that 'no State or Territory shall ever pass laws for the government of the Creek or Seminole tribes of Indians,' and the United States pledged that 'no portion of either of the tracts of country defined in [the treaty] shall ever be embraced or included within, or annexed to, any Territory or State.'" *Id.* (quoting Treaty with the Creek and Seminole Tribes, art. 4, Aug. 7, 1856, 11 Stat. 699, 700, *available at* 1856 WL 11367).

Following the Civil War, an 1866 treaty required "the Tribe . . . to cede the western portion of its domain." *Id.* "The Creek Nation retained title to its 'reduced . . .

reservation,'" which the United States promised would be "'forever set apart as a home for said Creek Nation.'" *Id.* (alteration in original) (quoting Treaty with the Creeks, arts. 3, 9, June 14, 1866, 14 Stat. 785, 786, 788, *available at* 1866 WL 18777).[39] The Creek Nation also agreed to new governance arrangements in the 1866 treaty by permitting "such legislation as Congress and the President of the United States may deem necessary for the better administration of justice and the protection of the rights of person and property within the Indian [T]erritory,"[40] including the establishment of courts in the Indian Territory "with such jurisdiction and organized in such manner as Congress may by law provide." 1866 Treaty, art. 10, 14 Stat. at 789. The Treaty also guaranteed Congress would not "interfere with or annul . . . present tribal organization, rights, laws, privileges, [or] customs." *Id.*

c. *1867 Constitution and government*

"In 1867, the Creeks established a written constitutional form of government which included a separation of powers into executive, legislative and judicial branches." *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1441 (D.C. Cir. 1988).

---

[39] As discussed below, the Creek Nation contends the 1866 borders remain the Reservation's boundaries today.

[40] "Although most of what is today Oklahoma was once the 'Indian Territory,' after the creation of Oklahoma Territory in 1890, the phrase referred to the eastern portion of present-day Oklahoma encompassing the lands of the Five Civilized Tribes, plus lands of other tribes situated in the extreme northeastern corner of the state." *Indian Country, U.S.A.*, 829 F.2d at 969 n.2. "No territorial government was ever created in the reduced Indian Territory, and it remained subject directly to tribal and federal governance." *Id.* at 974.

d. *Early congressional regulation of modern-day Oklahoma*

"In 1889, Congress created a special federal court of limited jurisdiction in the Indian Territory, which at that time encompassed most of present-day Oklahoma." *Indian Country, U.S.A.*, 829 F.2d at 977.

In 1890, "Congress carved the Territory of Oklahoma out of the western half of the Indian Territory." *Id.* "The lands in the east held by the Five Civilized Tribes remained Indian Territory, subject only to federal and tribal authority." *Id.* Also in 1890, "Congress expanded the civil and criminal jurisdiction of the special United States court in the diminished Indian Territory." *Id.* Congress provided that certain laws from neighboring Arkansas would apply in Indian Territory, provided they were "not locally inapplicable or in conflict . . . with any law of Congress." *Id.* (quotations omitted). "The tribes, however, retained exclusive jurisdiction over all civil and criminal disputes involving only tribal members, and the incorporated laws of Arkansas did not apply to such cases." *Id.*

e. *The push for allotment*

"During the 1880s and 1890s, the white population within the Indian Territory grew dramatically." *Id.* at 977. "[T]he white newcomers were frustrated by the communal tenure of the Indian lands, and pressured Congress to break up the tribal land base, attach freely alienable individual title to the land, and eventually create a new state." *Id.*

As already mentioned, the objectives, among others, of this allotment policy "were to end tribal land ownership and to substitute private ownership, on the view that private

- 62 -

ownership by individual Indians would better advance their assimilation as self-supporting members of our society and relieve the Federal Government of the need to continue supervision of Indian affairs." *N. Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 650 & n.1 (1976) (discussing General Allotment Act). The General Allotment Act did not apply to the Five Civilized Tribes, *see Indian Country, U.S.A.*, 829 F.2d at 977, but by separate means Congress encouraged the Five Civilized Tribes to allot their lands.

"In 1893, reflecting federal policies to forcibly assimilate Indians into the non-Indian culture and to eventually create a new state in the Indian Territory, Congress created the Dawes Commission to negotiate with the Five Civilized Tribes . . . ." *Id.* "The Five Civilized Tribes, however, refused to negotiate with the Dawes Commission, and Congress—still unsure of the scope of its authority to forcibly dispose of tribal lands[41]—began to force the issue by placing restrictions on the Indian governments . . . ." *Id.*

In 1897, Congress imposed several measures to force the Creek Nation's agreement to the allotment policy. Congress (1) "provid[ed] that the body of federal law in Indian Territory, which included the incorporated Arkansas laws, was to apply irrespective of race"; (2) broadened federal court jurisdiction, thereby divesting Creek tribal courts of exclusive jurisdiction over cases involving only Creeks; and (3) subjected Creek legislation to presidential veto. *Id.* at 978 (quotations omitted).

---

[41] In 1903, the Supreme Court decided Congress can unilaterally abrogate treaties with Indian nations. *See Lone Wolf*, 187 U.S. at 566-68; *see also Parker*, 136 S. Ct. at 1081 n.1; *Woodward*, 238 U.S. at 294, 304-05; Cohen at 198 & n.121.

An 1898 law, the Curtis Act, continued the campaign for allotment by "abolish[ing] the existing Creek court system and render[ing] then-existing tribal laws unenforceable in the federal courts." *Id.* It also "provided for forced allotment and termination of tribal land ownership without tribal consent unless the tribe agreed to allotment." *Muscogee (Creek) Nation*, 851 F.2d at 1441.

f. *Allotment and aftermath*

"In 1901, the Creek Nation finally agreed to the allotment of tribal lands." *Indian Country, U.S.A.*, 829 F.2d at 978. The 1901 Original Allotment Agreement ("Original Agreement" or "Agreement") provided: "All lands of said tribe, except as herein provided, shall be allotted among the citizens of the tribe . . . so as to give each an equal share of the whole in value . . . ." Original Agreement, ch. 676, ¶ 3, 31 Stat. 861, 862 (Mar. 1, 1901). "Although the vast majority of Creek Nation lands were allotted or sold, some lands remained in tribal ownership under the original treaty-based fee patents." *Indian Country, U.S.A.*, 829 F.2d at 978. The Agreement exempted certain lands from allotment, such as railroad sites and lands for Creek schools and courthouses. ¶ 24, 31 Stat. at 868. It also allowed some non-Indians to purchase lands within town sites. *See* ¶¶ 10-11, 31 Stat. at 865-66. In 1902, a Supplemental Allotment Agreement ("Supplemental Agreement") made certain amendments. *See generally* Supplemental Agreement, ch. 1323, 32 Stat. 500 (June 30, 1902).[42]

---

[42] We discuss these statutes in greater detail below as part of our step-one *Solem* analysis.

The Original Agreement, in addition to providing for allotment, addressed governance. It made clear the Creek courts, already abolished in 1898, were not being re-established. ¶ 47, 31 Stat. at 873. The Agreement continued presidential review of Creek laws "affecting the lands of the tribe, of individuals after allotment." ¶ 42, 31 Stat. at 872. Further, it anticipated the total elimination of the Creek government: "The tribal government of the Creek Nation shall not continue longer than March fourth, nineteen hundred and six, subject to such further legislation as Congress may deem proper." ¶ 46, 31 Stat. at 872.

As the termination date approached, however, "much remained to be done." *Harjo v. Kleppe*, 420 F. Supp. 1110, 1126 (D.D.C. 1976), *aff'd sub nom. Harjo v. Andrus*, 581 F.2d 949 (D.C. Cir. 1978). "[I]t was apparent that the affairs of the tribes could not be wound up by the date set," and "Congress in early 1906 debated and enacted the 'Five Tribes Act.'" *Id.* (citing ch. 1876, 34 Stat. 137 (Apr. 26, 1906)).

In the Five Tribes Act, "Congress expressly delayed any plans to terminate the tribes, and provided that the tribal governments 'are hereby continued in full force and effect.'" *Indian Country, U.S.A.*, 829 F.2d at 978 (quoting § 28, 34 Stat. at 148). Congress never dissolved the Creek government; it has enjoyed continuous and uninterrupted existence. Even while Congress contemplated the future dissolution of the tribal government, the Creek Nation continued to exercise taxing authority within its boundaries as confirmed by a decision of the Eighth Circuit, our predecessor court, which then had jurisdiction over the Indian Territory. *See Buster v. Wright*, 135 F. 947, 951-52 (8th Cir. 1905) (concluding the Creek Nation retained power "to fix the terms upon

- 65 -

which noncitizens might conduct business within its territorial boundaries" and had not "los[t] the power to govern the people within its borders"), *appeal dismissed*, 203 U.S. 599 (1906).

g.  *Creation of Oklahoma*

Months after preserving and extending the Creek tribal government in 1906, Congress passed the Oklahoma Enabling Act, ch. 3335, 34 Stat. 267 (June 16, 1906).  It allowed the Territory of Oklahoma, together with the Indian Territory, to apply for statehood.  This law and its 1907 amendment "provided that federal Article III courts would succeed the special United States court in the Indian territory with respect to all cases arising under the Constitution, laws, or treaties of the United States." *Indian Country, U.S.A.*, 829 F.2d at 978.  In addition, new state courts "were to succeed the Indian territory courts with respect to the remaining nonfederal cases." *Id.*  "The enabling act also provided that 'the laws in force in the Territory of Oklahoma, as far as applicable, shall extend over and apply to said State.'" *Id.* (emphasis omitted) (quoting § 13, 34 Stat. at 275).  "Finally, the enabling act preserved the authority of the federal government over Indians and their lands, and required the State to disclaim all right and title to such lands." *Id.* (quotations omitted).  Oklahoma entered the Union in 1907. *See* Proclamation, 35 Stat. 2160-61 (Nov. 16, 1907).

h.  *Away from allotment*

The 1930s saw another shift in federal policy as "Congress repudiated the practice of allotment" and passed the Indian Reorganization Act ("IRA"). *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 650 n.1 (2001). *See generally* Cohen at 79-84.  The IRA,

- 66 -

enacted in 1934, revitalized tribal "self-government pursuant to constitutions" and allowed "tribes to organize for economic purposes pursuant to corporate charters." *Muscogee (Creek) Nation*, 851 F.2d at 1442. The Creek Nation was excluded from the IRA, but, two years later in 1936, Congress passed the Oklahoma Indian Welfare Act ("OIWA"), which covered the Creek Nation and, "like the IRA, provided for constitutional governments and corporate charters." *Id.*; *see* OIWA, ch. 831, 49 Stat. 1967 (June 26, 1936).

In a 1943 case concerning Oklahoma real estate taxes, the Supreme Court acknowledged the Creek Nation's continuing vitality: "Thus far Congress has not terminated [its guardianship] relation with respect to the Creek Nation and its members. That Nation still exists, and has recently been authorized to resume some of its former powers." *Bd. of Cty. Comm'rs v. Seber*, 318 U.S. 705, 718 (1943) (citations and footnote omitted) (citing OIWA). In sum, following allotment, Congress re-empowered the Creek Nation's government, which it had never dissolved.

i. *Public Law 280*

Policy shifted again in the post-World War II period, known as the "termination era," as Congress focused on assimilating Indians and ending the United States' trust relationship with many Indian tribes. *See* Cohen at 92-93.

One important law enacted in 1953, "Public Law 280," addressed state jurisdiction. It allowed some states "to assert limited civil and broad criminal jurisdiction in Indian country." *Indian Country, U.S.A.*, 829 F.2d at 980 (citing ch. 505, 67 Stat. 588 (Aug. 15, 1953) (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321-26, 28

- 67 -

U.S.C. § 1360)).  Public Law 280, "delegat[ed] to five, later six, states jurisdiction over most crimes . . . throughout most of the Indian country within their borders."  Cohen at 537 (footnotes omitted).[43]  It "offered any other state the option of accepting the same jurisdiction," until a 1968 amendment "made subsequent assumptions of jurisdiction subject to Indian consent."  *Id.* at 537-38; *see* 25 U.S.C. §§ 1321(a), 1322(a), 1326.

Oklahoma chose not to use Public Law 280 to assert jurisdiction.  State officials regarded the law as unnecessary because, in their view, Oklahoma already had full jurisdiction over Indians and their lands.  *Indian Country, U.S.A.*, 829 F.2d at 980 n.6.  But "[t]he State's 1953 position that Public Law 280 was unnecessary for Oklahoma . . . [has] been rejected by both federal and state courts."  *Id.* (citing Tenth Circuit and Oklahoma cases).  Oklahoma has not obtained tribal consent following the 1968 amendment and has thus never acquired jurisdiction over Indian country through Public Law 280.  *See Cravatt*, 825 P.2d at 279 ("The State of Oklahoma has never acted pursuant to Public Law 83-280." (quoting *State v. Klindt*, 782 P.2d 401, 403 (Okla. Crim. App. 1989))); *see also* Cohen at 537-38 & n.47.

The termination era began to fade in the late 1950s as federal Indian policy shifted again toward tribal self-government and self-determination.  *See* Cohen at 93.

j.  *A new Creek Constitution*

In 1979, under OIWA, the Creek Nation adopted a new constitution "providing for three separate branches of government, including a judiciary."  *Muscogee (Creek) Nation*,

---

[43] The six states are Alaska, California, Minnesota, Nebraska, Oregon, and Wisconsin.  *See id.* at 537 nn.44-45.

851 F.2d at 1442. In 1982, when the tribe sought funding from the Bureau of Indian Affairs ("BIA") for its court system, the D.C. Circuit confronted the question whether the Creek Nation could operate a court system at all in light of Congress's earlier abolition of the tribal courts. The D.C. Circuit held that OIWA had repealed the earlier elimination of Creek courts. *Id.* at 1444-46. "[T]he Muscogee (Creek) Nation has the power to establish Tribal Courts with civil and criminal jurisdiction, subject, of course, to the limitations imposed by statutes generally applicable to all tribes." *Id.* at 1446-47 (emphases omitted).

       k. *Our decision in* Indian Country, U.S.A.

       In 1987, we held in *Indian Country, U.S.A.*, that the Creek Reservation continues to exist, at least in some form. The case arose when Oklahoma tried to tax a bingo operation located on Creek Nation land that had never been allotted and was still held by the Tribe. 829 F.2d at 970. Oklahoma argued the site was not a reservation and therefore subject to the State's taxation. *Id.* at 973. We rejected that argument and explained the site at issue was "part of the original treaty lands still held by the Creek Nation, with title dating back to treaties concluded in the 1830s and patents issued in the 1850s. These lands historically were considered Indian country and still retain their reservation status within the meaning of 18 U.S.C. § 1151(a)." *Id.* at 976. Accordingly, we invalidated the Oklahoma tax. *Id.* at 987. Our holding, however, was limited. Because the case concerned land that had never been allotted and was still held by the Tribe, we had—as we twice made clear—no cause to decide whether Congress had disestablished the Reservation's 1866 exterior boundaries. *Id.* at 975 n.3, 980 n.5.

- 69 -

We now confront that question.

3. **Applying *Solem***

We must apply the *Solem* framework to determine whether Congress has disestablished the Creek Reservation. If the Reservation's boundaries are still intact, the crime occurred within them. *See* Aplt. Br. at 20; Aplee. Br. at 11-12. The State argues, however, that Congress disestablished the Creek Reservation in the early twentieth century. Mr. Murphy and the Creek Nation disagree.

We conclude Congress has not disestablished the Creek Reservation. The most important evidence—the statutory text—fails to reveal disestablishment at step one. Instead, the relevant statutes contain language affirmatively recognizing the Creek Nation's borders. The evidence of contemporaneous understanding and later history, which we consider at steps two and three, is mixed and falls far short of "*unequivocally* reveal[ing]" a congressional intent to disestablish. *Parker*, 136 S. Ct. at 1080 (emphasis in original) (quoting *Solem*, 465 U.S. at 471). Because our application of the *Solem* framework shows Congress has not disestablished the Creek Reservation, the crime in this case occurred within the Reservation's boundaries. The State of Oklahoma accordingly lacked jurisdiction to prosecute Mr. Murphy.

a. *Step One: Statutory Text*

The State argues the Creek Reservation did not survive a series of statutes that allotted Creek lands and created the State of Oklahoma. The State "acknowledges that no relevant act of Congress contains language which expressly disestablished the Creek Nation reservation through the use of such words as 'cede' or 'relinquish.'" Aplee. Br. at

- 70 -

57. It attempts to show disestablishment based on the collective weight of eight different laws enacted between 1893 and 1906.

At oral argument, we asked whether the State was relying on any particular statutory language in any of these laws for its step-one argument:

> THE COURT: Where do you find your strongest statutory language that the Creek Reservation was diminished or disestablished?
>
> THE STATE: You have to start before the 1901 Allotment Act. . . . In 1893, Congress passed the law which set up the Dawes Commission.
>
> THE COURT: I asked for statutory language, not a general overview of a statute. Where in any of these acts is there language that disestablished the Reservation?
>
> THE STATE: In that 1893 Act, Congress said that they were appointing the Dawes Commission to negotiate with the Tribes in whatever means necessary in order to create a State embracing the Indian Territory and to substitute for the tribal governments a State government.
>
> THE COURT: But that didn't happen.
>
> THE STATE: The—well, I think that's what we're arguing about here today.
>
> THE COURT: Well, let's go to 1901.
>
> . . . .
>
> THE COURT: Where's the disestablishment in the Act? You haven't given us in your brief or anything you said today any language from any act that shows disestablishment. And isn't that the first *Solem* factor?
>
> THE STATE: Well, yes, Your Honor, but [Congress does not] have to use the words . . . .
>
> THE COURT: Well, okay, even if they don't use the words. Can you give us some examples?
>
> THE STATE: Of course—

- 71 -

THE COURT: Counsel, on the same point, I think . . . what we're looking for is what has been given in other Supreme Court cases where they have seized on language whether it's 'public domain' or whether it's the word 'cede' or whether it's a lump-sum payment. Those—there are words in a sentence in those acts, and what we're asking is can you show us words in a sentence in the acts that you're talking about that are equal or equivalent of those words rather than a general summary sort of an answer? We're looking for specific language.

THE STATE: Other than the entire context of what happened, I cannot. . . . I still argue that the acts themselves are sufficient, but, if not, under *Osage Nation*, when you look at the step-two evidence here, it's overwhelming.

THE COURT: Well, so your answer is that you don't have any language?

THE STATE: I do not have a specific section that I can look at and say this is—

THE COURT: And so the argument that I just heard is that it's context. Your word.

THE STATE: Correct. If you look at all of the acts together, which the Supreme Court has said you can do—no I can't—when you look at the specific language which provides for the allotment, it doesn't use words [like] 'cession,' it doesn't provide for a fixed sum, those sorts of things that have happened in other cases. But when you go all the way back to when Congress started passing acts that led up to the 1901 Act, it's very clear that their purpose was to substitute for the tribal government a State government and put the area of the Five Tribes under State law.

Oral Arg. at 50:23-54:07. This exchange aligns with the position taken in the State's brief. *See* Aplee. Br. at 57. At step one, the State does not rely on any particular statutory text but rather on all eight acts in general because it does not "have a specific section" in any law that accomplished disestablishment. Oral Arg. at 53:18-21.

We question whether the State's argument based on the overall thrust of eight different laws deserves to be called a step-one argument. At step one, "we start with the

*statutory text*."  *Parker*, 136 S. Ct. at 1079 (emphasis added); *see also Solem*, 465 U.S. at 470 ("The most probative evidence of congressional intent is the statutory *language* used to open the Indian lands." (emphasis added)); *Wyoming*, 849 F.3d at 869 ("*First*, we look to the text of the statute . . . .").  The State does not present us with any particular statutory language to analyze.  Our independent review of the laws has not uncovered a provision on which the State might rely, either.

Assuming the State's cumulative-effect argument belongs in step one where we consider text, as opposed to step two where we consider context, we proceed to (i) review each of the eight statutes the State relies on, paying particular attention to the 1901 Original Allotment Agreement, and then (ii) conduct our step-one analysis based on those laws.  The absence of statutory language in any of these acts disestablishing the Creek Reservation leads us to conclude the State "ha[s] failed at the first and most important step."  *Parker*, 136 S. Ct. at 1080.  In fact, the step-one evidence shows Congress recognized the existence of the Creek Nation's borders.  And the State's attempts to shift the inquiry into questions of title and governance are unavailing.

      i.   <u>The statutes</u>

We discuss the State's eight statutes in chronological order.

      1)  Act of March 3, 1893, ch. 209, 27 Stat. 612 ("1893 Act")

The State first draws our attention to an appropriations law providing money for the federal government to fulfill treaty obligations with Indian tribes throughout the country.  With respect to the Creek Nation, the 1893 Act provided funding for treaties

- 73 -

from 1790 to 1866 to pay for, among other things, annuities, blacksmithing, iron, steel, and interest on other funds. *See* 27 Stat. at 616-17.

In addition to providing funds, Congress gave "the consent of the United States" to the allotment of lands "within the limits of the country occupied by the Cherokees, Creeks, Choctaws, Chickasaws, and [S]eminoles." § 15, 27 Stat. at 645.[44] Congress instructed the President to appoint a commission, which became known as the Dawes Commission, to negotiate with the Creek Nation and the other tribes

> for the purpose of the extinguishment of the national or tribal title to any lands within that Territory now held by any and all of such nations or tribes, either by cession of the same or some part thereof to the United States, or by the allotment and division of the same in severalty among the Indians of such nations or tribes, respectively, as may be entitled to the same, or by such other method as may be agreed upon between the several nations and tribes aforesaid, or each of them, with the United States, with a view to such and adjustment, upon the basis of justice and equity, as may, with the consent of such nations or tribes of Indians, so far as may be necessary, be requisite and suitable to enable the ultimate creation of a State or States of the Union which shall embrace the lands within said India[n] Territory.

§ 16, 27 Stat. at 645. Congress provided the negotiators' priorities should be "first" to procure an allotment of lands "as may be agreed upon as just and proper to provide for each such Indian a sufficient quantity of land for his or her needs." § 16, 27 Stat. at 646. "[S]econdly," the negotiators were to "procure the cession, for such price and upon such

---

[44] The law provided that tribal members who accepted an allotment would be deemed U.S. citizens. § 15, 27 Stat. at 645. The Supreme Court has explained that "the extension of citizenship status to Indians does not, in itself, end the powers given Congress to deal with them." *United States v. John*, 437 U.S. 634, 653-54 (1978). "Nor has [U.S.] citizenship prevented the Congress . . . from continuing to deal with the tribal lands of the Indians." *Tiger v. W. Inv. Co.*, 221 U.S. 286, 312 (1911). *See generally* Cohen at 922-24 (discussing citizenship).

terms as shall be agreed upon, of any lands not found necessary to be so allotted or divided, to the United States." *Id.* Although Congress wanted to pursue both allotment and the sale of surplus lands to the United States, it granted the commissioners

> power to negotiate any and all such agreements as . . . shall be found requisite and suitable to such an arrangement of the rights and interests and affairs of such nations, tribes, bands, or Indians, or any of them, to enable the ultimate creation of a Territory of the United States with a view to the admission of the same as a state in the Union.

*Id.* The 1893 Act established the Dawes Commission to commence negotiations; it did not disestablish the Creek Reservation.

### 2) Act of June 10, 1896, ch. 398, 29 Stat. 321 ("1896 Act")

The State next relies on an 1896 appropriations law in which Congress again provided money to fulfill treaty obligations with the Creek Nation. 29 Stat. 326-27. The 1896 Act declared it "the duty of the United States to establish a government in the Indian Territory" for the purpose of "rectify[ing] the many inequalities and discriminations" in the Territory and "afford[ing] needful protection to the lives and property of all citizens and residents thereof." 29 Stat. at 340. The Dawes Commission was directed "to continue the exercise of the authority already conferred upon them by law and endeavor to accomplish the objects heretofore prescribed to them." 29 Stat. at 339. Nothing in this law altered the Reservation's boundaries.

### 3) Act of June 7, 1897, ch. 3, 30 Stat. 62 ("1897 Act")

The State's third statute is an 1897 appropriations statute in which Congress again approved funds to satisfy obligations arising from treaties with the Creek Nation. *See* 30 Stat. at 68. Congress also provided that, beginning in 1898, the United States courts

- 75 -

would have "original and exclusive jurisdiction" over both civil and criminal cases in the Indian Territory. 30 Stat. at 83. The laws of the United States and of neighboring Arkansas, which were already in force in the Indian Territory, would apply "to all persons therein, irrespective of race." *Id.* In addition, Congress legislated that, beginning in 1898, "all acts, ordinances, and resolutions" of the legislative bodies of the Five Civilized Tribes would be subject to presidential veto. 30 Stat. at 84. This provision did not apply to tribal legislation related to negotiations with the Dawes Commission. *Id.* The law also provided that if any of the Tribes reached a negotiated agreement with the Dawes Commission, that new agreement, once ratified, would "suspend" any provisions of the 1897 Act inconsistent with the agreement. *Id.* In sum, this statute altered federal and tribal governance arrangements in the Indian Territory, but it did not erase the Creek Reservation's borders.

4) "Curtis Act," ch. 517, 30 Stat. 495 (June 28, 1898)

In 1898, Congress imposed new limitations on the powers of tribal governments in the Indian Territory. Under the Curtis Act, tribal courts would be abolished within the year. § 28, 30 Stat. at 504-05. All cases would be transferred to the United States court in the Indian Territory, and tribal laws would be unenforceable. §§ 26, 28, 30 Stat. at 504-05. Congress instructed the Secretary of the Interior ("Secretary") to stop directing federal payments to tribal governments and to begin paying individual tribal members directly. § 19, 30 Stat. at 502. The Curtis Act included a default allotment scheme that would take effect following completion of the tribal citizenship rolls and survey of tribal

lands. § 11, 30 Stat. at 497-98.[45]  But, as discussed in the next section, Congress and the Creek Nation later agreed to a different allotment plan.  The Curtis Act made the most significant governance changes to date, but it did not address the Creek Reservation's borders.

5)  "Original Allotment Agreement," ch. 676, 31 Stat. 861 (March 1, 1901)

The Creek Nation reached a negotiated agreement with the federal government for the allotment of tribal lands, and Congress passed it into law in 1901.  The Original Agreement, supplemented by another agreement we discuss below, specified that its terms would control over conflicting federal statutes and treaty provisions, but it "in no wise affect[ed]" treaty provisions consistent with the Agreement.  ¶¶ 41, 44, 31 Stat. at 872.  Our discussion of the Original Agreement covers (a) the allotment of Creek lands, (b) provisions concerning town sites, (c) lands reserved for tribal purposes, and (d) the Agreement's plan for future governance within the borders of the Creek Reservation.

a)  Allotment

The Agreement's central purpose was to facilitate a transfer of title from the Creek Nation generally to its members individually.  It provided that "[a]ll lands belonging to the Creek tribe," except for town sites and lands reserved for public purposes, should be

---

[45] The Curtis Act also contained a proposed agreement between the federal government and the Creek Nation providing for the allotment of tribal lands, *see* § 30, 30 Stat. at 514-19, but the Creek Nation did not ratify the agreement.  A different allotment agreement was reached in 1901, and we discuss it in the next section.

appraised and allotted "among the citizens of the tribe." ¶¶ 2-3, 31 Stat. at 862-63.[46]

Tribal citizenship rolls determined an individual's eligibility for an allotment. ¶¶ 3, 28, 31 Stat. at 862-63, 869-70.[47] The United States would bear the costs of "the survey, platting, and disposition" of lots, except where town authorities undertook those efforts. ¶ 34, 31 Stat. at 871.

Creek citizens would receive an allotment of 160 acres valued at $6.50 per acre. ¶ 3, 31 Stat. at 862. Recognizing that the tracts would not have the same value, the Act provided that "the residue of lands" not otherwise allotted or reserved—the surplus lands—would be used "for the purpose of equalizing allotments." ¶ 9, 31 Stat. at 864. Creek citizens with more valuable lots could have the excess value charged against their entitlement to other tribal funds. ¶ 3, 31 Stat. at 862-63. The Tribe's funds from earlier treaties were made available to equalize allotments. ¶ 27, 31 Stat. at 869.

The assignment of allotments was not random. Creek citizens who had built improvements or possessed particular lands could select those lands. *See* ¶¶ 3, 5-6, 31

---

[46] The Agreement defined "citizen" as "a member . . . of the Muskogee tribe or nation of Indians." ¶ 1, 31 Stat. at 862. The Act stipulated "the words 'Creek' and 'Muskogee'" were synonymous. *Id.*

[47] The Agreement provided citizens of the Seminole Nation who had settled in lands belonging to the Creeks were allowed to take allotments in Creek lands, and the same terms were extended to Creek citizens in Seminole lands. ¶ 36, 31 Stat. at 871.

Stat. at 862-63.[48]  The Agreement provided for dispute resolution when Creek citizens

contested their right to select certain tracts.  ¶ 6, 31 Stat. at 863.

The Tribe's principal chief was assigned the task of transferring title from the

Tribe to the individual allottees.  ¶ 23, 31 Stat. at 867-68.  Each deed conveyed to the

allottee "all right, title, and interest of the Creek Nation and of all other citizens in and to

the lands embraced in [the] allotment certificate."  ¶ 23, 31 Stat. at 868.  For the allottee,

acceptance of the deed represented "assent to the allotment and conveyance of all the

lands of the tribe" and a "relinquishment of all his right, title, and interest in" the rest of

the allotted lands as provided in the Agreement.  *Id.*

The Secretary of the Interior was supposed to approve the conveyances, and this

approval would serve "as a relinquishment" to the Creek citizen "of all the right, title, and

interest of the United States in and to the lands embraced in [the] deed."  *Id.*[49]  But the

Agreement provided for various forms of continuing federal supervision.  For example, it

restricted the ability of allottees to encumber or alienate their lands without approval

from the Secretary.  ¶ 7, 31 Stat. at 863-64.  A five-year restriction period applied to

---

[48] For members of the Creek Nation unable to select lands for themselves—children, "prisoners, convicts, and aged and infirm persons"—the Agreement provided a mechanism for selection on their behalf and in "the best interests of such parties."  ¶ 4, 31 Stat. at 863; *see also* ¶¶ 7, 23, 31 Stat. at 863-64, 867-68.

[49] The United States was understood to have a reversionary interest in the Tribe's lands.  *See* 1833 Treaty, art. 3, 7 Stat. at 419 (providing the Creek Nation's fee simple interest would continue "so long as they shall exist as a nation, and continue to occupy the country hereby assigned them"); § 15, 27 Stat. at 645 (consenting that "upon the allotment of the lands held by [the Five Civilized Tribes] the reversionary interest of the United States therein shall be relinquished and shall cease").

allotted lands generally, but a 21-year restriction applied to a subset of an allottee's lands—the 40 acres selected as a homestead. *Id.* Creek citizens were allowed to rent their allotments, subject to restrictions . ¶ 37, 31 Stat. at 871.

b) Town sites

The Agreement excluded "town sites" from allotment. ¶¶ 2, 24(a), 31 Stat. at 862, 868. Towns "in the Creek Nation" with more than 200 people would be "surveyed, laid out, and appraised." ¶ 10, 31 Stat. at 864. Town commissions, which were to include Creek commissioners, would administer the sale of town lots "for the benefit of the tribe." ¶ 10, 31 Stat. at 865. "Any person," not just Creek citizens, "in rightful possession of any town lot having improvements thereon" was given the opportunity to purchase the lot. ¶ 11, 31 Stat. at 866; *see also* ¶¶ 12-13, 31 Stat. at 866 (providing similar purchase opportunities to people with residential or business holdings in towns). Town sites lacking improvements would be sold at public auction within 12 months of their appraisal. ¶ 14, 31 Stat. at 866. Once sold, town lots were subject to municipal taxation. ¶ 17, 31 Stat. at 867.[50]

Some town sites were not available for purchase. The Agreement instructed town surveyors to set aside lands for cemeteries, ¶ 18, 31 Stat. at 870, and lots where church houses had been erected were conveyed to the churches at no cost, ¶ 21, 31 Stat. at 867. Educational institutions in Muskogee and other towns "in the Creek Nation" were given

---

[50] The Agreement gave municipal corporations authority to issue bonds and borrow money for public projects such as for "the construction of sewers, lighting plants, waterworks, and schoolhouses." ¶ 25, 31 Stat. at 869.

the chance to purchase lands at a discount. ¶ 20, 31 Stat. at 867. The United States reserved a right to "purchase, in any town in the Creek Nation, suitable land for court-houses, jails, and other necessary public buildings for its use, by paying the appraised value thereof." ¶ 19, 31 Stat. at 867.

c) Lands reserved for tribal purposes

In addition to town sites, the Agreement provided certain other lands would be "reserved from the general allotment" scheme. ¶ 24, 31 Stat at 868. Most of the reserved lands were for tribal purposes: Creek schools and orphan homes, ¶ 24(c)-(*l*), 31 Stat. at 868; cemeteries, ¶ 24(m), 31 Stat. at 868; a university, ¶ 24(n), 31 Stat. at 868-69; Creek courthouses, ¶ 24(o), 31 Stat. at 869; and churches and schools outside of towns, ¶ 24(p), 31 Stat. at 869. If and when these lands were no longer "needed for the purposes for which they are at present used," the Agreement provided they should be sold at auction "to citizens only." ¶ 24, 31 Stat. at 869.

d) Future governance

The Agreement contemplated roles for both the Tribe and the federal government in the post-allotment governance of the Creek Nation. It recognized Creek jurisdiction as continuing but also limited and temporary. It also provided for ongoing federal regulation and defined federal responsibilities by reference to the Creek Nation's borders.

A continuing role for the tribal government was apparent in a provision recognizing Creek legislative authority over both unallotted tribal lands and allotted lands. ¶ 42, 31 Stat. at 872. "[A]ct[s], ordinance[s], [and] resolution[s]" of the Creek National Council remained subject to presidential approval, but the Agreement

- 81 -

recognized the Creek government's authority to regulate "the lands of the tribe" as well as lands belonging to "individuals after allotment." *Id.*; *see also id.* (providing for Creek regulation, with presidential oversight, of "the moneys or other property of the tribe, or of the citizens thereof"). The Agreement also provided that Creek law would determine issues of descent and distribution. ¶¶ 7, 28, 31 Stat. at 864, 870.[51]

Under the Agreement, the Tribe continued to exercise authority over its finances: "No funds belonging to said tribe shall hereinafter be used or paid out for any purposes by any officer of the United States without consent of the tribe, expressly given through its national council, except as herein provided." ¶ 33, 31 Stat. at 870; *see also* ¶ 31, 31 Stat. at 870 (requiring that the federal government provide monthly, itemized financial reports to the principal chief regarding the Tribe's funds in the U.S. Treasury). The Agreement assigned the Creek National Council responsibility for appropriating money to operate tribal schools. ¶ 40, 31 Stat. at 872. It also authorized lawsuits "in the name of the principal chief, for the benefit of the tribe" to enforce liens against the property of people who defaulted on their purchase of property in towns. ¶ 30, 31 Stat. at 870.

Despite these recognitions of continuing Creek governmental authority, the Agreement contemplated this authority would be temporary. It said the tribal government would not continue past March 4, 1906, "subject to such further legislation as Congress may deem proper." ¶ 46, 31 Stat. at 872. In other words, the Agreement set

---

[51] Creek courts, already abolished under the Curtis Act, were not reestablished. ¶ 47, 31 Stat. at 873.

a date for the dissolution of the tribal government while recognizing a later Congress could change course. Congress did change course, and dissolution never happened.

In addition to providing a limited role for tribal government, the Agreement assigned powers and responsibilities to the United States, many of which were expressly tied to the Creek Nation's territorial boundaries. For example, the Secretary was authorized to collect a grazing tax when cattle were brought "into the Creek Nation" and grazed on unallotted lands. ¶ 37, 31 Stat. at 871. Revenue from the tax was "for the benefit of the tribe." *Id.* Similarly, although Creek citizens could dispose of timber on their allotments, no timber could be taken from unallotted lands "without payment of [a] reasonable royalty" and under conditions prescribed by the Secretary. ¶ 38, 31 Stat. at 871. The mineral-leasing provisions from the Curtis Act were not to apply "in the Creek Nation." ¶ 41, 31 Stat. at 872. And the United States agreed to maintain strict laws against the introduction of liquor "in said nation." ¶ 43, 31 Stat. at 872.[52]

To summarize, the Original Agreement shifted communal Creek land into individual allotments and provided for dissolution of the tribal government in the future.

---

[52] The task of removing "objectionable" persons from the lands of Creek citizens fell to the Secretary of the Interior and the United States Indian agent. ¶ 8, 31 Stat. at 864.

The Secretary was also to administer the Creek school fund, and Creek schools were to be governed under the Secretary's rules and regulations as well as "under Creek laws" subject to the Secretary's oversight. ¶ 40, 31 Stat. at 871-72. The Agreement included a hiring preference for Creek citizens in teaching positions. ¶ 40, 31 Stat. at 872.

It also reserved from allotment lands for tribal purposes and repeatedly recognized the continuing existence of the Creek Nation's borders.

6) "Supplemental Allotment Agreement," ch. 1323, 32 Stat. 500 (June 30, 1902)

The 1902 Supplemental Allotment Agreement clarified the Original Agreement and made several amendments. Allotment-eligible lands would be appraised at no more than $6.50 per acre, not including improvements. ¶ 2, 32 Stat. at 500. The Dawes Commission was assigned exclusive jurisdiction to resolve the disputes of Creek citizens over the selection of particular allotments. ¶ 4, 32 Stat. at 501.[53] The Supplemental Agreement made corrections to the Creek Nation's citizenship rolls and addressed the situation of citizens entitled to an allotment who died before receiving it. ¶¶ 7-9, 32 Stat. at 501-02.

The Supplemental Agreement provided that Arkansas law, not Creek law, would govern inheritance but said "only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation." ¶ 6, 32 Stat. at 501. Noncitizen heirs could inherit when there was no Creek descendent. *Id.*

Anti-encumbrance and alienation provisions were reaffirmed and set to run from the date of the Supplemental Agreement. ¶ 16, 32 Stat. at 503. Restrictions on leases were also clarified. *See* ¶ 17, 32 Stat. at 504 (addressing leases for mineral extraction (prohibited), grazing (limited to one year), and agricultural purposes (limited to five

---

[53] *See also* ¶ 5, 32 Stat. at 501 (providing for corrections when selected land did not include allottee's home).

years)).  Other parts of the Supplemental Agreement addressed public resources.  *See*

¶ 13, 32 Stat. at 503 (providing for the purchase of land for parks within towns); ¶ 15, 32

Stat. at 503 (subjecting Creek courthouse lands to allotment); ¶ 18, 32 Stat. at 504

(regulating introduction of cattle "into the Creek Nation").

The Supplemental Agreement left in place the planned dissolution of the tribal

government.  It required the Secretary, following dissolution of the tribal government, to

pay the Tribe's remaining funds to the citizens of the Creek Nation.  ¶ 14, 32 Stat. at 503;

*see also* ¶ 19, 32 Stat. at 504 (requiring the Secretary "during the continuance of the tribal

government" to defend allottees against claims on their land arising from illegal leases

and conveyances).

Overall, the Supplemental Agreement continued the policies embodied in the

Original Agreement.  It did not address the Creek Reservation's borders except to

recognize their existence.

7)  "Five Tribes Act," ch. 1876, 34 Stat. 137, April 26, 1906[54]

The State relies on two more statutes, both from 1906.[55]  The first is the Five

Tribes Act, in which Congress recognized and extended the Creek government's

existence while also imposing new limitations on its authority.  It provided the Creek

Nation's "tribal existence and present tribal government[]" would "continue[] in full

---

[54] The Five Tribes Act was passed after March 4, 1906, the date the Original
Agreement had set for the dissolution of the Creek government, *see* ¶ 47, 31 Stat. at
872, but Congress extended the Creek government's existence before the deadline on
March 2, 1906, *see* 34 Stat. 822.  As this section discusses, the Five Tribes Act
extended the Creek government again, this time indefinitely.

force and effect for all purposes authorized by law, until otherwise provided by law."

§ 28, 34 Stat. at 148. It continued presidential oversight of tribal legislation, and further restricted tribal legislative functions by limiting tribal governments to 30-day legislative sessions each year. *Id.*

The Five Tribes Act gave new authority to the President and Secretary of the Interior. The President received authority to appoint a tribal citizen as principal chief when the principal chief died, became disabled, or refused or neglected to perform his duties. § 6, 34 Stat. at 139. The Secretary received power to approve land conveyances if the principal chief failed to act. *Id.* The Act also authorized the Secretary to "assume control and direction" of the Tribes' schools in 1906 with the goal of retaining "tribal educational officers" and "the present system so far as practicable" until a "public school system" was established under a future territorial or state government. § 10, 34 Stat. at 140-41. The Secretary received authorization to bring suit in the United States courts in the Indian Territory for the recovery of money or lands claimed by the Creek Nation. § 18, 34 Stat. at 144.[56]

---

[55] The State contends these laws "carry less weight" because they were passed after the allotment agreements. Aplee. Br. at 62. This suggests the State considers the 1901-02 allotment agreements to be the legislative enactments in which Congress disestablished the Creek Reservation, yet the State includes the 1906 statutes in its step-one argument. We consider the text of the 1906 laws as step-one evidence, as opposed to step-three, later-history evidence, because statutory text is the concern of step one. *See Parker*, 136 S. Ct. at 1079 ("[W]e start with the statutory text . . . .").

[56] Congress also assigned new powers at the town level. It provided for the operation of light and power companies within the Indian Territory and granted new

Continued . . .

The Five Tribes Act continued many of the restrictions on allotted lands and amended others. Congress continued the Original Agreement's provisions for the equalization of Creek allotments. § 2, 34 Stat. at 137-38. It also clarified that lands reserved for public purposes would "revert to the tribe and be disposed of as other surplus lands" when the land was no longer used for the public purpose for which it was reserved. § 14, 34 Stat. at 142. The Secretary was instructed to sell unallotted lands not otherwise provided for and deposit the proceeds into the Treasury for the Tribe's benefit. § 16, 34 Stat. at 143.[57] New 25-year restriction periods against alienation and encumbrance were imposed on allotted lands, but allotted lands were immune from taxation "as long as the title remain[ed] in the original allottee." § 19, 34 Stat. at 144. Allottees remained free to lease their lands, subject to restrictions. §§ 19-20, 34 Stat. at 144-45.[58]

The Five Tribes Act provided for the future distribution of tribal property to Creek citizens. It abolished tribal taxes and instructed the Secretary to wind up claims against

taxing powers to towns with more than two thousand people. *See* §§ 25-26, 34 Stat. at 146-48.

[57] Purchasers of town lots who failed to make timely payments were liable to forfeit the purchase and have the Secretary re-sell the land at public auction. § 12, 34 Stat. at 141-42.

[58] Congress made several changes to the laws of descent and inheritance. For allottees who died intestate and without heirs, their lands would revert to the Tribe or escheat to the future state or territorial government. § 21, 34 Stat. at 145. Adult Indian heirs were permitted to sell the lands they inherited, subject to the Secretary's approval. § 22, 34 Stat. at 145. Adult Indians were permitted to make wills, subject to court oversight when the will disinherited certain closely related family members. § 23, 34 Stat. at 145.

the Tribe following the dissolution of the tribal government.  § 11, 34 Stat. at 141.  Tribal

citizenship rolls would be finalized by March 4, 1907.  §§ 1, 2, 34 Stat. at 137-38.  The

Secretary would eventually take possession of and sell tribal buildings, furniture, and

lands.  § 15, 34 Stat. at 143.  Local governments—be they state, territorial, county, or

municipal—received the first chance to buy; proceeds would be deposited in the Treasury

for the benefit of the Tribe.  *Id.*[59]  As had been the case in earlier acts, the Secretary was

required to distribute the proceeds from the sale of tribal property to the Tribe's members

on a per capita basis.  § 17, 34 Stat. at 143-44.

In a section labeled "Tribal lands to be held in trust," the Act provided that, upon

dissolution of the Five Tribes, tribal lands "shall not become public lands nor property of

the United States, but shall be held in trust by the United States for the use and benefit"

of the Tribes' members and their heirs.  § 27, 34 Stat. at 148.  And, as mentioned above,

the Act extended the tribal governments' existence without setting a date for dissolution,

providing only that they would continue "until otherwise provided by law."  § 28, 34 Stat.

at 148.  The Five Tribes Act thus recognized that the Creek Nation's government

continued to exist in "full force and effect," and that, in the event of the future dissolution

of the tribal government, "the land[] belonging to the . . . Creek [Nation]" would be held

in trust by the United States for the Tribe.  *Id.*  It did not terminate the Reservation's

borders.

---

[59] Later in 1906, Congress delayed the implementation of § 15—providing for the sale of tribal property—and clarified it would "not take effect until the date of the dissolution of the tribal governments of the Choctaw, Chickasaw, Cherokee, Creek, and Seminole tribes."  Act of June 21, 1906, ch. 3504, 35 Stat. 325, 342.

8) "Oklahoma Enabling Act," ch. 3335, 34 Stat. 267 (June 16, 1906)

In the Oklahoma Enabling Act, the final statute the State relies on, Congress did not dissolve the Creek government, but it granted permission to the inhabitants of both the Territory of Oklahoma and the Indian Territory to adopt a constitution and seek admittance into the Union as the State of Oklahoma. § 1, 34 Stat. at 267-68. Congress imposed restrictions on the new state's ability to affect Indians and Indian property. "[N]othing" in the state constitution was

> to limit or impair the rights of person or property pertaining to the Indians of said Territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise . . . .

*Id.* Further, Congress required the people of the territories to

> forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States.

§ 3, 34 Stat. at 270. Congress also prohibited the new state from allowing the liquor trade for 21 years within the Indian Territory, the bordering Osage Reservation, and "any other part of said State which existed as Indian reservations" as of 1906. § 3, 34 Stat. at 269.

Oklahoma was awarded five seats in the House of Representatives. § 6, 34 Stat. at 271-72. Congress instructed that the third district must "comprise all the territory now constituting the Cherokee, Creek, and Seminole nations, and the Indian reservations lying northeast of the Cherokee Nation, within said State." *Id.*

- 89 -

The United States granted Oklahoma certain townships for the State's school system but withheld "any lands embraced in Indian, military, or other reservations of any character" and specified that "land owned by Indian tribes or individual members of any tribe" were excluded "until the reservation shall have been extinguished and such lands be restored to and become a part of the public domain." § 7, 34 Stat. at 272.

Upon Oklahoma's admission as a State, the territorial laws in force within the Territory of Oklahoma would take effect statewide, and all applicable federal laws would take effect as they applied elsewhere in the country. § 21, 34 Stat. at 277-78.

The Oklahoma Enabling Act, as this court has already said, does not "contain express termination language." *Osage Nation*, 597 F.3d at 1124.

\* \* \* \*

The foregoing statutes show the Creek Nation accepted an allotment scheme that retained "surplus" lands for tribal citizens, and Congress established the State of Oklahoma. We now consider further whether, as the State insists, these laws also disestablished the Creek Reservation.

ii.  Analysis

None of these statutes disestablished the Creek Reservation. The State's case for termination of the Creek Reservation thus falters at "the first and most important step." *Parker*, 136 S. Ct. at 1080. The State argues the cumulative effect of the eight laws demonstrate that Congress disestablished the Creek Reservation. For three reasons, we disagree. First, the statutes lack any of the textual "hallmarks" demonstrating congressional intent to disestablish, and no other language shows Congress altered the

- 90 -

Creek Reservation's boundaries. *See id.* at 1079. Second, specific statutory language—"[t]he most probative evidence of congressional intent," *Solem*, 465 U.S. at 470—shows Congress continued to recognize the Reservation's borders. Third, the State's reliance on the statutes' reforms of title and governance arrangements within the Reservation is unavailing because these changes did not disestablish the Reservation.

### 1) No hallmarks of disestablishment or diminishment

Congress never expressly terminated the Creek Reservation in any of the statutes, nor did it use the kind of language recognized by the Supreme Court as evidencing disestablishment. It has long been clear "the Congresses that passed the surplus land acts" were hostile to the reservation system; indeed they "anticipated [its] imminent demise" and "passed the acts partially to facilitate the process," but *Solem* prevents courts from "extrapolat[ing]" this general congressional expectation into "a specific congressional purpose" with respect to a given reservation. 465 U.S. at 468-69; *see also Shawnee Tribe*, 423 F.3d at 1220 & n.18 (explaining that, notwithstanding the "Congressional desire to end the reservation system," the question of "[w]hether a particular treaty or Congressional act was intended to extinguish some or all of an existing reservation requires a case-by-case analysis"). "The effect of any given surplus land act depends on *the language* of the act and the circumstances underlying its passage." *Solem*, 465 U.S. at 469 (emphasis added). Here at step one, we consider the language and find no congressional purpose to disestablish the Creek Reservation's borders.

We have not identified termination language in any of the statutes the State cites. Indeed, the State concedes that not one of the eight statutes contains particular language that disestablished the Creek Reservation.

The absence of such language is notable because Congress is fully capable of stating its intention to disestablish or diminish a reservation, as the following examples illustrate:

- "[T]he Smith River reservation is hereby discontinued." Act of July 27, 1868, ch. 248, 15 Stat. 198, 221; *see Mattz*, 412 U.S. at 504 n.22 (citing statute as an example of "clear language of express termination").

- "That subject to . . . allotment . . . a [legislatively defined] portion of the Colville Indian Reservation . . . is hereby, vacated and restored to the public domain . . . ." Act of July 1, 1892, ch. 140, § 1, 27 Stat. 62, 62-63; *see Mattz*, 412 U.S. at 504 n.22 (citing as example of "clear language of express termination"); *Seymour*, 368 U.S. at 354 (discussing as example of diminishment language).

- "Subject to the allotment of land . . . and for the considerations hereinafter mentioned . . . [the] Comanche, Kiowa, and Apache Indians hereby cede, convey, transfer, relinquish, and surrender, forever and absolutely, without any reservation whatever, express or implied, all their claim, title, and interest, of every kind and character, in and to the lands embraced in the following-described tract of country in the Indian Territory . . . ." Act of June 6, 1900, ch. 813, art. 1, 31 Stat. 672, 676-77; *see Tooisgah v. United States*, 186 F.2d 93, 97 (10th Cir. 1950) (discussing statute as example of language "disestablish[ing] the organized reservation").

- "[A]ll the unallotted lands within said reservation shall be restored to the public domain." Act of May 27, 1902, ch. 888, 32 Stat. 245, 263; *see Hagen*, 510 U.S. at 412 (discussing statute and explaining that "Congress considered Indian reservations as separate from the public domain").

- "[T]he reservation lines of the said Ponca and Otoe and Missouria Indian reservations be, and the same are hereby, abolished." Act of April 21, 1904, ch. 1409, 33 Stat. 189, 218; *see Mattz*, 412 U.S. at 504 n.22 (citing as example of "clear language of express termination").

- "The said Indians belonging on the Shoshone or Wind River Reservation, Wyoming, for the consideration hereinafter named, do hereby cede, grant, and relinquish to the United States, all right, title, and interest which they may have to all the lands embraced within the said reservation, except the lands within and bounded by the following lines . . . ." Act of March 3, 1905, ch. 1452, art. 1, 33 Stat. 1016, 1016; *see Wyoming*, 849 F.3d at 870 (calling this language "precisely suited to diminishment" (quotations omitted)).[60]

Indeed, Congress has had no difficulty addressing the boundaries of the Creek Reservation, and, as the following treaties show, Congress used clear language on these occasions:

- "The Creek Nation of Indians cede to the United States all the land belonging to the said Nation in the State of Georgia, and lying on the east side of the middle of the Chatahoochie river. And, also, another tract of land lying within the said State, and bounded as follows . . . ." 1826 Treaty, art. 2, 7 Stat. at 286-87.

- "The Creek tribe of Indians cede to the United States all their land, East of the Mississippi river." 1832 Treaty, art. 1, 7 Stat. at 366.

- "The United States hereby agree . . . that the Muskogee or Creek country west of the Mississippi, shall be embraced within the following boundaries . . . ." 1833 Treaty, art. 2, 7 Stat. at 418.

---

[60] Additional examples can even be found within the statutes the State cites, but not with respect to the Creek Nation. In the 1893 appropriations law—the State's first statute—Congress provided money to satisfy sum-certain purchases of Indian lands under agreements previously negotiated with two Tribes. First, Congress approved $30,600 "to pay the Tonkawa tribe of Indians in the Territory of Oklahoma for all their right, title, claim, and interest of every kind and character in and to four townships of land . . . conveyed and relinquished to the United States." § 11, 27 Stat. at 643-44. Second, Congress appropriated $80,000 "to pay the Pawnee tribe of Indians in Oklahoma, formerly a part of the Indian Territory, for all their right, title, claim, and interest of every kind and character in and to all that tract of country between the Cimarron and Arkansas rivers embraced within the limits of seventeen specified Townships of land, ceded, conveyed, and relinquished to the United States." § 12, 27 Stat. at 644. Further, Congress declared these newly acquired lands to be "part of the public domain." § 13, 27 Stat. at 644.

- "The Creek Nation doth hereby grant, cede, and convey to the Seminole Indians, the tract of country included within the following boundaries . . . ."  1856 Treaty, art. 1, 11 Stat. at 699; *see also id.* at art. 2, 11 Stat. at 700 ("The following shall constitute and remain the boundaries of the Creek country . . . ."); *id.* at arts. 5-6, 11 Stat. at 700-02 (providing for release of Creek claims to specified lands in consideration of $1 million paid by United States).

- "[T]he Creeks hereby cede and convey to the United States . . . the west half of their entire domain, to be divided by a line running north and south; the eastern half of said Creek lands, being retained by them, shall, except as herein otherwise stipulated, be forever set apart as a home for said Creek Nation; and in consideration of said cession of the west half of their lands . . .  the United States agree to pay the sum of . . . nine hundred and seventy-five thousand one hundred and sixty-eight dollars . . . ."  1866 Treaty, art. 3, 14 Stat. at 786; *see also id.* at art. 9, 14 Stat. at 788 (providing for the construction of buildings "in the reduced Creek reservation").

The Supreme Court has said that when earlier treaties contained unequivocal language of disestablishment or diminishment and a later enactment "speaks in much different terms," "[t]he change in language . . . undermines [the] claim that Congress intended to do the same with the reservation's boundaries in [the later statute] as it did in [the earlier treaties]." *Parker*, 136 S. Ct. at 1080; *see also Mattz*, 412 U.S. at 504 ("Congress was fully aware of the means by which termination could be effected.  But clear termination language was not employed in the [relevant statute].  This being so, we are not inclined to infer an intent to terminate the reservation."); *Seymour*, 368 U.S. at 355 (comparing earlier statute "expressly vacating the South Half of the reservation and restoring that land to the public domain" with later statute and finding that later statute "repeatedly refer[red] to the Colville Reservation in a manner that makes it clear that the intention of Congress was that the reservation should continue to exist as such").

Although the State contends the cumulative force of the eight statutes disestablished the Creek Reservation, Congress again discussed Creek boundaries in direct terms immediately following passage of the State's final statute. The Oklahoma Enabling Act was passed on June 16, 1906. 34 Stat. at 267. Days later, on June 21, Congress recommitted to the boundary separating "the Creek Nation" and "the Territory of Oklahoma." Act of June 21, 1906, ch. 3504, 34 Stat. 325, 364. The line, surveyed in 1871 and reestablished by the U.S. Geological Survey in 1895 and 1896, was "declared to be the west boundary line of the Creek Nation." *Id.* In the same statute, Congress established a new recording district in the Indian Territory and did so by reference to "the north line of the Creek Nation." 34 Stat. at 343. These references to the lines and boundaries of the Creek Nation undercut the State's contention that its eight statutes cumulatively disestablished the Creek Reservation.

As we recently said in *Wyoming*, "[t]here are no magic words of cession required to find diminishment. Rather, the statutory language, whatever it may be, must 'establish an express congressional purpose to diminish.'" 849 F.3d at 869-70 (quoting *Hagan*, 510 U.S. at 411). There are no traditional textual signs of disestablishment in any of the statutes, and our review uncovers no other language to overcome the presumption that the Creek Reservation continues to exist. *See Solem*, 465 U.S. at 481. In fact, the Original Agreement recognized the Reservation's boundaries.

2) Signs Congress continued to recognize the Reservation

The eight statutes not only lack textual evidence that Congress disestablished the Creek Reservation, the Original Agreement contains language recognizing the existence

- 95 -

of the Creek Nation's borders. *See, e.g.*, ¶ 10, 31 Stat. at 864 (discussing towns "in the Creek Nation"); ¶ 25, 31 Stat. at 869 (municipal corporations "in the Creek Nation"); ¶ 37, 31 Stat. at 871 (introduction of cattle "into the Creek Nation"); ¶ 41, 31 Stat. at 872 (application of other laws and treaties "in the Creek Nation"); ¶ 42, 31 Stat. at 872 (notice through publication in newspapers "having a bona fide circulation in the Creek Nation"); ¶ 43, 31 Stat. at 872 (maintenance of liquor laws "in said nation"). And so did other statutes. *See, e.g.*, Supplemental Agreement, ¶¶ 11, 13, 17-18, 32 Stat. at 502-04; Five Tribes Act, §§ 12, 14, 16, 24, 27, 34 Stat. at 141-43, 146, 148; Oklahoma Enabling Act, § 6, 34 Stat. at 272.

The Original Agreement also reserved lands for tribal purposes. *See* ¶ 24, 31 Stat. at 868. *Solem* explained that retention of lands for tribal purposes "strongly suggests" continued reservation status. *See* 465 U.S. at 474 (explaining "[i]t is difficult to imagine why Congress would have reserved lands for such purposes" if the land was no longer a reservation). "Surplus" Creek lands were not made a part of the public domain or even opened to unrestricted non-Indian settlement. Congress and the Tribe instead agreed lands not initially claimed as allotments would be used for the Tribe's benefit by equalizing the allotments of Creek citizens. *See* ¶¶ 3, 9, 31 Stat. at 862, 864; *see also* § 7, 34 Stat. at 272.

And instead of making a sum-certain payment to the Creek Nation for all—or even a portion of—its land, the Agreement provided the Tribe would receive an uncertain amount of revenue based on future sales to non-Indian settlers of surveyed town lots. *See* ¶¶ 11-15, 31 Stat. at 866; *see also Parker*, 136 S. Ct. at 1079 (finding no intent to

- 96 -

diminish where Tribe did not "receiv[e] a fixed sum for all of the disputed lands" because "the Tribe's profits were entirely dependent upon how many nonmembers purchased the appraised tracts of land"); *id.* at 1080 ("Such schemes allow non-Indian settlers to own land on the reservation. But in doing so, they do not diminish the reservation's boundaries." (citation and quotations omitted)).

Thus, not only do the State's statutes lack any language showing disestablishment, they show Congress's continued recognition of the Reservation's boundaries.

### 3) The State's title and governance arguments

The State's arguments for disestablishment based on Congress's general goals of extinguishing tribal title and establishing a new state government fail. Relying on its first statute—the 1893 appropriations law in which Congress announced the commencement of negotiations—the State argues Congress intended to disestablish the Creek Reservation because Congress aimed for (1) the "extinguishment" of tribal title and (2) the "ultimate creation" of one or more state governments in the Indian Territory. Aplee. Br. at 58 (quoting § 16, 27 Stat. at 645). Congress largely achieved both goals,[61] but the State's arguments fail because they confuse questions of title and governance with the issue before us—the Reservation's boundaries.

---

[61] Tribal title was never fully extinguished because, as we explained in *Indian Country, U.S.A.*, the Creek Nation has retained title to some lands within the Reservation. 829 F.2d at 976.

a) Title

Whether a reservation has been disestablished or diminished depends on whether its boundaries were erased or constricted, not on who owns title to land inside the lines. "This distinction between a property's title and a reservation's territory is important." *Shawnee Tribe*, 423 F.3d at 1220 n.17. Congress has defined "Indian country" to include "all land within the limits of any Indian reservation." 18 U.S.C. § 1151(a). Based on this definition, the Supreme Court has accepted the "inescapable" conclusion that allotment alone does not terminate a reservation. *Mattz*, 412 U.S. at 504. "[A]djudicating reservation boundaries is conceptually quite distinct from adjudicating title to the same lands. One inquiry does not necessarily have anything in common with the other, as title and reservation status are not congruent concepts in Indian law." *Navajo Tribe*, 809 F.2d at 1475 (footnote and quotations omitted). In other words, who has title is not the same question as whether Congress has erased or altered a reservation's boundaries. *See Yazzie*, 909 F.2d at 1394 (observing "the distinction between title and boundary [is] an important one"); *see also Solem*, 465 U.S. at 470 ("[N]o matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.").

The allotment of Creek lands—the transfer of title from the Tribe to its members—does not mean Congress disestablished the Creek Reservation. Allotment can be "completely consistent with continued reservation status." *Mattz*, 412 U.S. at 497; *see Navajo Tribe*, 809 F.2d at 1475 ("[A]llotment in severalty to individual Indians and subsequent entry by non-Indians is entirely consistent with continued reservation status."

- 98 -

(quotations omitted)); *see also Solem*, 465 U.S. at 469 ("[I]t is settled law that some surplus land acts diminished reservations, and other surplus land acts did not." (citations omitted)). *Solem* provides the framework for the required case-by-case evaluation, and here the State presents no language showing Congress altered the Creek Reservation's boundaries. Its focus on the extinguishment of tribal title and the shift to individual ownership misses the mark because "the Supreme Court has required that specific congressional intent to diminish *boundaries* and not just Indian land titles be clearly established." *Yazzie*, 909 F.2d at 1394-95. As the Creek Nation explains, the allotment of Creek lands "effectuate[d] an uncompensated change from communal title to title in severalty," but this "transfer of title sa[id] nothing about reservation boundaries." Creek Nation Br. at 15.

### b) Governance

Neither do changes in governance over the Creek Reservation show that Congress disestablished the Reservation. The State argues the erosion of Creek governmental authority and the creation of Oklahoma demonstrate Congress disestablished the Creek Reservation. For three reasons, we disagree.

First, a tribal government's *powers* and its reservation's *boundaries* are not the same thing. At times, the State's brief recognizes this point. *See* Aplee. Br. at 89 (arguing Mr. Murphy has "confuse[d] the question of whether the Nation was dissolved as a political entity with the issue in this case, i.e., whether the reservation was disestablished"); *see also id.* at 84 n.33 (noting "the Creek Nation continued to exist as a political entity"). But the State's attempt to tie Congress's regulation of the Creek

government's authority to what Congress must have intended regarding the Reservation's borders fails to satisfy *Solem*'s step one. *See* 465 U.S. at 470 (explaining Congress must "clearly evince an intent to change boundaries" (quotations omitted)).[62]

Second, even if the State could show that dissolution of a tribal government is relevant to disestablishing a reservation, that would not mean the Creek Reservation has been disestablished. This is so because Congress never dissolved the Creek government. Even when Congress contemplated the *future* dissolution of the Creek government, it continued to recognize the Tribe's governmental authority within the Reservation's boundaries. *See, e.g.*, Original Agreement, ¶ 42, 31 Stat. at 872. Thirty years ago, this court explained:

> Although Congress at one time may have envisioned the termination of the Creek Nation and complete divestiture of its territorial sovereignty, the legislation enacted in 1906 reveals that Congress decided not to implement that goal, and instead explicitly perpetuated the Creek Nation and recognized its continuing legislative authority. Congress subsequently repudiated its earlier policies of termination and enacted legislation designed to restore governmental powers to the Oklahoma tribes.

*Indian Country, U.S.A.*, 829 F.2d at 981 (citation omitted). And, as all parties agree, the Creek government continues to exist today.

Third, Oklahoma's admission into the Union is compatible with the Creek Reservation's continuation. States and reservations co-exist throughout the country. *See,*

---

[62] The State's contention that regulation of the tribal government indirectly reveals what Congress thought about the Reservation's borders may more appropriately be a step-two argument about the contemporary understanding of the Acts, rather than a step-one textual argument. Either way, it fails to show Congress disestablished the Creek Reservation's boundaries.

*e.g.*, *Parker*, 136 S. Ct. at 1076 (Omaha Indian Reservation within Nebraska); *Solem*, 465 U.S. at 465-66 (Cheyenne River Sioux Reservation within South Dakota); *Indian Country, U.S.A.*, 829 F.2d at 976 (Creek Reservation within Oklahoma); *see also Donnelly v. United States*, 228 U.S. 243, 270-72 (1913) (holding California's admission did not affect federal jurisdiction over murder on Indian reservation).

In sum, the eight statutes do not, individually or collectively, show that Congress disestablished the Creek Reservation. They lack any of the "hallmarks of diminishment," *Parker*, 136 S. Ct. at 1079, and what they do say supports the view of Mr. Murphy and the Creek Nation that the 1866 Reservation borders continue to exist. The State's arguments about tribal title and governance miss the mark. Its case for disestablishment has "fail[ed] at the first and most important step." *Id.* at 1080.

b. *Step Two: Contemporary Historical Evidence*

When the statutory text at step one does not reveal that Congress has disestablished or diminished a reservation, such a finding requires "unambiguous evidence" that "*unequivocally* reveals" congressional intent. *Parker*, 136 S. Ct. at 1080-81 (alterations and quotations omitted); *see also Solem*, 465 U.S. at 478 ("[I]n the absence of some clear statement of congressional intent to alter reservation boundaries, it is impossible to infer from a few isolated and ambiguous phrases a congressional purpose to diminish [a reservation].").

At step two of the *Solem* analysis, courts consider how pertinent legislation was understood to affect the reservation when it was enacted. Evidence of this contemporary understanding may include the negotiations between the tribe and the federal

- 101 -

government, congressional floor debates, and committee reports about the relevant

statues. *See Solem*, 465 U.S. at 476-78; *see also Wyoming*, 849 F.3d at 874-75

(considering earlier, failed legislation as indicative of intent).

We have relied on step-two evidence to find disestablishment. In *Osage Nation*,

we concluded Congress had disestablished the Osage Reservation, despite an absence of

clear textual evidence, because we found "the legislative history and the negotiation

process [made] clear that all the parties at the table understood that the Osage reservation

would be disestablished by the Osage Allotment Act." 597 F.3d at 1125.[63]

The State argues the contemporary historical evidence shows Congress intended to

disestablish the Creek Reservation. Mr. Murphy and the Creek Nation contend there is

no unequivocal historical evidence of disestablishment. Instead, they argue the evidence

supports continued recognition of the Creek Nation's borders during the relevant period.

The mixed evidence we discuss below falls short of "*unequivocally* reveal[ing]" that

Congress disestablished the Creek Reservation. *Parker*, 136 S. Ct. at 1080 (quotations

omitted).[64]

---

[63] In *Osage Nation,* we referred in passing to the Creek Reservation as disestablished, *see* 597 F.3d at 1124, but the disestablishment or diminishment of the Creek Reservation was not before us in that case; the Creek Nation was not a party and therefore was not heard; and the court performed no *Solem* analysis regarding the Creek Reservation. The State acknowledges *Osage Nation* does not bind us here. *See* Aplee. Br. at 93 ("[T]his Court's statement that the Creek reservation was disestablished was dicta . . . .").

[64] Had the State chosen to present its eight-statute, cumulative-effect argument as step-two contextual evidence—as opposed to step-one textual evidence—we would still conclude Congress did not disestablish the Creek Reservation. The eight

Continued . . .

The State's step-two evidence comes from the years preceding the 1901 Original

Allotment Agreement. On their own, pre-1901 understandings do little to advance the

analysis because the State "does not dispute that the reservation was intact in 1900."

Aplee. Br. at 75 n.25. But we understand the State to argue that Congress had a pre-1900

intention to disestablish the Creek Reservation and that this intention carried through later

legislation. *See Wyoming*, 849 F.3d at 878-79 (finding a "continuity of purpose" and

stating "Congress's consistent attempts . . . to purchase the disputed land compel the

conclusion that this intent continued through the passage of the 1905 Act").

The State largely relies on court decisions discussing Creek history as opposed to

primary sources from the relevant time period. *See* Aplee. Br. at 69-70 (citing

*Woodward*, 238 U.S. at 293; *Sizemore v. Brady*, 235 U.S. 441, 447 (1914); *Stephens v.*

*Cherokee Nation*, 174 U.S. 445, 483 (1899); *United States v. Hayes*, 20 F.2d 873, 888

(8th Cir. 1927); *Harjo*, 420 F. Supp. at 1110). Many of these cases were decided years

after the allotment of Creek lands and after Oklahoma became a state, thus providing

second-hand evidence of any contemporaneous historical understanding. To the extent

the State's cases discuss legislative documents from the era, we look to the documents

themselves.

statutes reveal a congressional hostility to Creek independence consistent with the
assimilationist impulse of the era. *See Solem*, 465 U.S. at 466-69. But they do not
show, and certainly not unequivocally, "a specific congressional purpose" to
disestablish the Reservation's borders. *Id.* at 469. As our step-two discussion
demonstrates, the contemporary historical evidence that the Reservation was
disestablished is mixed.

1) 1892 Senate debate

The State cites *Hayes* for its earliest historical evidence of Congress's intent to disestablish the Creek Reservation. *Hayes*, a 1927 decision by the Eighth Circuit, discussed an 1892 Senate floor debate in which Senators Jones and Platt opposed a joint resolution proposing to create a commission to negotiate with the Five Civilized Tribes to induce them to allot their lands. *See* 20 F.2d at 879-82 (summarizing debate). Senator Jones argued the government's goal should be to induce the Indians "to abandon their tribal organizations and their tribal governments and to become citizens of the United States." 24 Cong. Rec. 98 (Dec. 13, 1892). Allotment should be offered, he said, *in exchange for* the dissolution of tribal governments. *Id.* He argued the joint resolution would "give away the single advantage we have." *Id.*

Senator Platt thought the "real question" was whether the country could "endure five separate, independent, sovereign, and almost wholly foreign governments within the boundaries of the United States." *Id.* at 100. Although acknowledging "[t]he United States conveyed to each of the five civilized tribes their lands in fee simple, and agreed that they should never be included in any Territorial or State government, so long as the tribes continued to exist and occupy the lands," he contended things had changed. *Id.* The "original idea" had been "that white people were not to dwell in that country," but he thought the influx of white settlers into the Indian Territory showed the Tribes no longer wished to remain isolated. *Id.* The changing demographic situation required new governing structures. *Id.* at 101-02. Elimination of the tribal governments, he argued, would eventually have to happen with or without the Tribes' consent. *Id.* at 102. Senator

Platt also pointed out the Committee on Indian Affairs was drafting a bill to create a commission "much wider in scope than is contained in the joint resolution." *Id.*

The joint resolution "died upon the table without reference to committee," *Hayes*, 20 F.2d at 880 (quotations omitted), but, as discussed above, Congress created the Dawes Commission the next year though the 1893 Act, which instructed the Commission to pursue the purchase or allotment of tribal lands and to secure conditions "suitable to enable the ultimate creation of a State or States of the Union which shall embrace the lands within said India[n] Territory," § 16, 27 Stat. at 645.

This legislative history of a failed resolution falls far short of what would permit us to find disestablishment. "[I]solated statements" from a few legislators do not show that Congress disestablished a reservation, *Parker*, 136 S. Ct. at 1080, especially when, as here, the discussion concerns tribal title and governance rather than a reservation's boundaries.

### 2) 1894 Senate committee report

Next, the State looks to an 1894 report from a Senate select committee on the Five Civilized Tribes discussed in *Stephens*, an 1899 Supreme Court decision involving the constitutionality of laws regulating the Indian Territory. *See* 174 U.S. at 483. The report noted 1890 census figures showing the white population in the Indian Territory greatly outnumbering the Indian population. S. Rep. No. 53-377, at 6 (1894). Within the Indian Territory there were "[f]lourishing towns . . . composed wholly of white people." *Id.* To the committee, this state of affairs undercut the isolationist notion undergirding earlier treaties:

> It must be assumed . . . that the Indians themselves have determined to abandon the policy of exclusiveness, and to freely admit white people within the Indian Territory, for it cannot be possible that they can intend to demand the removal of the white people either by the Government of the United States or their own. They must have realized that when their policy of maintaining an Indian community isolated from the whites was abandoned for a time it was abandoned forever.

*Id.* at 7.

The committee report also commented on the state of land ownership and governance within the Indian Territory. Although the Tribes held title for the benefit of all their citizens, the report found that some tribal citizens, "frequently not Indians by blood but by intermarriage," had managed to take effective control over large swaths of the best agricultural land and earn private income by renting out sections of the land. *Id.* at 11-12. The report observed that this development disadvantaged many tribal citizens and the United States might have to intervene to ensure that tribal holdings were administered for the benefit of all a Tribe's members. *Id.* The report viewed the Tribes in the Indian Territory as incapable of reforming the situation, labelling "their system of government" as "not only non-American" but "radically wrong." *Id.* at 12. "There can be no modification of the system. It can not be reformed. It must be abandoned and a better one substituted." *Id.* Convinced change was needed, but "not car[ing] to . . . suggest what . . . will be the proper step for Congress to take," the committee simply noted that the Dawes Commission was hard at work, and said it would "wait and see." *Id.* at 12-13.

This report describing 1890s conditions does not address whether Congress understood its later reforms would disestablish the Creek Reservation. And again, the

State's contextual evidence concerns title and governance and does not speak to the reservation question.

> 3) Other sources

The State references an 1895 report from the Dawes Commission to Congress, which stated that the "so-called governments" in the Indian Territory were "wholly corrupt, irresponsible, and unworthy to be longer trusted" with the lives and property of Indian citizens. Dep't of the Interior, H.R. Doc. No. 54-5, at XCV (1st Sess. 1895). The Commission predicted the situation would not "remain peaceabl[e]" if the white population were excluded from the governance arrangement and stressed the United States was "bound by constitutional obligations to see to it that government everywhere within its jurisdiction rests on the consent of the governed." *Id.* at XC.

The State argues an 1897 report by the Secretary of the Interior similarly found that a uniform system of government would have to be provided for the Indian Territory. The State also observes that the Creek Nation and the Dawes Commission negotiated agreements that were rejected by either the Tribe or Congress before both sides agreed to the Original Allotment Agreement, but the State does not cite any particular provisions in these earlier, proposed deals to argue they reveal a contemporary understanding that Congress intended to disestablish or diminish the Creek Reservation.

These materials fail to show that Congress intended to disestablish the Creek Reservation by enacting any of the eight statutes.

ii. <u>Mr. Murphy's and the Creek Nation's evidence</u>

Mr. Murphy contends there is no unequivocal historical evidence supporting disestablishment. To the contrary, he and the Tribe cite sources from both before and after the 1901 Original Agreement to argue the Creek Nation's borders remain intact.

1) 1894 Dawes Commission records

The Creek Nation points to records from the Dawes Commission's early years. Its 1894 report to Congress discussed the Commission's negotiations and explained the Tribes had refused to discuss changes "in respect either to their form of government or the holdings of their domains." Dep't of the Interior, H.R. Doc. No. 53-1, at LIX-LX (3d Sess. 1894). The Commission explained to Congress it had proposed allotment after "abandon[ing] all idea of purchasing" tribal lands because "the Indians would not, under any circumstances, agree to cede any portion of their lands to the Government." *Id.* at LVX. The same report included a copy of the terms the Commission had submitted to the Creek Nation—the propositions "upon which [the Commission] proposed to negotiate." *Id.* at LX-LXI. The eighth proposition stated that, if an agreement was reached, Congress would be allowed to form a territorial government "over the territory of the Creek Nation." *Id.*

2) 1895 Dawes letter

Next, the Tribe points to an 1895 letter from Chairman Dawes to the Creek Nation's principal chief explaining:

> [T]he Commission have not come here to interfere at all with the administration of public affairs in these nations, or to undertake to deprive any of your people of their just rights. On the other hand, it is their purpose

- 108 -

and desire, and the only authority they have, to confer with you upon lines that will result in promoting the highest good of your people and securing to each and all of them their just rights under the treaty obligations which exist between the United States and your nation.

H.R. Doc. No. 54-5, at LXXXI. These treaty obligations, the Creek Nation argues, included the 1866 treaty's recognition of the Tribe's territorial integrity.

### 3) 1900 Attorney General opinion

The Creek Nation also relies on a 1900 Attorney General opinion, which addressed the "conditions now existing in the Indian country occupied by the Five Civilized Tribes" to argue the 1898 Curtis Act did not affect the Reservation's boundaries. 23 U.S. Op. Att'y Gen. 214, 215 (1900), *available at* 1900 WL 1001. Responding to an inquiry from the Secretary of the Interior about the presence of non-Indians in the Indian Territory, the Attorney General explained that the Tribes, even after passage of the Curtis Act, still had the power to exclude intruders and to set the terms upon which non-members could enter the Tribes' lands. *See id.* at 215-18. The opinion said the Tribes could regulate activity within their borders because, although outsiders could purchase town lots, "the legal right to purchase land within an Indian nation gives to the purchaser no right of exemption from the laws of such nation." *Id.* at 217. Tribal laws "requiring a permit to reside or carry on business in the Indian country" were still in effect. *Id.* Non-members grazing cattle or otherwise occupying Indian lands were "simply intruders" who "should be removed, unless they obtain such permit and pay the required tax, or permit, or license fee." *Id.* at 219. The Attorney General concluded the Secretary of the Interior had

the authority and duty . . . to remove all persons of the classes forbidden by treaty or law, who are there without Indian permit or license; to close all business which requires a permit or license and is being carried on there without one; and to remo[v]e all cattle being pastured on the public land without Indian permit or license, where such license or permit is required; and this is not intended as an enumeration or summary of all the powers or duties of your Department in this direction.

*Id.* at 220; *see also Maxey v. Wright*, 54 S.W. 807, 809-10, 812 (Indian Terr.) (upholding Creek occupancy tax imposed on non-member lawyers practicing law within the Creek Nation), *aff'd*, 105 F. 1003 (8th Cir. 1900).

### 4) Post-allotment evidence

Mr. Murphy and the Tribe argue contemporary historical evidence shows an understanding that the Creek Nation's borders continued after allotment. In its report to Congress in 1900, the Dawes Commission reflected on what its negotiations had—and had not—achieved:

Had it been possible to secure from the Five Tribes a cession to the United States of the entire territory at a given price, the tribes to receive its equivalent in value, preferably a stipulated amount of the land thus ceded, equalizing values with cash, the duties of the commission would have been immeasurably simplified, and the Government would have been saved incalculable expense. . . . When an understanding is had, however, of the great difficulties which have been experienced in inducing the tribes to accept allotment . . . it will be seen how impossible it would have been to have adopted a more radical scheme of tribal extinguishment, no matter how simple its evolutions.

Dep't of the Interior, H.R. Doc. No. 56-5, at 9 (2d Sess. 1900).

Mr. Murphy points out that, in the years immediately following passage of the allotment agreements, the regional federal circuit court with jurisdiction over the Indian Territory continued to recognize the Creek Nation's borders. In *Buster*, federal agents

enforced the Creek Nation's licensing fee on trade "within its borders" by closing the

businesses of non-Indians who had refused to pay. 135 F. at 949-50. The non-Indian

business owners sought to enjoin federal enforcement of the tax and argued the Creek

Nation's power had been withdrawn by the Original and Supplemental Allotment

Agreements, which authorized the presence of individuals in lawful possession of town

lots. *Id.* at 950. The Eighth Circuit held that, although allotment had altered title

arrangements, the Creek Nation's power to govern the area was "not conditioned or

limited by the title to the land." *Id.* at 951. "Neither the United States, nor a state, nor

any other sovereignty loses the power to govern the people within its borders . . . by the

ownership [or] occupancy of the land within its territorial jurisdiction by citizens or

foreigners." *Id.* at 952. The Creek Nation retained "its power to fix the terms upon

which noncitizens may conduct business *within its borders*." *Id.* (emphasis added). The

Eight Circuit said in summation:

> The ultimate conclusion of the whole matter is that purchasers of lots in
> town sites in towns or cities within the original limits of the Creek Nation,
> who are in lawful possession of their lots, are still subject to the laws of that
> nation prescribing permit taxes for the exercise by noncitizens of the
> privilege of conducting business in those towns, and that the Secretary of
> the Interior and his subordinates may lawfully enforce those laws by
> closing the business of those who violate them, and thereby preventing the
> continuance of that violation.

*Id.* at 958.[65]

---

[65] The Supreme Court has questioned *Buster*'s approach to Indian taxing
authority, but we consider the case only as a contemporary source revealing an
understanding that Congress had not disestablished the Creek Reservation.

Continued . . .

iii. Analysis

The State's evidence at step two largely speaks to changes (or anticipated changes) in title and governance. It does not show that Congress understood it was disestablishing the Creek Reservation. Although Mr. Murphy and the Creek Nation present counter evidence showing a continuing understanding that the Creek Reservation's borders remained intact, we need not settle which side has the stronger argument about the contemporary historical evidence. Under *Solem*, our inquiry is simpler. Because no clear textual evidence shows Congress disestablished the Creek Reservation at step one, it is enough for us to say at step two that the "historical evidence in no way '*unequivocally* reveal[s] a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation.'" *Parker*, 136 S. Ct. at 1080 (alteration and emphasis in original) (quoting *Solem*, 465 U.S. at 471).

None of the step-two evidence, whether viewed in isolation or in concert, shows unmistakable congressional intent to disestablish the Creek Reservation. The State's historical evidence supports the notion that Congress intended to institute a new government in the Indian Territory and to shift Indian land ownership from communal

In *Atkinson Trading Co.*, the Supreme Court invalidated a hotel occupancy tax challenged by a non-Indian who owned a hotel within the borders of the Navajo Reservation. 532 U.S. at 647-48, 659. In doing so, the Court made clear that it has never endorsed *Buster*'s broad statement "that an Indian tribe's 'jurisdiction to govern the inhabitants of a country is not conditioned or limited by the title to the land which they occupy in it.'" *Id.* at 653 n.4 (quoting 135 F. at 951). For our purposes, the correctness of *Buster*'s pronouncements on Indian taxing authority is irrelevant. Mr. Murphy and the Creek Nation rely on *Buster* simply as contemporary historical evidence.

holdings to individual allotments. But this does not show, unequivocally or otherwise, that Congress had erased or even reduced the Creek Reservation's boundaries. Even if the State's evidence offers some suggestion of a contemporary understanding that the Creek Reservation was disestablished, Mr. Murphy and the Creek Nation have marshalled evidence showing an understanding that the Reservation's borders continued. The step-two evidence is at most debatable, and we need not parse it further because ambiguous evidence cannot overcome the missing statutory text at step one. *See Hagen*, 510 U.S. at 411 ("Throughout the inquiry, we resolve any ambiguities in favor of the Indians . . . .").

After the first two steps, the statutory-text analysis fails to show that Congress disestablished or diminished the Creek Reservation, and there is no unequivocal evidence of a contemporaneous understanding that the legislation terminated or redrew the Creek Nation's borders at step two. We turn to step three.

c. *Step Three: Later History*

We consider at step three "federal and local authorities' approaches to the lands in question and . . . the area's subsequent demographic history." *Shawnee Tribe*, 423 F.3d at 1222; *see Solem*, 465 U.S. at 471; *see also Parker*, 136 S. Ct. at 1081 (considering tribal presence in contested territory). "Congress's own treatment of the affected areas," especially in the years immediately following passage of legislation that opens a reservation to non-Indian settlement, "has some evidentiary value, as does the manner in which the Bureau of Indian Affairs and local judicial authorities" treated the disputed area. *Solem*, 465 U.S. at 471. Step three also concerns "who actually moved onto

- 113 -

opened reservation lands," *id.*, but later demographic facts are "the least compelling" evidence for disestablishment or diminishment because "[e]very surplus land Act necessarily resulted in a surge of non-Indian settlement and degraded the 'Indian character' of the reservation." *Yankton Sioux Tribe*, 522 U.S. at 356.

*Solem* provides that, as compared to steps one and two, step-three evidence is considered "[t]o a lesser extent." 465 U.S. at 471. In its most recent decision applying *Solem*, the Supreme Court observed that although it has "suggest[ed]" step-three evidence "might reinforce" a conclusion based on statutory text, it "has never relied solely on this third consideration to find diminishment." *Parker*, 136 S. Ct. at 1081 (alterations and quotations omitted); *see also Wyoming*, 849 F.3d at 879 ("[S]ubsequent events cannot undermine substantial and compelling evidence from an Act and events surrounding its passage." (quotations omitted)).

We proceed to discuss (i) the treatment of the area and (ii) its demographic history. The conflicting step-three evidence discussed below does not allow us to say that Congress disestablished the Creek Reservation.

     i.    <u>Treatment of the area</u>

        1)  Congress

Both sides cite evidence to show what later Congresses understood about the Creek Reservation's existence. We start with the earliest examples.

The Creek Nation cites the following statutes in arguing Congress continued to recognize the Reservation's boundaries following passage of the allotment agreements: Act of April 21, 1904, ch. 1402, 33 Stat. 189, 204 (granting Secretary of the Interior

authority to sell "the residue of lands in the Creek Nation"), *repealed by* Act of March 3, 1905, ch. 1479, 33 Stat. 1048, 1072 (revoking Secretary's authority); Act of March 3, 1909, ch. 263, 35 Stat. 781, 805 (providing for "equalization of allotments in the Creek Nation"); and Act of May 25, 1918, ch. 86, 40 Stat. 561, 581 (appropriating money for "the common schools in the Cherokee, Creek, Choctaw, Chickasaw, and Seminole Nations"). We find these laws carry some weight because, within step three, *Solem* emphasizes the years "immediately following" passage of the relevant laws. *See* 465 U.S. at 471; *see also Hagen*, 510 U.S. at 420 (repeating the Court's "longstanding observation that the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one" (brackets and quotations omitted)).

The Creek Nation cites other statutes showing that reservations continued to exist in Oklahoma, though they do not speak directly to the Creek Reservation. *See* Act of May 29, 1924, ch. 210, 43 Stat. 244, 244 (regulating oil and gas leases on "unallotted land on Indian reservations other than lands of the Five Civilized Tribes and the Osage Reservation"); Act of June 26, 1936, ch. 831, 49 Stat. 1967, 1967 (authorizing Secretary of the Interior to acquire land and water rights "within or without existing Indian reservations" in Oklahoma).

The State points to more recent statutes in which Congress defined "reservation" to include, among other things, "former Indian reservations in Oklahoma." Aplee. Br. at

85.[66] These laws also include existing reservations within their definitions, however, and none of them reference the Creek Reservation as being disestablished in particular. Congress's choice to include former reservation lands in Oklahoma within various regulatory programs does not show that Congress has disestablished the Creek Reservation.

The State also cites two congressional committee reports. First, a 1935 report by a Senate committee said that in Oklahoma, as the result of allotment, "Indian reservations as such have ceased to exist." S. Rep. No. 74-1232, at 6 (1935). But as the Creek Nation argues, the legislation associated with the report, the Oklahoma Indian Welfare Act, referenced "existing Indian reservations." *See* § 1, 49 Stat. at 1967. Second, the State argues "[a] survey in 1952 referred to the lands of the Five Civilized Tribes as areas, rather than reservations." Aplee. Br. at 85 (citing H.R. Rep. No. 82-2503, at 745, 753, 777, 793, 952 (1952)). Mr. Murphy and the Creek Nation do not address this report, but the State does not explain why "areas" and "reservations" cannot refer to the same land.

Altogether, these conflicting signals from later Congresses do not overcome the lack of evidence at steps one and two. Given "the textual and contemporaneous evidence" in this case, "confusion in the subsequent legislative record does nothing to alter our conclusion" that the Creek Reservation's borders still exist. *Hagen*, 510 U.S. at

---

[66] The State cites the following examples: 12 U.S.C § 4702(11); 16 U.S.C. § 1722(6)(C); 25 U.S.C. §§ 1452(d), 2020(d)(1)-(2), 3103(12), 3202(9); 29 U.S.C. § 741(c); 33 U.S.C. § 1377(c); 42 U.S.C. §§ 2992c(2), 5318(n)(2). Within 29 U.S.C. § 741, "reservation" is actually defined in subsection (d), and within 42 U.S.C. § 2992c, "Indian reservation" is defined in subsection (3).

420; *see also id.* ("The subsequent history is less illuminating than the contemporaneous evidence.").

### 2) Executive

The parties' evidence from the executive branch also is mixed. The Creek Nation contends that the Bureau of Indian Affairs continued to regard the Reservation as intact in the early years of the twentieth century. The BIA's annual reports following Creek allotment and Oklahoma statehood consistently included the Creek Nation in tables summarizing reservation statistics. *See* Creek Nation Br., App'x B. Similarly, the Department continued to include the Creek Nation on its "Maps Showing Indian Reservations within the Limits of the United States." *See id.* App'x C (maps from 1900-14).

But the State argues a later BIA regulation concerning land acquisition policies shows that the BIA concluded the Creek Reservation was disestablished because the regulation defined "Indian reservation" to mean:

> that area of land over which the tribe is recognized by the United States as having governmental jurisdiction, except that, in the State of Oklahoma or where there has been a final judicial determination that a reservation has been disestablished or diminished, Indian reservation means that area of land constituting the former reservation of the tribe as defined by the Secretary.

25 C.F.R. § 151.2(f) (2016).[67] Even if this evidence supports the State, it merely creates a conflict with the other BIA evidence.

---

[67] The regulation dates to 1980. *See* Land Acquisitions, 45 Fed. Reg. 62034, 62036 (Sept. 18, 1980) (announcing regulation's finalization).

- 117 -

The Supreme Court has said that government officials' later treatment of the disputed area "has 'limited interpretive value.'" *Parker*, 136 S. Ct. at 1082 (quoting *Yankton Sioux Tribe*, 522 U.S. at 355); *see also Solem*, 465 U.S. at 469 ("The first and governing principle is that only *Congress* can divest a reservation of its land and diminish its boundaries." (emphasis added)). And, more generally, the "subsequent treatment of the disputed land cannot overcome the statutory text" when the relevant laws are "devoid of any language" indicating Congress intended to disestablish a reservation. *Parker*, 136 S. Ct. at 1082.

### 3) Federal courts

Both sides point to passing references in federal court decisions across the decades that reveal conflicting understandings of the Creek Reservation's status.

The State invokes a handful of twentieth-century cases "indicat[ing], in dicta, a widely held belief that the reservation was disestablished." Aplee. Br. at 78-79 (citing *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 171 (1973); *Okla. Tax Comm'n v. United States*, 319 U.S. 598, 602-03, 608 (1943); *Grayson v. Harris*, 267 U.S. 352, 353 (1925); *Woodward*, 238 U.S. at 285; *McDougal v. McKay*, 237 U.S. 372, 383 (1915); *Washington v. Miller*, 235 U.S. 422, 423 (1914); *Harjo*, 420 F. Supp. at 1143). But the State's characterization of these cases is overstated. *McClanahan*, for instance, does not discuss the Creek Nation at all. And in *Woodward*, the Supreme Court described the case as involving a 160-acre tract "formerly part of the domain of the Creek Nation," but, in the next sentence, the opinion explained "[t]he tract was allotted to Agnes Hawes, a Creek freedwoman." 235 U.S. at 285. The Court's description of the

- 118 -

land is consistent with the transfer of title from the Creek Nation, which formerly owned it, to Ms. Hawes. As previously explained, a change in title from tribal to individual ownership does not disestablish a reservation. Other cases the State cites suffer the same flawed understanding that allotment had terminated the reservation. *See Grayson*, 267 U.S. at 353, 357 (describing allotted lands "lying within the former Creek Nation"); *Washington*, 235 U.S. at 423 (referring to "lands within what until recently was the Creek Nation in the Indian Territory"). To the extent the State's cases reflect a later understanding that the Creek Reservation had been disestablished, these references, as the State acknowledges, are dicta.

The Creek Nation argues that "[f]ederal courts in the decades after allotment sometimes subscribed to [the] erroneous assumption" that the Creek Reservation had been disestablished based on a mistaken belief that the tribal government had been dissolved. Creek Nation Br. at 32. For example, in *Turner v. United States*, the Court of Claims remarked—incorrectly—that the "Creek Nation of Indians kept up their tribal organization . . . until the year 1906, at which date the tribal government was terminated by the general provisions of [the Original Allotment Agreement]." 51 Ct. Cl. 125, 127 (1916), *aff'd*, 248 U.S. 354 (1919). But, as discussed above, Congress extended the tribal government beyond 1906 and has never dissolved it. *See* § 28, 34 Stat. at 148. The Supreme Court affirmed the Court of Claims' decision and repeated its mistake that "[o]n March 4, 1906, the tribal organization was dissolved pursuant to" the Original Agreement. *Turner*, 248 U.S. at 356. But, as the Court later recognized, the Creek

Nation "still exists" and has "resume[d] some of its former powers." *Seber*, 318 U.S. at 718 & n.23.

As we have explained, the question of tribal governmental powers is distinct from reservation boundaries, but the Creek Nation persuasively argues these clear errors are an "indication of just how shaky such judicial assumptions were" in the decades after allotment. Creek Nation Br. at 32-33.

Scattered dicta in later court decisions do not justify a conclusion that Congress disestablished the Creek Reservation. We have undertaken the three-part *Solem* analysis *because* no Supreme Court or Tenth Circuit case has addressed the question. *See Indian Country, U.S.A.*, 829 F.2d at 975 (reserving issue of "whether the exterior boundaries of the 1866 Creek Nation have been disestablished").

### 4) Oklahoma

The Creek Nation acknowledges the State "asserts considerable governmental authority over the Creek reservation." Creek Nation Br. at 37. Oklahoma's general exercise of authority over the former Indian Territory has included criminal prosecutions of Indians, but we agree with Mr. Murphy and the Creek Nation that the exercise of State authority has not disestablished the Creek Reservation.

In *Ex parte Nowabbi*, Oklahoma convicted a member of the Choctaw Tribe in state court of murdering another tribal member on the victim's allotment. 61 P.2d 1139, 1141-42 (Okla. Crim. App. 1936), *overruled by Klindt*, 782 P.2d 401. The defendant argued the federal district court had exclusive jurisdiction. *Id.* at 1143. The OCCA

concluded state jurisdiction was proper and said Congress had failed to reserve federal

jurisdiction for crimes committed within the former Indian Territory. *Id.* at 1154, 1156.[68]

Since then, however, the state courts have changed course. In 1989, the OCCA

concluded *Nowabbi* had erred in holding Oklahoma had jurisdiction to prosecute an

Indian defendant for a murder committed on an Indian allotment. *See Klindt*, 782 P.2d at

404 ("There is ample evidence to indicate that the *Nowabbi* Court misinterpreted the

statutes and cases upon which it based its opinion. . . . *Nowabbi* is hereby overruled.");

*see also Cravatt*, 825 P.2d at 280 (vacating Indian defendant's state-court conviction for

murder committed on allotment). These cases addressed allotments, not the reservation

question. Still, they show that Oklahoma has shifted away from its earlier position that

there is no Indian country in the former Indian Territory.

The State has not provided us with other examples of Oklahoma prosecuting

Indians for murders committed within the Creek Reservation,[69] but such cases would be

---

[68] The Oklahoma Attorney General similarly concluded in 1979 that Oklahoma has jurisdiction over the former Indian Territory: "Due to the dissolution of the Indian tribes of former 'Indian Territory' as *governments of limited sovereignty*, there is no 'Indian country' in said former 'Indian Territory' over which tribal and thus federal jurisdiction exists." 11 Okla. Op. Att'y. Gen. 345 (1979), *available at* 1979 WL 37653, at *8-9.

[69] In the 1990s, we rejected an attempt by the federal government to allow Oklahoma to prosecute a Creek citizen for the murder of another Creek citizen. *Sands*, 968 F.2d at 1061. We did not address the reservation issue, however, because we determined the crime occurred on an allotment—and thus in Indian country under 18 U.S.C. § 1151(c). *Id.* at 1062. After prosecuting the defendant in federal court, the federal government "urge[d] us to adopt its frequently raised, but never accepted, argument that the State of Oklahoma retained jurisdiction over criminal offenses in

Continued . . .

- 121 -

of little value because the Supreme Court has explained that even when a state's exercise of jurisdiction goes unquestioned, lands retain their Indian country status until Congress decides otherwise. In *United States v. John*, 437 U.S. 634 (1978), the Supreme Court rejected an argument by the State of Mississippi that the federal government's failure to assert its jurisdiction had made the State's exercise of jurisdiction proper:

> [The State argues] that since 1830 the Choctaws residing in Mississippi have become fully assimilated into the political and social life of the State, and that the Federal Government long ago abandoned its supervisory authority over these Indians. Because of this abandonment, and the long lapse in the federal recognition of a tribal organization in Mississippi, the power given Congress "to regulate Commerce . . . with the Indian Tribes," Const. Art. I, § 8, cl. 3, cannot provide a basis for federal jurisdiction. To recognize the Choctaws in Mississippi as Indians over whom special federal power may be exercised would be anomalous and arbitrary.

> We assume for purposes of argument, as does the United States, that there have been times when Mississippi's jurisdiction over the Choctaws and their lands went unchallenged. But . . . we do not agree that Congress and the Executive Branch have less power to deal with the affairs of the Mississippi Choctaws than with the affairs of other Indian groups. Neither the fact that the Choctaws in Mississippi are merely a remnant of a larger group of Indians, long ago removed from Mississippi, nor the fact that federal supervision over them has not been continuous, destroys the federal power to deal with them.

*Id.* at 652-53 (brackets and footnote omitted); *see also Indian Country, U.S.A.*, 829 F.2d at 974 ("[T]he past failure to challenge Oklahoma's jurisdiction over Creek Nation lands, or to treat them as reservation lands, does not divest the federal government of its exclusive authority over relations with the Creek Nation or negate Congress' intent to protect Creek tribal lands and Creek governance with respect to those lands.").

---

Indian country." *Id.* at 1061. We rejected the argument and affirmed the defendant's federal conviction. *Id.* at 1061-63, 1067.

Oklahoma's exercise of jurisdiction within the Creek Reservation is not a proper basis for us to conclude that Congress disestablished the Reservation.

### 5)  Creek Nation

The Creek Nation has maintained a significant and continuous presence within the Reservation.  The tribal government, which was never extinguished, saw many of its powers restored when Congress passed OIWA in 1936.  *See Indian Country, U.S.A.*, 829 F.2d at 981.  Later, "[i]n 1979, the Creeks reorganized their tribal government . . . and adopted a new Creek Constitution, which was approved by the United States Department of the Interior."  *Id.* at 970.  Today, the tribal government maintains a capital complex in Okmulgee and provides extensive services within the Creek Nation's borders.  *See* Creek Nation Br., App'x D (maps reflecting Tribe's capital complex and locations of community centers, medical centers, and emergency response teams throughout the Reservation).  The Creek Nation further contends it applies its traffic laws throughout the territory and supports traditional churches and ceremonial grounds on the Reservation. *Id.* at 37.[70]  Mr. Murphy also observes the Creek Nation has entered into deputation agreements for law enforcement services "within the exterior boundaries of the Muscogee (Creek) Nation."  Aplt. Br., Attach. F.  The Creek Nation's continued presence and activity provides a much stronger case for reservation continuation than in *Parker*,

---

[70] *See also* The Muscogee (Creek) Nation, http://www.mcn-nsn.gov/services/# (providing overview of tribal services including, among others, language programs, environmental services, family violence prevention programs, historical and cultural preservation programs, senior services, and education and transportation programs) [https://perma.cc/Q82C-ZVZY].

where the Supreme Court held a reservation was intact notwithstanding the fact that "the Tribe was almost entirely absent from the disputed territory for more than 120 years." 136 S. Ct. at 1081. The value of this evidence may be slight, but it weighs in favor of Mr. Murphy and the Creek Nation.[71]

ii. Demographics

There is a large, non-Indian population within the Creek Reservation. The State argues that, even "[b]y 1906, four-fifths of the persons living in Indian Territory were non-Indian." Aplee. Br. at 86 (citing H.R. Rep. No. 59-496, at 10 (1906)). In 2000, the year Mr. Murphy was convicted in McIntosh County,[72] the census determined that—of a total county population of 19,456—14,123 people were white (73%) compared to 3,152 people who identified as American Indian or Alaska Native (16%).[73] And within the Reservation but beyond McIntosh County lies the city of Tulsa with a population, the State maintains, that is only 5.3% Indian. *Id.* at 86 (citing 2015 census figures).

---

[71] Mr. Murphy has submitted other step-three materials in the form of reports and legislative history criticizing the Oklahoma probate courts for their handling of Indian estates in the years after allotment. *See* Aplt. Br., Attach. E. Similarly, he cites a lengthy 1928 report commissioned by the Department of the Interior, *see id.* at 42 n.19 (citing Institute for Government Research, "The Problem of Indian Administration" (1928)), on which the State also draws. We have considered these materials, but they do not affect our conclusion.

[72] The 1866 boundaries of the Creek Reservation, however, cover more than McIntosh County.

[73] *See* United States Census Bureau, "American FactFinder," Profile of General Demographic Characteristics: 2000 [https://perma.cc/LH7M-32WX].

Mr. Murphy argues this demographic evidence is unhelpful because "[t]he increase of non-Indian intruders into Indian Territory was occurring before the allotment acts and Enabling Act were passed," and even before allotment and Oklahoma statehood, "the [Creek] Nation's citizens were the minority within their own territory." Aplt. Br. at 65-66. Although many non-Indians have come to live in the area, the Tribe points out that approximately half of its members continue to live within the 1866 borders of the Reservation.

The demographic evidence does not overcome the absence of statutory text disestablishing the Creek Reservation. *See Parker*, 136 S. Ct. at 1082 (explaining it is not the "role" of courts to "rewrite" earlier statutes "in light of . . . subsequent demographic history" (quotations omitted)). *Solem* acknowledged that "[r]esort to subsequent demographic history is . . . an unorthodox and potentially unreliable method of statutory interpretation." 465 U.S. at 472 n.13; *see also Wyoming*, 849 F.3d at 887 n.6 (Lucero, J., dissenting) (applying step three but observing "[t]he demographic makeup of an area decades or more following passage of a statute cannot possibly tell us anything about the thinking of a prior Congress"). We take account of it as part of our step-three analysis but do not rest our decision upon it.

### iii. Step-three concluding comment

When steps one and two "fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands," courts must accord "traditional solicitude" to Indian tribes and conclude "the old reservation boundaries" remain intact.

*Solem*, 465 U.S. at 472. Such is the case here. None of the step-three evidence allows us to conclude that Congress disestablished the Creek Reservation.

## IV. **CONCLUSION**

Applying *Solem*, we conclude Congress has not disestablished the Creek Reservation. Consequently, the crime in this case occurred in Indian country as defined in 18 U.S.C. § 1151(a). Because Mr. Murphy is an Indian and because the crime occurred in Indian country, the federal court has exclusive jurisdiction. Oklahoma lacked jurisdiction. *See* 18 U.S.C. § 1153(a).

Mr. Murphy's state conviction and death sentence are thus invalid. The OCCA erred by concluding the state courts had jurisdiction, and the district court erred by concluding the OCCA's decision was not contrary to clearly established federal law. We therefore reverse the district court's judgment and remand with instructions to grant Mr. Murphy's application for a writ of habeas corpus under 28 U.S.C. § 2254. The decision whether to prosecute Mr. Murphy in federal court rests with the United States. Decisions about the borders of the Creek Reservation remain with Congress.